**FILED**

JAN 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 880 – RETAIL FOOD EMPLOYERS JOINT PENSION FUND 2828 Euclid Avenue Cleveland, OH 44155 <br><br> and <br><br> UNITED FOOD AND COMMERCIAL WORKERS UNION-EMPLOYER PENSION FUND 2828 Euclid Avenue Cleveland, OH 44155, <br><br> Individually and On Behalf of All Others Similarly Situated, <br><br>                     Plaintiffs, <br><br>    vs. <br><br> SUNRISE SENIOR LIVING, INC. 7902 Westpark Drive McLean, VA 22102 <br><br>    and | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil No. <br><br> <u>CLASS ACTION</u> <br><br> *JURY ACTION* <br><br> CASE NUMBER  1:07CV00102 <br><br> JUDGE: Reggie B. Walton <br><br> DECK TYPE: General Civil <br><br> DATE STAMP: 01/16/2007 <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

[Caption continued on following page.]

## COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

PAUL J. KLAASSEN                          )
9050 Falls Run Road                       )
McLean, VA  22102                         )
                                          )
    and                )
                                          )
THOMAS B. NEWELL                          )
9119 Mill Pond Valley Drive               )
McLean, VA  22102                         )
                                          )
    and                )
                                          )
BRADLEY B. RUSH                           )
371 Church Street, NE                     )
Vienna, VA  22180                         )
                                          )
    and                )
                                          )
RONALD V. APRAHAMIAN                      )
9311 Cornwell Farm Road                   )
Great Falls, VA  22066                    )
                                          )
    and                )
                                          )
J. DOUGLAS HOLLADAY                       )
3333 North Glebe Road                     )
Arlington, VA  22207                      )
                                          )
    and                )
                                          )
THOMAS J. DONOHUE                         )
8008 Coach Street                         )
Potomac, MD  20854                        )
                                          )
    and                )
                                          )
WILLIAM G. LITTLE                         )
950 North Michigan Avenue, Apt. 2902      )
Chicago, IL  60611                        )
                                          )
————————————————————————)

[Caption continued on following page.]

and                             )
                                )
TERESA M. KLAASSEN              )
9050 Falls Run Road             )
McLean, VA 22102                )
                                )
and                             )
                                )
CRAIG R. CALLEN                 )
75 Walcott Avenue               )
Jamestown, RI 02835             )
                                )
and                             )
                                )
J. BARRON ANSCHUTZ              )
304 Summer Way                  )
Rockville, MD 20850,            )
                                )
                    Defendants. )
_____ )

Shareholders of Sunrise Senior Living . . . have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

All of that resulted in a $342 million hit to the market value of the company . . . . But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing it accounting practices and delaying its financial filing.

*     *     *

Selling during the period were Paul J. Klaassen, the founder and chief executive; . . . Ronald V. Aprahamian, . . . chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay . . . a director.

*     *     *

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. . . .

An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35.

*     *     *

Another apparently well-timed sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares at $37.85 each, generating $757,040. . . .

Mr. Donohue . . . has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings.

Gretchen Morgenson, *Shedding Light on Sales at Sunrise*, N.Y. Times, 11/26/06.

## INTRODUCTION AND OVERVIEW

1.      This is a securities class action on behalf of all persons who purchased or

otherwise acquired the publicly traded securities of Sunrise Senior Living, Inc. ("Sunrise" or

the "Company") between 8/4/05 and 6/15/06 (the "Class Period"), including those who

owned Sunrise common stock from 2000 through 2006 at the time Sunrise's 2000-2006

Proxy Statements were circulated to shareholders to solicit their votes on various matters.

The defendants are Sunrise, certain of its officers and all of its directors. The action asserts

violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Sunrise provides residential and other services to retirees and elderly persons

through facilities it develops and constructs and then manages, often through joint ventures.

Sunrise makes profits from these activities and also by selling real estate, often to its joint

ventures.   For the last several years, Sunrise has been pursuing a vigorous expansion

program. However, because Sunrise's access to the capital necessary to fund this expansion

program was limited, it has been forced to pursue various strategies, including utilizing joint

venture arrangements (normally 20% owned by Sunrise and 80% owned by other investors),

to raise the capital needed to fund its expansion program.

3.      For Sunrise's expansion program to succeed and for its top executives and

other insiders to obtain the types of personal economic gains they wanted to obtain from the

enterprise, it was critical that Sunrise appear to be achieving strong profits even during this

expansionary – and capital intensive – phase of its business. However, Sunrise learned early

on that because its business model was not yet proven and its facilities normally suffered

losses during their start-up phase and period of early operations, frequently it could not

- 2 -

attract joint venture partners to participate in ventures to construct new residential facilities unless it gave to those partners preferential returns from the joint venture. These entities, the joint venture partner(s), were to receive guarantees of preferential distributions from the operations of the joint ventures or upon the sale of the facility. Sunrise also discovered early on that to sell certain of its real estate or facilities it was necessary to provide financial guarantees to the entity financing the sale.

4.     This created a problem for Sunrise. It could not obtain the capital it needed through the joint venture arrangements or sell real estate assets or completed facilities without providing these preferential distribution and guarantee arrangements. However, under applicable accounting rules, if Sunrise structured its joint ventures with preferential guarantees and distributions to its partners, Sunrise, as the managing entity in the joint venture, was required to *absorb 100% of the early period or start-up losses of the new facilities*, rather than just its 20% share, and was allowed to recoup those early period losses only later on when the joint venture's facility was operating successfully and profitably and/or was sold. And Sunrise could not record profits on sales of facilities if it provided financial guarantees in connection with the sale. Accounting for its joint venture operations or real estate sales in this manner – which was required by Generally Accepting Accounting Principles ("GAAP") and principles of fair presentation – would heavily penalize Sunrise's reported financial results, depriving it of real estate sales profits, while requiring it to recognize millions and millions of dollars of current period losses from the joint venture operations. This would prevent it from showing the kind of strong profitable growth which was indispensable for the success of its business plan and necessary to allow its insiders to

personally profit from large annual bonuses and to push its stock price to the high levels they desired so they could sell off their Sunrise stock at inflated – and very profitable – prices.

5. Thus, to achieve the ends they desired, Sunrise and the other defendants cheated, pursuing a scheme to defraud and a course of business that operated as a fraud or deceit on purchasers of Sunrise's publicly traded securities. Instead of following the required accounting rules and principles, Sunrise's top managers and directors, including the members of its Audit Committee, falsified Sunrise's reported profits from at least 1999-2005, falsely reporting over $100 million in profits and concealing significant joint venture losses, which falsification enabled Sunrise insiders to pocket large and unjustified cash bonuses and to personally profit by insider trading to take advantage of the artificially inflated price of Sunrise's common stock.

6. Beginning on 5/9/06, a series of revelations caused the scheme to unravel and the truth about Sunrise's prior false representations and its accounting irregularities to enter the market. Sunrise first disclosed a "delay" in reporting its 1stQ 06 results to allow a "review" of its financial statements, making it appear that Sunrise was "changing" accounting methods to adopt a more preferable method, which might or might not impact its prior financial reports. However, under pressure from the SEC – which questioned Sunrise's accounting and the accuracy of these statements – on 7/31/06, Sunrise revealed it would be forced to *restate*[1] its financial statements going back several years – at least to 1999 – because

---

[1]    Under GAAP, a restatement of prior period financial statements is an admission of the falsity of those financial statements when issued.

its prior accounting was false and its prior financial statements could no longer be relied upon, and it would discontinue doing business with joint ventures with preferential returns and engaging in real estate sales with guarantees. Sunrise also admitted it could not file current period financial statements for the 1stQ, 2ndQ and 3rdQ of 2006 and that when it restated its financial results, at least $100 million of previously reported profits from its joint ventures and real estate sales would be eliminated – and that, contrary to prior representations, Sunrise had serious weaknesses in its internal controls. As these revelations unfolded, Sunrise's stock fell from $39.62 on 5/8/06 to as low as $24.40 on 7/31/06.

7.    Sunrise's fraudulent accounting manipulations and contrivances had an enormous impact on Sunrise's publicly issued financial statements. For instance, in a joint venture in which Sunrise had a 20% interest and its partner an 80% interest, where the venture suffered $1 million in losses during its start-up and early operations phase, GAAP required Sunrise to recognize and report 100% of these losses, or $1 million. However, by falsifying its accounting and acting as if the joint venture did not have a distribution preference, Sunrise recognized and reported losses of only $200,000. This tricky falsification over 1999-2005, when combined with Sunrise's phony real estate accounting to improperly recognize profits on sales where Sunrise provided guarantees, overstated Sunrise's reported profits by at least $100 million!

8.    This case also concerns defendants' manipulation of Sunrise's stock option program, including grants to enrich themselves in a secret and inherently deceptive manner, which manipulation also caused the Company's financial statements to be false and misleading. A stock option allows the corporate officer to purchase the specified number of

- 5 -

shares of company stock at a specified price – referred to as the "exercise price" or "strike price" – for a specified period of time. Stock options are granted by public companies as compensation for executives – supposedly to create incentives for them to boost long-term corporate performance and profitability by good, honest management efforts. When the executive exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's market price at the time the option is exercised. The exercise price of stock options are the market price on the date of grant – *so if the stock goes up over time, the executive makes a profit*. If the system is abused by "backdating," which refers to picking an option-grant date earlier than the actual date the option was granted – a date when the stock price was lower than the actual grant date – or by "spring-loading," *i.e.*, granting the stock option just before the company is going to issue positive news which will push the stock price up, the executive gets an instant, guaranteed and riskless profit. The company is also hurt, as the "spread" between the true grant exercise price and the market price is required by law to be treated as compensation expense, which reduces profits. In addition, the backdating causes the corporate stock option plan to lose its tax protection and results in the corporation's internal non-public information being misappropriated by the executives for their personal profit. Shareholders and share purchasers are also hurt, as reported corporate profits are improperly inflated, as is the trading price of the stock (at least until the truth comes out), their ownership interest in the corporation is unfairly diluted and, since they voted to approve the stock option plan and elect the directors who proposed the plan and oversee its implementation and administration, their corporate suffrage rights are violated.

9.    In violation of the Company's own stated policies and applicable laws, defendants engaged in or permitted "backdating" and "spring-loading" in the issuance of executive stock options for many years. All the Company's stock option plans required stock options to have an exercise price equal to the fair market value of stock on the date of the grant, and defendants regularly represented that stock options covered by the stock option plans were not granted at less than 100% of fair market value on the date of grant, but this was not true. ***Often the grants were made and were backdated to when Sunrise stock was lower in price or were granted just prior to the release of positive corporate news and a likely increase in the market price of the Company's stock, thus positioning the executives to achieve an instant, riskless profit.***

10.    During the Class Period, defendants issued materially false and misleading statements regarding the Company's business, its stock option plans, its compensation practices and its financial results, while employing contrivances and manipulative acts in connection with Sunrise's stock option programs and financial statements. As a result of defendants' false statements, contrivances and manipulative acts, Sunrise's common stock traded at artificially inflated prices during the Class Period, reaching a high of $39.68 per share on 3/29/06, as Sunrise reported outstanding financial results. In addition, Sunrise's stock option plans were approved and its directors were elected and re-elected by shareholder votes made pursuant to false and misleading proxy statements, thus perpetuating the directors' and their allies' hold on their positions of power, prestige and profit at Sunrise. The individual defendants took advantage of these falsified financial results, the artificial inflation of Sunrise's stock and the manipulation of its stock option plans by selling shares of

- 7 -

their Sunrise stock for illegal insider trading proceeds of over $34 million – ill-gotten gains

that were enhanced due to the improper "backdating" and "spring-loading" of their options to

purchase Sunrise stock – while Sunrise's top officers pocketed millions more in unjustified

bonus payments enhanced in part by Sunrise's falsified profits.

11.    Sunrise's top insiders personally profited from their illegal behavior in several

ways.  First of all, top executives received large cash bonuses which were based in

significant part on Sunrise's purported profitably which was falsified.  In addition, in order to

maximize their personal profit from their illegal conduct, these top insiders secured the

approval of Sunrise's shareholders of executive compensation programs, which not only

authorized or ratified these types of performance bonuses, but also of a stock option plan

which supposedly was to be administered by a committee of independent directors (the

Compensation/Stock Option Committee) who would honestly run the stock option program,

granting options that were exercisable only at the closing price of Sunrise stock on the date

that the option was actually granted.  However, these stockholder approvals were obtained in

violation of the Exchange Act's proxy provisions and rules – including by way of false and

misleading proxy statements that did not disclose the ongoing accounting fraud, which was

inflating Sunrise's reported profits, and the bonuses being granted the executives, or that the

top insiders at Sunrise were manipulating Sunrise's stock option plans to backdate stock

options or grant "spring-loaded" stock options to themselves and their allies so as to give the

options exercise prices significantly lower than the actual closing prices of the stock options

on the dates they were actually granted or to grant options at low prices before the release of

corporate news, which was likely to boost the stock price, a deception which not only assured the insiders of profits, but maximized their ill-gotten gains from the scheme.

12.    During late 2005, as Sunrise insiders learned that it would be impossible to continue the accounting fraud much longer,[2] and in early 2006,[3] as widespread revelations of a stock option backdating scandal began to sweep corporate America, the top insiders at Sunrise took advantage of the artificial inflation in Sunrise's shares to bail out of the stock, unloading almost a million shares of the stock at artificially inflated prices, obtaining almost $35 million of insider trading proceeds for themselves – a deceit some of them furthered by implementing so-called 10b5-1 executive stock sale plans, putting those stock plans in place, knowing that they were already pursuing a scheme to defraud and falsifying Sunrise's reported financial results, and establishing plan terms that did not comply with regulatory requirements, but hoping that implementing their sales through the 10b5-1 plans would give them protection from the legal liability they knew they would otherwise face for such insider trading. The chart below shows the Sunrise executives' insider selling:

---

[2]    Sunrise's CFO has admitted that Sunrise began to consider the problem with Sunrise's accounting for its joint ventures and had considered changing its accounting "late in 2005."

[3]    In early 2006, a number of incidents involving stock option "backdating" and "spring-loading" by public companies surfaced, including Securities and Exchange Commission ("SEC") investigations, executive resignations and financial restatements. On 3/18/06, *The Wall Street Journal* published an article raising questions about whether several public companies had been manipulating stock option grants to enrich executives by backdating these grants to lower prices or granting options to executives ahead of the release of positive corporate news.



**Sunrise Senior Living, Inc.**
All Defendants - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

13.    Sunrise's press releases, SEC filings and analyst conference calls during the Class Period were false and misleading. The true facts, which were known by the defendants but concealed from the investing public during the Class Period were:

(a)    Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales and contrivances and manipulations in the administration of Sunrise's stock options, including "backdating" and "spring-loading," and failing to properly record or account for the actual amount, and tax consequences, of the compensation expense of its executives.

(b)    Sunrise's excellent financial and operating results reported during the Class Period were not due to the skill and business acumen of its top executives, their successful management of its business or the outstanding performance of its business units, as represented. In fact, a significant part was due to falsification of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for (and thus understating) the true compensation expense of its executive and management team.

(c)    Sunrise's top executives were manipulating the Company's stock option plans so as to enrich themselves by "backdating" or "spring-loading" the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties, and even criminal proceedings.

(d)    Sunrise's internal financial and accounting controls were materially deficient and not effective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

14.    The failure to disclose the setting of the exercise prices to achieve maximum benefit for Sunrise's directors and executives caused the 2000-2006 Proxy Statements and 2005 Form 10-K and 2005 Forms 10-Q issued by the Company to be materially misleading

- 11 -

in violation of the proxy rules and the Exchange Act. Among the false statements made during the Class Period and in the 2000-2006 Proxy Statements were:

- Sunrise's joint venture operations, properly accounted for under the equity accounting methodology, had been producing substantial profits for Sunrise.

- The Company's internal financial, accounting and disclosure controls were adequately designed and functioning in a manner so as to prevent fraud or manipulation.

- Sunrise's financial reports and statements fairly presented its financial condition and results in accordance GAAP.

- Sunrise's stock option plans would help assure the Company's future success by offering to top executives incentives to put forth maximum effort for the success of the Company's business.

- Sunrise's stock option plans assured favorable tax treatment of stock-based awards and ensured stock-option compensation was tax deductible for the Company, and stock options could not and would not be granted at less than 100% of fair market value (*i.e.*, stock market closing price) on the date of grant.

- Sunrise's stock option plans were administered by a committee of all independent directors.

- The Compensation Committee was authorized only to grant options in accordance with the terms of the plan, including limiting option exercise prices to not less than 100% of fair market value of the stock on the date of grant.

- The value of the Company's stock option grants was tied to the Company's future performance and the full value of option grants would be obtained only over time as the stock price appreciated.

- Specified officers of Sunrise had been granted options to buy specified numbers of shares of Sunrise stock at specified prices, *i.e.*, fair market value on the date the options were granted.

- Because of the way Sunrise's stock option plans were structured and administered and because the Company grants stock options at an exercise price not less "than the fair market value of the Company's common stock on the date of grant," Sunrise did not have to recognize compensation expense in connection with its grant, or any subsequent exercise, of stock options.

15.    As a result of defendants' false statements, Sunrise's stock traded at artificially inflated levels during the Class Period, massive stock option plans for executives were approved and all of the current Sunrise directors were elected or re-elected, perpetuating their control of Sunrise. The improper falsification of Sunrise's financial statements, the "backdating" and "spring-loading" of Sunrise's top insiders' stock options and the artificial inflation of Sunrise's stock allowed Sunrise's top insiders to reap millions of dollars via illegal insider trading of their Sunrise stock, while the falsification of the Company's financial statements contributed to huge bonuses for them based in part on Sunrise's inflated profits. However, the public purchasers and owners of Sunrise's stock were damaged. The ownership of Sunrise by public stockholders was improperly diluted as Sunrise executives and directors got millions of stock options they were not entitled to or got more shares at lower option prices than they were entitled to, and Class members were damaged as they purchased Sunrise stock at artificially inflated prices and then the Company's stock declined in price as the truth entered the market. The chart below shows these events:

Dollars Per Share

# Sunrise Senior Living
## April 30, 2004 - July 28, 2006

| Insider | Shares Sold | Proceeds | % of Stock Actually Owned and Sold |
|---|---|---|---|
| Ronald V. Aprahamian, Ch. Audit/Comp/Comp. Com. | 20,000 | $757,000 | 90.9% |
| Thomas J. Donohue, Chair Comp. Com/Audit Com. | 102,666 | $3,392,085 | 71.2% |
| James D. Holliday, Dir. | 36,000 | $1,259,000 | 100.0% |
| Paul J./Teresa M. Klaassen CEO/CEO | 660,000 | $21,426,000 | 10.4% |
| Thomas B. Newell Pres. | 216,000 | $7,399,080 | 46.0% |
| Bradley B. Rush CFO | 13,874 | $432,144 | 29.2% |
| J. Barron Anschutz CAA | 5,926 | $194,767 | 100.0% |
| Totals: | 994,466 | $34,860,075 | |

P. Klaassen
Chairman and CEO

Ronald V. Aprahamian
Ch. Audit/Comp/Comp. Com.

Donahue
Audit Committee/
Chair Compensation
Committee

Thomas J. Donohue
Chair Comp. Com/Audit. Com.

James D. Holliday
Dir.

Aprahamian
Chair Audit
Committee/
Compensation
Committee

Rush
CFO

Newell
President

Holliday
Director

**Class Period**
**8/4/05 - 6/15/06**

$26.55    8/2/05

$30.35    5/9/06

$27.89    6/15/06

$35.62    5/8/06

4/04: 2004 Proxy Statement. Board reelected. Stock options granted only at market price; full value realized over time with price appreciation.

3/05 2004 10K

4/05: 2006 Proxy Statement. Board reelected. Stock options granted only at market price; full value realized over time with price appreciation.

8/05-10/05 Insiders sell 103,874 shares for $3.27 million.

11/05-12/05 Insiders sell 260,666 shares for $9 million.

8/4/05: 2nd Q 05 EPS $.46. $.08 better than expected due to $2.1 million more in JV equity earnings. Equity investment income expected to grow.

8/9/05: 2nd Q 10Q filed. Internal accounting and disclosure controls functioning and adequate. SEC filings accurate. Financial statements fairly presented. No undisclosed fraud exists. Options granted with exercise price equal to fair value on date of grant.

9/1/05: Meeting w/ analyst. Sunrise forecasts 15% EPS growth for next several years.

1/05/06: Insiders sell 376,000 shares for $13.91 million.

3/7/06: 4th Q 05 & 05 results. EPS $.01 EPS write off. 4th Q 05 - .06 EPS. Reaffirm time write off. 2006 equity earnings of $16.6 million. Expect 15% growth in 06. 3/06 05 Annual Report/10K. EPS 01-.05-.06: $1.01-.02-.$1.12; 03-.$1.32; 04 = $1.12-.05 - $1.87. Internal accounting and controls functioning and adequate. SEC filings accurate. Financial statements fairly presented. No undisclosed fraud exists. Options granted with exercise price equal to fair value on date of grant.

11/8/05: 3rd Q 05 results. EPS $.24. Results reflect growth in earnings. Growth in equity earnings grew $.79 million in 3rd Q vs $2.1 million in 3rd Q 04. Continue to benefit from equity investments. 11/9/05: 3rd Q 05 10Q filed. Internal accounting and disclosure controls functioning and adequate. SEC filings accurate. Financial statements fairly presented. No undisclosed fraud exists. Options granted with exercise price equal to fair value on date of grant.

5/8-11/06: Delays 1st Q 06 results. Investigating JV equity accounting. Will change JV equity accounting method to preferable method. No review, but will not materially affect 07 results.

**Later Events**
- Prior financial statements should not be relied upon.
- Will restate Q3, Q4 and 05 results.
- 9/5/06 net income reduced by $.10 million.
- Unable to file 1st Q, 2nd Q, 3rd Q 10-Qs or issue current financial statements.
- Material weaknesses in internal controls exist.
- Investigation may involve both JV equity accounting and sales of real estate.
- No more JV with preferential terms; no more real estate sales with guarantees.
- Stock options backdating inquiry begins.

04/30/2004  07/22/2004  10/11/2004  12/30/2004  03/22/2005  06/10/2005  08/30/2005  11/17/2005  02/09/2006  05/02/2006  07/21/2006

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under §§10(b), 14(a), 20(a) and 20A of the
Exchange Act, 15 U.S.C. §§78j(b), 78n(a), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R.
§240.10b-5, promulgated thereunder. In connection with the acts, conduct and other wrongs
complained of herein, defendants, directly or indirectly, used the means and instrumentalities
of interstate commerce, the United States mail and the facilities of a national securities
market.

17.    Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and
28 U.S.C. §1331.

18.    Venue is proper in this district pursuant to §27 of the Exchange Act, 15 U.S.C.
§78aa, and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation
and dissemination of materially false and misleading information, occurred in substantial
part in this District. Sunrise filed false and misleading SEC filings in this District. Sunrise
has four communities in operation or under development in Washington, D.C. Further, the
Individual Defendants conduct business in this District.

## PARTIES

19.    (a)    Plaintiff United Food and Commercial Workers Union Local 880 –
Retail Food Employers Joint Pension Fund is a Taft-Hartley pension plan that invests and
administers the retirement savings of UFCW members. As set forth in the Certification
attached hereto, this plaintiff purchased Sunrise publicly traded securities during the Class
Period, including its purchases on the open market, and remains an owner of over 24,300
shares of Sunrise common stock. This plaintiff has owned Sunrise stock continually since

- 15 -

3/05 to the current date. As a result, this plaintiff has suffered economic loss and damages and had its position as a Sunrise shareholder unfairly and improperly diluted.

(b)    Plaintiff United Food and Commercial Workers Union-Employer Pension Fund is a Taft-Hartley pension plan that invests and administers the retirement savings of UFCW members. As set forth in the Certification attached hereto, this plaintiff purchased Sunrise publicly traded securities during the Class Period, including its purchases on the open market, and remains an owner of over 14,800 shares of Sunrise common stock. This plaintiff has owned Sunrise stock continually since 3/05 to the current date. As a result, this plaintiff has suffered economic loss and damages and had its position as a Sunrise shareholder unfairly and improperly diluted.

20.    Defendant Sunrise is a public company. Sunrise offers senior living services, including independent living, assisted living, care for individuals with Alzheimer's, as well as nursing and rehabilitative care. Sunrise operates communities in the United States, Canada, Germany and the United Kingdom.

21.    Defendant Paul J. Klaassen ("P. Klaassen") was at all relevant times CEO and Chairman of Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $21,426,000 by selling 600,000 shares of his Sunrise stock, 10.4% of the stock he owned and could sell. Defendant P. Klaassen signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant P. Klaassen's (combined with his wife Teresa M. Klaassen's) insider selling is shown as follows:



**Sunrise Senior Living, Inc.**
Paul J. Klaassen/Teresa M. Klaassen - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

| Class Period Insider Sales | 10.4% |
| Class Period Shares Sold | 600,000 |
| Class Period Proceeds | $21,426,000 |

22.    Defendant Bradley B. Rush ("Rush") was at all relevant times Chief Financial Officer ("CFO") of Sunrise. During the Class Period, Rush reaped illegal insider selling proceeds of $432,144 by selling 13,874 shares of his Sunrise stock, 29.2% of the stock he owned and could sell. Defendant Rush signed or was associated with the 2005 Form 10-K and 2005 Forms 10-Q. Defendant Rush's insider selling is shown as follows:

- 17 -



**Sunrise Senior Living, Inc.**
Bradley B. Rush - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

23.    Defendant Thomas B. Newell ("Newell") was at all relevant times President of Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $7,399,080 by selling 216,000 shares of his Sunrise stock, 46% of the stock he owned and could sell. Defendant Newell's insider selling is shown as follows:

- 18 -



**Sunrise Senior Living, Inc.**
Thomas B. Newell - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

24.    Defendant J. Douglas Holladay ("Holladay") was at all relevant times a director of Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $1,259,000 by selling 36,000 shares of his Sunrise stock, 100% of the stock he owned and could sell. Defendant Holladay signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant Holladay's insider selling is shown as follows:





**Sunrise Senior Living, Inc.**
J. Douglas Holladay - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

25.    Defendant Thomas J. Donohue ("Donohue") was at all relevant times a director of Sunrise and Chairman of the Compensation Committee and on the Audit Committee.    During the Class Period, he reaped illegal insider selling proceeds of $3,392,085 by selling 102,666 shares of his Sunrise stock, 71.2% of the shares he owned and could sell.    Defendant Donohue signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant Donohue's insider selling is shown as follows:



**Sunrise Senior Living, Inc.**
Thomas J. Donohue - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

26.    Defendant Ronald V. Aprahamian ("Aprahamian") was at all relevant times a director of Sunrise and Chairman of the Sunrise Audit Committee. During the Class Period, he reaped illegal insider selling proceeds of $757,000 by selling 20,000 shares of his Sunrise stock, 90.9% of the shares he owned and could sell. Defendant Aprahamian signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant Aprahamian's insider selling is shown as follows:

- 21 -



**Sunrise Senior Living, Inc.**
**Ronald V. Aprahamian - Class Period Insider Sales Quarterly Dollar Volume**
**August 2004 to June 2006**

| Class Period Insider Sales | 90.9% |
|---|---|
| Class Period Shares Sold | 20,000 |
| Class Period Proceeds | $757,000 |

Class Period: 8/4/05 - 6/15/06

27.    Defendant J. Barron Anschutz ("Anschutz") was at relevant times Chief Accounting Officer ("CAO") of Sunrise. During the Class Period, he reaped illegal insider selling proceeds of $194,767 by selling 5,926 shares of his Sunrise stock, 100% of the stock he owned and could sell. Defendant Anschutz signed or was associated with the 2004-2005 Forms 10-K and the 2005 Form 10-Qs. Defendant Anschutz's insider selling is shown as follows:





28.    Defendant William G. Little ("Little") was at all relevant times a director of Sunrise. Defendant Little signed or was associated with the 2005-2006 Proxy Statements and signed the 2004-2005 Forms 10-K.

29.    Defendant Teresa M. Klaassen ("T. Klaassen"), wife of P. Klaassen, was at all relevant times a director of Sunrise. During the Class Period, she reaped illegal insider selling proceeds of $21,426,000 by selling 600,000 shares of her Sunrise stock, 10.4% of the stock she owned and could sell. Defendant T. Klaassen signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K. Defendant T. Klaassen's (combined with defendant P. Klaassen's) insider selling is shown as follows:

- 23 -



**Sunrise Senior Living, Inc.**
Paul J. Klaassen/Teresa M. Klaassen - Class Period Insider Sales Quarterly Dollar Volume
August 2004 to June 2006

30.    Defendant Craig R. Callen ("Callen") was at all relevant times a director of Sunrise and on its Audit and Compensation Committees. Defendant Callen signed or was associated with the 2000-2006 Proxy Statements and signed the 2004-2005 Forms 10-K.

31.    According to Sunrise's 2006 Proxy, the Sunrise Board had the following committees:

| Director | Audit Committee | Compensation Committee | Executive Committee |
|---|---|---|---|
| Ronald V. Aprahamian | X* | X | |
| Craig R. Callen | X | X | |
| Thomas J. Donohue | X | X* | X |
| J. Douglas Holladay | | | X |
| Paul J. Klaassen | | | X* |

* Chairman.

- 24 -

32.    The defendants who were directors of Sunrise are referred to herein as the "Director Defendants." The defendants who were officers of Sunrise are referred to herein as the "Officer Defendants." The defendants who sold stock during the Class Period and are referred to herein as the "Insider Selling Defendants." Collectively, the Officer and Director Defendants are referred to herein as the "Individual Defendants."

**Defendants' Duties**

33.    Each officer and director of Sunrise owed Sunrise shareholders the duty to exercise care and diligence in the management and administration of the affairs of the Company.

34.    By reason of their positions as officers and directors of Sunrise and because of their ability to control the business and corporate affairs of the Company, the defendants owed Sunrise shareholders an obligation of candor. As officers and/or directors of a publicly held company, the defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, finances and compensation practices.

35.    Because of their positions of control and authority as directors or officers of Sunrise, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. These acts include: (i) agreement to and/or acquiescence in the improper stock option practices; (ii) causing Sunrise to disseminate false Proxy Statements for 2000-2006, which Proxy Statements failed to disclose defendants' improper option activities and failed to disclose that executives were able to "backdate" or "spring load" their stock option grants via oral notification in order to lower the exercise price of the stock options they received, or pick the grant date of their option grants so as to

- 25 -

benefit from the upcoming release of positive corporate news which would likely boost the stock price; (iii) causing Sunrise to file false SEC filings, including Sunrise's 2003, 2004 and 2005 Annual Reports, its 2003-2005 Forms 10-Q, its 2000-2006 Proxy Statements, all in violation of the U.S. securities laws. Because of their positions with Sunrise, each of the defendants had access to adverse non-public information and was required to disclose these facts promptly and accurately to Sunrise shareholders and the financial markets but failed to do so.

36.    To discharge their duties, the directors of Sunrise were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the business and financial affairs of Sunrise. By virtue of such duties, the officers and directors of Sunrise were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of Sunrise in accordance with applicable federal law, government rules and regulations, and the charter and bylaws of Sunrise, including its stock option plans;

(b)    not permit any officer, director or employee of Sunrise to engage in self-dealing, insider trading or stock manipulation;

(c)    not permit any officer, director or employee of Sunrise to violate applicable laws, rules and regulations;

(d)    remain informed as to the status of Sunrise's operations, including its practices in relation to its executive compensation practices, financial statement preparation and internal financial, accounting and disclosure controls, and upon receipt of notice or information of imprudent, improper or unsound practices, to make inquiry in connection

- 26 -

therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the federal securities laws and their duty of candor to the Company's shareholders;

(e)    establish and maintain systematic and accurate records and reports of the business and affairs of Sunrise and procedures for the reporting to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    maintain and implement an adequate, functioning system of internal legal, financial, disclosure and accounting controls, such that Sunrise's financial statements – including its expenses, accounting for stock option grants and other financial information – would be accurate and in accordance with applicable laws;

(g)    exercise control and supervision over the public statements to the securities markets and trading in Sunrise stock by the officers and employees of Sunrise; and

(h)    supervise the preparation and filing of any financial reports or other information required by law from Sunrise and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Sunrise and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

37.    The defendants, as corporate officers and/or directors, were obligated to comply with applicable laws and to disclose the truth about Sunrise. Each of the defendants participated in the issuance and/or review of the false and/or misleading statements, including the false SEC filings and reports issued to Sunrise shareholders.

- 27 -

38.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Sunrise's Proxy Statements, quarterly reports, press releases, SEC filings, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports, Proxy Statements, SEC filings, registration statements and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

39.     The defendants named in the §10(b) claim are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Sunrise. These defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Sunrise's publicly traded securities was a success, as it: (i) deceived the investing public regarding Sunrise's prospects and business; (ii) artificially inflated the prices of Sunrise securities; (iii) allowed defendants to sell some $34 million worth of their Sunrise stock at inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Sunrise publicly traded securities at inflated prices and suffer damages when the securities later declined as the truth entered the market.

## FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

40.     On 8/4/05, Sunrise reported its 2ndQ 05 results via a press release which referred to "*growth in equity in earnings on investments in unconsolidated senior living properties.*" The press release stated in part:

"We are extremely pleased with the results we are reporting today," said Paul Klaassen, Sunrise Senior Living chairman and CEO." We are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction . . . ."

\*       \*       \*

"At the end of the quarter, we had minority equity interests in 132 communities held in joint ventures, with a balance sheet investment book value of over $108 million," said Thomas Newell, president, Sunrise Senior Living. *"Since a substantial majority of our new development activity, and most of our acquisitions, are being conducted through joint ventures, we expect our minority equity investments to continue to grow. We participate in the earnings of the joint venture communities based on our percentage ownership and we also expect to continue to receive incentives as these ventures exceed performance thresholds. As a result, we expect to see substantial growth in our income from earnings and returns on equity investments going forward."*

41.    On 8/4/05, Sunrise held a telephone conference call for analysts to discuss its business and its financial results. During the call, the following occurred:

**[P. Klaassen – CEO:]** We had an excellent second quarter. Virtually every segment performed at or above expected levels. As a result we have a significant increase in core earnings which were defined as total earnings excluding income from property sales and acquisitions transition expenses. . . . We have now met or exceeded our expectations every quarter for the past six years and we continue that unbroken streak in the second quarter. *We significantly exceeded the high end of our guidance range. In hindsight our forecast is probably a bit conservative as we outperformed . . . earnings from joint ventures . . . .*

\*       \*       \*

**[Question:]** One of the things that drove number for the quarter I guess was unexpected on my part, was the equity in earnings line. I understand that some of those were incentive fees related to sale. I was wondering if you can give color exactly on the transaction but quarter? And if you can give us any help on thinking about projecting that on a go forward basis, additional sales and incentive fees that we might see?

**[P. Klaassen:]** The transaction on the quarter I will not break down too much. We negotiate these things every day and night to not want to hurt

ourselves and those negotiations by giv[ing] too much information on it. We try to make the best deal that we can, you could see the growth that occurred in that line item, it gives to the idea of the range. For competitive reasons I do not want to get too detailed. . . . All I can say is that those investments are long-term. We're happy with the structure. We think those are good investments. The money was spent wisely and we think over the long-term they will pay off.

42.    Analysts that followed Sunrise reacted favorably to this 2ndQ 05 report.

    (a)    On 8/4/05, Legg Mason reported:

- Yesterday, Sunrise reported 2Q05 EPS adjusted for unusual items of $0.46, $0.08 above our estimate and consensus. . . .

- While operating fundamentals appeared solid, the entire earnings upside came from $2.1 million more in *equity earnings on joint venture investments that we had not expected, primarily because a JV sold two communities and Sunrise received additional equity earnings related to the sale*.

                    *    *    *

**2Q05 Results**

    . . . Reported results were $0.08 above the high end of company guidance and our estimate. The company attributed the beat to . . . higher-than-expected earnings from Sunrise's minority equity investments in joint ventures . . . . From our perspective . . . the upside came entirely from an asset sale driven increase in equity earnings.

    (b)    On 8/4/05, Davenport Equity Research reported:

- **Q2 2005 EPS of $0.46 is well ahead of our $0.38 estimate.** *Most of the $0.08 upside from our estimate is a result of higher than expected equity in unconsolidated facilities, which increased 76.2% year-over year to $3.7 million* (versus our $750,000 forecast). . . . .

- **Equity investment income is expected to grow.** With most new development activity and acquisitions conducted through joint ventures, income from equity investments is expected to grow.

- 30 -

(c)    On 8/5/05, Jefferies & Co. reported:

While the owned and managed portfolios posted solid improvement during the quarter, *the quarter's upside was primarily driven by a significant increase in equity income relating to improved operations in the Joint Venture (JV) portfolio* . . . .

*        *        *

With the recent capacity additions, expected pre-opening income from construction starts, and the improvement in equity earnings from JV properties, we view the company's more favorable outlook for 2005 and 2006 as achievable. . . .

**Overview of Second Quarter 2005 Results**

**Second quarter operating EPS of $0.46 versus $0.34 in 2Q04, were $0.09 above consensus and our estimate.** While the owned and managed portfolios posted solid improvement during the quarter, *the quarter's upside was primarily driven by a significant increase in equity income, relating to improved operations in the Joint Venture (JV) portfolio* . . . .

43.    On 8/9/05, Sunrise filed its 2ndQ 05 10-Q Report with the SEC. It was signed by Rush as CFO and Anschutz as CAO. It contained the Sarbanes-Oxley certification as pleaded at ¶62. It also reported the following:

|  | Three months ended 6/30, | | Six months ended 6/30, | |
|---|---|---|---|---|
|  | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $12,358 | $22,184 | $22,966 | $43,307 |
|  | *    * | * |  |  |
| Equity in earnings and return on investment in nconsolidated senior living properties | $3,696 | $2,072 | $5,220 | $3,740 |
|  | *    * | * |  |  |
| Net income | $10,338 | $15,132 | $18,350 | $29,063 |
|  | *    * | * |  |  |
| [EPS] data: |  |  |  |  |
|  | *    * | * |  |  |
| Diluted net income per common share | $.46 | $.66 | $.82 | $1.26 |

It also reported stockholders' equity of $550,702,000.

44.     The 2ndQ 05 10-Q also stated:

**Stock-Based Compensation**

Stock options are granted for a fixed number of shares to employees *with an exercise price equal to the fair value of the shares at the date of grant*. Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), and accordingly, *does not recognize compensation expense for stock option grants.* . . .

\*     \*     \*

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at June 30, 2005*. In connection with the evaluation by management, including our Chief Executive Officer and Chief Financial Officer, no changes in Sunrise's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended June 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

45.     On 9/13/05, officers of Sunrise met with Davenport Equity Research. On 9/14/05, Davenport reported the results of that meeting to the market, repeating what Sunrise's officers had told them. Davenport's 9/14/05 report stated:

*   **Reiterate Buy rating following meetings with management**. We are comfortable with our forecast for 15% earnings growth for the next several years. We believe our investment thesis remains sound, while the company continues to execute its *growth strategies under its new management services orientation*.

\*     \*     \*

- **Management services business model generates stable revenue and reduces the company's risk profile**. The sale of most consolidated facilities and subsequent increase in management contracts has made SRZ's revenue stream more predictable with upside potential from performance bonuses and the minority interest usually retained. In addition, capital, construction, and fill-ups risks are now shared with the development partners.

46.    In 10/05 Sunrise stock was split 2-for-1.

47.    On 11/8/05, the Company issued a press release entitled "Sunrise Reports Third-Quarter 2005 Results." The press release stated in part:

> Sunrise Senior Living, Inc. today reported third-quarter 2005 earnings per share of $0.24 (diluted) compared to $0.21 (diluted) per share in the third quarter of 2004. *The 14 percent increase in third-quarter, year-over-year earnings per share reflects . . . growth in equity in earnings and return on investments in unconsolidated senior living properties*.
>
> *   *   *
>
> *Sunrise's income from equity in earnings and return on investments in unconsolidated senior living properties increased to $7.8 million in the third quarter of 2005 from $2.1 million in the prior year period primarily as a result of a transaction in which a venture partner sold its equity portion of 13 senior living communities*. Through this transaction, Sunrise's ownership interest in the venture increased to 25 percent from 20 percent and Sunrise received performance incentive distributions under the terms of the venture agreement. Sunrise venture agreements typically include provisions rewarding Sunrise through various performance incentives. Sunrise continues to manage these 13 senior living communities under long-term management contracts.
>
> *"We continue to benefit from* our management services business model and *our minority equity investments in unconsolidated properties*," said Thomas Newell, president, Sunrise Senior Living. "At the end of the third quarter, we had minority equity investments in 152 communities in unconsolidated ventures with a balance sheet investment book value of $128 million. We strive to create value for our investment partners through operational excellence and when we succeed we also generate substantial returns for Sunrise through our percentage ownership in these communities and the incentives triggered when these ventures exceed performance thresholds. We have set a long-term target to earn a 15 percent annual return on our investments in unconsolidated senior living properties."

- 33 -

48.    On 11/8/05, Sunrise held a conference call for analysts to discuss its business and finances.  During the call, the following occurred:

> **[P. Klaassen, CEO:]** Our income statement, balance sheet and cash flow are all in excellent shape and ready to support a very strong '06 outlook.  Our growth drivers are producing consistent with our expectations and as a result we are able to report earnings per share excluding acquisition transition and hurricane related expenses of $0.26 a share in 2003 after our two for one stock split . . . .  *As anticipated, we also continued to benefit from growth in our equity and earnings line.*  Our 152 joint venture communities are making substantial contributions to our growth through our percentage ownership in these communities. . . .  We target a 15% annual return on our $128 million investment in these unconsolidated senior living properties.  And we expect to continue to benefit from our percentage ownership in these joint venture communities for many years to come.

*      *      *

> **[Question:]**  I want to ask a little bit about equity and earnings and guidance.  The equity and earnings bounces around a little bit because you're selling properties.  You have various things coming in.  I wanted to see if we could get additional guidance on that beyond what you provided and clarify maybe what your own assumptions are say in '05, '06 numbers for that.

> **[Newell – President:]**  . . . We have given a target long-term of 15% earnings on the $128 million we invested.  That's through 152 properties and joint ventures and it is lumpy as you said because included in that line will be start of – startup losses from homes in development ventures as they open.  As they ramp up then, we begin to share in the earnings and cash from those joints ventures.   As performance hurdles are met, we begin to share disproportionately which is what you saw in this quarter and last quarter as investor partners received distributions in excess of the hurdles we generate substantial returns.  Our assumptions internally that over time from those investments we will hit a 15% irr.  We model out all 152 communities over a long period of time and calculate that in our guidance.  It's very difficult to predict out more than one or two quarters.  We have a sense of what's coming and we do our best and giving guidance what we are very confident of these are very good investments and communities that are performing very well.  For the long run for Sunrise, we will generate a great return on that.

49.    On 11/9/05, Jefferies & Co. reported:

**Portfolio Development Activities**

- 34 -

. . . A major component of the company's development strategy is to make equity investments (usually 20%) with development JV partners. During the quarter, Sunrise opened four communities, assumed management of another three properties, and acquired an interest in and management of 18 communities as part of The Fountains acquisition (18 properties, resident capacity of 4,500, and $165 million of annualized revenue). In addition, the company terminated two management contracts in 3Q05. During the quarter, Sunrise started construction on five new properties (four in the U.S. and one in Canada) for a total of 39 communities under construction, with a combined capacity of 4,600 residents. The company expects 16 additional construction starts by the end of 2005. Of the 39 properties currently under construction, 26 are expected to open in the next four quarters. Of the 26 openings, three will be wholly owned by third parties, 20 are JVs, and three will be wholly owned by Sunrise. The 26 openings over the next year include: three JV properties and one third-party owned property in 4Q05; eight JV owned properties, and one third-party owned property in 1Q06; one wholly owned property; eight JV owned properties, and one third-party owned property in 2Q06; and two wholly owned properties and one JV property in 3Q06. Higher development and pre-opening management fees for facility openings (offset by corresponding pre-opening expenses) are expected to significantly contribute to earnings for the foreseeable future and can cause some earnings volatility as was experienced this quarter.

50.    On 11/9/05, Sunrise filed its 3rdQ 05 10-Q. It was signed by Rush/CFO and

Anschutz/CAO. It reported:

|  | Three months ended 9/30, | | Nine months ended 9/30, | |
|---|---|---|---|---|
|  | **2005** | **2004** | **2005** | **2004** |
| Income from operations | $9,395 | $11,821 | $32,361 | $55,130 |
| * | * | * |  |  |
| Equity in earnings and return on investment in nconsolidated senior living properties | $7,801 | $2,095 | $13,021 | $5,834 |
| * | * | * |  |  |
| Net income | $11,049 | $8,912 | $29,379 | $37,975 |
| EPS data: |  |  |  |  |
| * | * | * |  |  |
| Diluted net income per common share | $.24 | $.21 | $.66 | $84 |

The 3rdQ 05 10-Q also reported stockholders' equity of $572,283,000.

51.    The 3rdQ 05 10-Q also stated:

**Stock-Based Compensation**

Stock options are granted to employees for a fixed number of shares *with an exercise price equal to the fair value of the shares at the date of grant*. Sunrise accounts for stock-based compensation using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees* ("APB 25"), *and accordingly, does not recognize compensation expense for stock option grants*.

\*    \*    \*

**Controls and Procedures**

We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of Sunrise's disclosure controls and procedures as defined in Exchange Act Rule 13a-15(e). *Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at September 30, 2005*. In connection with the evaluation by management, including our Chief Executive Officer and Chief Financial Officer, no changes in Sunrise's internal control over financial reporting (as defined in Exchange Act Rule 13a-15(f)) during the quarter ended September 30, 2005 were identified that have materially affected or are reasonably likely to materially affect Sunrise's internal control over financial reporting.

52.    The 3rdQ 10-Q also stated:

Certification of Chief Executive Officer and Chief Financial Officer
Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002
(18 U.S.C. Section 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)    the Quarterly Report on Form 10-Q of the Company for the period Ended September 30, 2005 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

- 36 -

     (b)    *information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*

53.    On 3/7/06, the Company issued a press release entitled "Sunrise Reports Fourth-Quarter 2005 Results." The press release stated in part:

> Sunrise Senior Living, Inc., today reported fourth-quarter 2005 earnings of $1.01 per share (diluted) compared to $0.28 (diluted) per share in the fourth quarter of 2004. For the full year 2005, Sunrise reported earnings per share of $1.67 (diluted) compared to earnings per share of $1.12 (diluted) in 2004. . . .
>
> "The fourth quarter and year closed strongly, as we expected, and positions us for a very good 2006 during which we will be celebrating our 25th anniversary," said Paul Klaassen, Sunrise Senior Living's chairman and CEO.
>
>        *     *     *
>
> "We are extremely excited about the opportunities that lie ahead for our business," said Thomas Newell, president of Sunrise Senior Living. "As we move forward, we expect to continue to benefit from our expanded development program and our management services business model. In 2006, we anticipate a record number of community openings and substantial returns from our minority investments in joint venture partnerships. In addition, the strength of our balance sheet is expected to provide significant flexibility as we enter into the next phase of our growth strategy."
>
>        *     *     *
>
> Sunrise's 2006 earnings per share is expected to be driven . . . by further growth in earnings generated by Sunrise's equity investments in unconsolidated ventures.

54.    On 3/7/06, Sunrise held a conference call for analysts to discuss its business and finances. During the call, the following occurred:

> **[P. Klaassen – CEO:]** The fourth quarter closed out strongly as we expected and ended a busy and successful year for Sunrise. All four of our growth engines are firing on all cylinders. As you may know, those four growth engines are: 1, growth from new construction; 2, growth from new management contract; 3, internal growth from existing operations; 4, growth generated by our balance sheet. . . . Our success in 2005 was the result of many factors . . . . ***Regarding equity in earnings, excluding the $3.6 million***

*one-time write-down of our original investment in that at-home venture, we would have reported equity in earnings of un [sic] – of approximately $3.8 million in Q4, and, I guess that would be $16.8 million for the year. We expect an additional 15 percent growth in this business segment in 2006.* Our ownership percentage in these 156 unconsolidated joint venture communities in which we have invested $138 million should therefore generate about $19 million in pretax income this year. These minority ownership positions align our interests with our capital partners, and allows you to participate in community performance upside, without the negative impact of increased debt levels or additional amortization and depreciate quags [sic] expenses. . . .

55. In 3/06, Sunrise issued its 2005 Annual Report to Shareholders. It contained the following financial statements:

FINANCIAL HIGHLIGHTS
(dollars in thousands)

| YEAR ENDED DECEMBER 31, | | **2005** | **2004** | **2003** |
|---|---|---|---|---|
| Operating revenues | | $1,819,479 | $1,446,471 | $1,096,260 |
| Net income | | $79,742 | $50,687 | $62,178 |
| | * | * * | | |
| Total assets | . | $1,328,276 | $1,105,756 | $1,009,798 |
| | * | * * | | |
| Stockholders' equity | | $632,677 | $523,518 | $490,276 |

(Footnotes omitted.)

56. Sunrise's 2005 financial statements at Note 13 stated:

13. Stockholders' Equity

Stock Option Plan

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors . . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted. . . . The option exercise price is not less than the fair market value of a share of common stock on the date the option is granted.*

- 38 -

> *. . . Under the terms of the Directors' Plan, the option exercise price*
> *was not less than the fair market value of a share of common stock on the*
> *date the option was granted.*

Sunrise's 2005 10-K contained an identical representation.

57.     The 2005 Annual Report contained a letter signed by Klaassen and Newell which stated:

> **2005 Results**   Overall, we are very pleased with our performance in 2005.

*       *       *

> **Joint Venture Partners**   Strong industry demographics, operational excellence, and our strong financial condition continue to accelerate interest among our impressive group of joint venture partners. At the end of 2005, 156 of our communities were held in joint ventures, and *nearly all of our new development and acquisitions are conducted through joint ventures.* Through our percentage ownership in these communities and the incentives we receive for exceeding performance thresholds, *these partnerships contributed significantly to our growth in 2005.* In addition, these joint venture partnerships reduce our corporate risk profile *since we share capital and construction risk with our partners.*

58.     Elsewhere, the 2005 Annual Report stated:

> **Equity in Earnings and Return on Investment in Unconsolidated Senior Living Communities**
>
> Equity in earnings and return on investment in unconsolidated senior living communities represents our allocation of the results of operations and returns on our investment from the distributions of proceeds from transactions with our unconsolidated ventures.
>
> **2005 Compared to 2004**
>
> Equity in earnings and return on investment in unconsolidated senior living  communities was $13.2 million in 2005 compared to $9.4 million in 2004, an increase of $3.8 million, or 41%, which was primarily comprised of:
>
> •       $8.8 million return on our investment pursuant to the terms of a venture agreement;

- 39 -

- a decrease of $4.9 million from our portion of start-up losses associated with two international development ventures. In 2005, these two ventures opened four communities which incurred losses in 2005;

- $2.9 million return on our investment whereby an unconsolidated venture sold two senior living communities to Sunrise REIT;

- $3.0 million return on our investment whereby an unconsolidated venture sold its three senior living communities and distributed the proceeds to its members. We recognized the $3.0 million of cash received in excess of our investment;

- a decrease of $3.6 million from the write-down of our interest in Sunrise at Home; and

- a decrease of $2.5 million from the results of operations from other unconsolidated ventures, including our portion of start-up losses from development ventures.

**2004 Compared to 2003**

Equity in earnings and return on investment in unconsolidated senior living communities was $9.4 million in 2004 compared to $5.3 million in 2003, an increase of $4.1 million, or 76%, which primarily resulted from improved operations and additional incentive fees.

59.    The 2005 Annual Report contained a section stating:

**Management's Report on Internal Control over Financial Reporting**

Management of Sunrise Senior Living, Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting and for the assessment of the effectiveness of internal control over financial reporting. As defined by the Securities and Exchange Commission, internal control over financial reporting is a process designed by, or under the supervision of, the Company's principal executive and principal financial officers and effected by the Company's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the consolidated financial statements in accordance with U.S. generally accepted accounting principles.

The Company's internal control over financial reporting is supported by written policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets; [and] (2) *provide*

*reasonable assurance that transactions are recorded as necessary to permit preparation of the consolidated financial statements in accordance with generally accepted accounting principles . . . .*

\*       \*       \*

In connection with the preparation of the Company's annual consolidated financial statements, management has undertaken an assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO Framework). *Management's assessment included an evaluation of the design of the Company's internal control over financial reporting and testing of the operational effectiveness of those controls.*

*Based on this assessment, management has concluded that as of December 31, 2005, the Company's internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.*

\*       \*       \*

Paul J. Klaassen Chief Executive Officer

Bradley B. Rush Chief Financial Officer

60.    Note 2 to Sunrise's 2005 financial statements represented:

**Investments in Unconsolidated Senior Living Communities**

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIEs") in accordance with FASB Interpretation No. 46, *Consolidation of Variable Interest Entities* ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIEs when it determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), *the investments are accounted for under the equity method.*

*The equity method investments are recorded at cost* and subsequently are adjusted for equity in net income (losses) and distributions. Sunrise determines its share of the investees' earnings or losses based on the distributions of cash flow from a hypothetical liquidation of the investee's

assets and liabilities. The equity earnings are adjusted for the impact on the investee's reported earnings, if any, for the basis differences between Sunrise's carrying value of the equity investments and the investee's underlying assets. Sunrise recognizes profits on sales of services to these ventures to the extent of the ventures' outside ownership interest.

*Sunrise owned interests in 187 unconsolidated senior living communities (31 of which are under development) through ownership interests in 30 unconsolidated ventures at December 31, 2005 that are accounted for under the equity method and one unconsolidated venture accounted for under the cost method.* Those ventures are generally limited liability companies and partnerships. Sunrise's interest in those ventures generally range from five to 25%. Sunrise has one community in which it owns less than 10%, 147 communities in which it owns between 10% and 20%, and 20 communities in which it owns between 10% and 30%, and 19 communities in which it owns more than 30%.

*    *    *

**Variable Interest Entities**

At December 31, 2005, Sunrise had an interest in 11 ventures that are considered VIEs. Sunrise is the primary beneficiary and, therefore, consolidates eight of these VIEs. Seven of these consolidated VIEs are development communities in which Sunrise has a majority of the voting interest and is developing for Sunrise REIT (see Note 4). At December 31, 2005, included in Sunrise's consolidated balance sheet were $56.1 million of development costs and $50.7 million of debt, including $6.6 million of third-party construction debt secured by the development communities and $44.1 million of borrowings from Sunrise REIT guaranteed by Sunrise. The only recourse to Sunrise with respect to these seven VGFIEs is under borrowings from Sunrise REIT.

61.    On 3/16/06, the Company filed its Form 10-K for the fiscal year ended 12/31/05, which included its previously reported 2003-2005 financial results and statements. The 10-K also included certifications, signed by Klaassen and Rush, which stated the following:

1.    I have reviewed this annual report on Form 10-K of Sunrise Senior Living, Inc.;

- 42 -

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*     \*     \*

**CERTIFICATION OF [CEO] AND [CFO]
PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002 (18 U.S.C. SECTION 1350)**

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)   the Annual Report on Form 10-K of the Company for the Period Ended December 31, 2005 filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b)   *information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*

62.   Sunrise's 1stQ 05 10-Q, 2ndQ 05 10-Q and 3rdQ 05 10-Q contained the

following Sarbanes-Oxley certifications, signed by P. Klaassen and Rush:

I, [Paul J. Klaassen/Bradley B. Rush], certify that:

1.   I have reviewed this quarterly report on Form 10-Q of Sunrise Senior Living, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

- 45 -

Date: [_____]                    [Paul J. Klaassen
                                  Chief Executive Officer

                                  Bradley B. Bush
                                  Chief Financial Officer]

                           *      *      *

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
AND CHIEF FINANCIAL OFFICER PURSUANT
TO SECTION 906 OF THE SARBANES-OXLEY
ACT OF 2002 (18 U.S.C. SECTION 1350)**

The undersigned, the Chief Executive Officer and the Chief Financial
Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies
that, to his knowledge on the date hereof:

(a)     the Quarterly Report on Form 10-Q of the Company for the
        Period Ended [_____] filed on the date hereof with the Securities
        and Exchange Commission (the "Report") fully complies with
        the requirements of Section 13(a) or 15(d) of the Securities
        Exchange Act of 1934, as amended; and

(b)     information contained in the Report fairly presents, in all
        material respects, the financial condition and results of
        operations of the Company.

                                  /s/ Paul J. Klaassen
                                  Paul J. Klaassen
                                  Chief Executive Officer
                                  Date: [_____]

                                  /s/ Bradley B. Rush
                                  Bradley B. Rush
                                  Chief Financial Officer
                                  Date: [_____]

63.     Identical certificates covering Sunrise's financial statements were contained in

Sunrise's 2003, 2004 and 2005 10-Ks filed 3/04, 3/05 and 3/16/06, signed by P. Klaassen.

Rush signed the 2005 Form 10-K.

64.    Sunrise's 2005 financial statements at Note 13 stated:

13. Stockholders' Equity

Stock Option Plans

Sunrise has stock option plans providing for the grant of incentive and nonqualified stock options to employees, directors, consultants and advisors. . . . *Under the terms of the plans, the option exercise price and vesting provisions of the options are fixed when the option is granted. . . . [T]he option exercise price was not less than the fair market value of a share of common stock on the date the option was granted. . . .*

Sunrise's 2005 10-K contained an identical representation.

65.    The true facts, which were known by the defendants but concealed from the investing public during the Class Period were:

(a)    Sunrise's 2003, 2004 and 2005 and prior year financial results, including its net income, EPS, profit and shareholders' equity, were all materially overstated due to improper accounting for minority interests in joint ventures and real estate sales and contrivances and manipulations in the administration of Sunrise's stock options, including "backdating" and "spring-loading," and failing to properly record or account for the actual amount, and tax consequences, of the compensation expense of its executives.

(b)    Sunrise's excellent financial and operating results reported during the Class Period were not due to the skill and business acumen of its top executives, their successful management of its business or the outstanding performance of its business units, as represented.  In fact, a significant part was due to falsification of Sunrise's financial statements by improperly avoiding recognizing losses on minority interests in joint ventures, improper recognition of gains on real estate sales and not properly accounting for (and thus understating) the true compensation expense of its executive and management team.

- 47 -

(c)    Sunrise's top executives were manipulating the Company's stock option plan so as to enrich themselves by "backdating" or "spring-loading" the stock options they were granted to set the options at a much lower exercise price – one well below the market price or fair value of the stock when the option was actually granted – or by granting them before the release of positive corporate news that would boost the stock, thus giving them an instant, riskless profit, while exposing the Company to the risk of regulatory investigations, tax penalties, and even criminal proceedings.

(d)    Sunrise's internal financial and accounting controls were materially deficient and not effective in providing the necessary and required degrees of assurance that Sunrise's financial results and reports were fairly and accurately presented and free from fraud.

66.    On 5/8/06, Sunrise's stock traded as high as $39.62 and closed at $39.30 per share. On 5/9/06, the Company suddenly revealed it was "rescheduling its first quarter 2006 earnings release to allow additional time for further review of the accounting treatment applied to its investments in unconsolidated senior living communities, and to complete the review of its Form 10-Q for the first quarter ended March 31, 2006." On 5/10/06, Sunrise revealed the accounting treatment review was focused on the allocation of profits and losses for a "limited number" of Sunrise's joint ventures where Sunrise was a minority partner and the capital partner received a preference, either on the return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties, or cash flow from operations. On 5/11/06, Sunrise said "*it has decided to use a different methodology to allocate profits and losses in its joint ventures.*" On 5/9/06, Sunrise's stock fell to as low as

- 48 -

$30.35 per share on huge volume of 4.4 million shares, but by 5/11/06 traded as high as $36 before closing at $33.64 per share.

67.    During a 5/11/06 conference call, the following occurred:

**[P. Klaassen – CEO:]** During the final preparation of our first-quarter Form 10-Q, an issue arose that required additional time for review by our team and our outside accountants to ensure the integrity and the accuracy of our financial statements. The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities. Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.

Now, approximately 15% of Sunrise's communities are held by joint ventures that would fall into this category. Throughout the year, and in connection with our quarterly filings, we conduct a review of our various accounting policies, including the methodology we use to allocate profits and losses in our joint ventures where our capital partner is entitled to a preferential return. In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of these ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow to refinancing or sale of the property.

*Now, as a result, we are now in the process of assessing the implications of adopting this alternate methodology and whether adjustments are necessary to prior period financial statements.* In order to have time to effectively complete this review, we will not be filing our Form 10-Q with the Securities and Exchange Commission today. Instead, we will take the time it takes to carefully review and finalize this matter. . . . [W]e do not expect the outcome of this review to adversely affect our previously furnished earnings guidance for 2006 or 2007, due to the limited number of current joint ventures affected and because of the various stages of those ventures.

*    *    *

*[W]e will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future ventures. We were*

- 49 -

*able to do this now because of the successful track record that we have established for these ventures.*

\*          \*          \*

The general effect of using this different methodology – known, I am told, as the hypothetical liquidation at book value method – *is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital*. . . .

Perhaps a simplified example will help illustrate this rather technical and complicated issue. Assuming a one-property development venture built a $20 million Sunrise community, it the venture obtains 75% or $15 million of construction debt, the partners would contribute $5 million of equity. If it is a typical 80/20 partnership, *our share of the equity would be 1 million* and our capital partner would contribute 4 million. In our now typical model, where there is no capital return preference to our partner, all losses and profits *would be allocated 80/20* . . . .

Now, if this partnership were to experience 1 million of initial losses . . . Sunrise would initially recognize *20% or $200,000 of the $1 million of losses* . . . for a total of *$1 million profit from the venture*. . . .

Now, if the same venture had included a capital return preference . . . Sunrise would be allocated 100% or all million dollars of the initial losses . . . .

\*          \*          \*

**Derrick Dagnan, Analyst – Avondale Partners:**    Is the new accounting method or the new treatment under GAAP – is that a new option to you, or has that been available to you for a number of years and you just recently found it?

**[Rush – CFO:]**  It has been available for a number of years.  And again, with the scrutiny that Paul and Tom mentioned earlier, *it came into consideration late in 2005.  And when we took a look at it, we thought we should look deeper.*

68.    On 6/15/06, *MarketWatch* reported that:

Sunrise Senior Living, Inc. had one quarter and two years' worth of per-share earnings estimates cut by Stifel Nicolaus on Thursday . . . .  Preliminary first-quarter results provided by the company, coupled with the buyout of 10 management contracts by Five Start Quality Care Inc., prompted Stifel Nicolaus to take its full-year 2006 outlook to $1.15 from $1.18 a share.  The

- 50 -

firm also reduced its full-year 2007 per-share forecast to $1.32 from $1.36, and lowered its first-quarter forecast to 21 cents from 23 cents.

After this occurred, Sunrise's stock dropped to $27.89 per share on 6/15/06 and to as low as $26.29 on 6/20/06, three trading days later. On 6/15/06, Stifel Nicolaus reported:

- SRZ shares declined 5.3% yesterday, with most of the damage coming late in the day on a couple of large block trades.

- Shares are down 26.3% from their 4/4/06 high due to general market conditions. Sunrise's delay in reporting 1Q06 results as a result of an accounting issue concerning its development joint ventures and yesterday's block sales.

69.    By late 7/06, Sunrise stock fell to as low as $25.08 per share as rumors circulated of a massive financial restatement by Sunrise. On 7/27/06, Stifel Nicolaus reported:

### Announced July 31, 2006 Date for Releasing 1Q06 Earnings Rapidly Approaching

- SRZ shares are down 31.5% since the company delayed 1Q06 earnings due to an accounting question about recognition of earnings on some of its joint venture investments.

- In a 6/30/06 press release announcing an acquisition, Sunrise said it "expects to complete its accounting review prior to July 31, 2006."

- We believe the release of Sunrise's much delayed 1Q06 results will be a catalyst for the stock to rebound.

- With three business days to go, Sunrise has not scheduled an earnings release and it is our sense that the company may or may not meet its expected timetable for completing its accounting review.

70.    On 7/31/06, Sunrise *announced a huge, multi-year financial restatement*.

Sunrise's press release stated in part:

[T]he Company will *restate* its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of

sale accounting and recognition of income from prior sales of real estate. *The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including the years 1999 through 2005, by an estimated $60 million to $110 million. . . . Sunrise is unable at this time to provide the precise impacts of the restatement since its review of these issues has not yet concluded. . . .* The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years *should no longer be relied upon.*

71.    In its 7/31/06 announcement, Sunrise admitted it had been *improperly accounting for its joint venture investments and operations and for certain real estate sales*, and that it would no longer engage in real estate sales with guarantees and other ongoing financial commitments. On 7/31/06, Sunrise stock fell to as low as $24.40 per share. In 11/06, Sunrise disclosed its accounting review *was still not completed* and that, subject to completion of its auditor's review and clearing comments from the SEC, Sunrise expected to file its restated 2005 Form 10-K before year-end, which would be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006, and to be current in its filings with the SEC, it would file its 2006 Form 10-K on or before 3/1/07. *Sunrise indicated that the cumulative impact of the restatement was anticipated to reduce net income for all periods impacted, including 1999 through 2005, by approximately $100 million. Approximately 50% of this amount related to the periods from 1999 through 2002.*

72.    An 11/26/06 *New York Times* article by Gretchen Morgenson stated in part:

Shareholders of Sunrise Senior Living, a provider of residential communities and services for the elderly, have seen their holdings decline 17 percent since last spring. Problematic bookkeeping kept the company from filing three quarterly financial statements on time, forced it to restate earnings for 2003 through 2005, drew Securities and Exchange Commission inquiries about its accounting and led it to warn that its internal controls were probably inadequate.

All of that resulted in a $342 million hit to the market value of the company, based in McLean, VA. But a raft of insiders escaped some of that damage. Three of the company's directors and its two founders sold $32 million worth of Sunrise stock in the six months leading up to the May 9 announcement that it was changing it accounting practices and delaying its financial filing.

Reviewing stock sales over the six months before the announcement is relevant because, during a conference call with investors in May, Sunrise officials said that "late in 2005" they had begun contemplating the accounting shift that later clobbered Sunrise shares.

\*      \*      \*

Selling during the period were Paul J. Klaassen, the founder and chief executive; Theresa M. Klaassen, his wife and Sunrise's chief cultural officer; Ronald V. Aprahamian, a consultant and investor who is chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay, a founder of a private equity firm and a director.

\*      \*      \*

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006. The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements. They were part of a series of planned sales put in place in December by the executives.

An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings. On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35. On Friday, the stock closed at $32.50

Reached last Wednesday at a vacation home in Florida, Mrs. Klaassen, who is also a director, declined to comment. The Klaassens continue to hold a large stake in Sunrise – 5.2 million shares, or approximately 10 percent of the stock outstanding. Although they entered into a derivatives contract relating to a forward sale of 750,000 shares last year, the 600,000-share sales are their first outright disposal of Sunrise stock since the company went public in 1996.

\*      \*      \*

Another apparently well-times sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares

at $37.85 each, generating $757,040. Mr. Aprahamian declined to comment when reached last Wednesday at his home in Virginia. He said he had not seen the shareholder letter, addressed to Sunrise directors and hand-delivered to the company last Monday. He declined to provide a fax number or e-mail address where a reporter could send a copy.

Mr. Donohue, the Chamber of Commerce chairman, has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings. Mr. Klaassen is on both the Chamber of Commerce's board and that of its research arm, the National Chamber Foundation.

73.    After shareholder complaints that Sunrise "backdated" or "spring-loaded" stock option grants and a demand that the grants be investigated, in 12/06, Sunrise announced an internal investigation of its stock option grant process over the past several years.

## SUNRISE'S FALSE FINANCIAL REPORTING
## DURING THE CLASS PERIOD

74.    In order to inflate the price of Sunrise's securities, defendants caused the Company to falsely report its results for 2003 through 2005 through improper accounting for investments in unconsolidated senior living communities. As a result of its improper accounting, Sunrise prematurely recognized income involving many of its joint ventures. The Company also falsified its financials by not accounting for backdated options given to certain executives.

75.    The 2003 through 2005 results were included in press releases disseminated to the public and Forms 10-Q and 10-K filed with the SEC.

76.    Sunrise has now admitted that it will restate to change the accounting treatment applied to its investments in unconsolidated senior living communities because its prior accounting was in error. Sunrise also commenced a probe of its stock option practices.

- 54 -

77.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. §210.10-01(a).

**Improper Accounting for Unconsolidated
Senior Living Centers**

78.    GAAP, as set forth in AICPA Statement of Position ("SOP") 78-9, *Accounting for Investments in Real Estate Ventures*, states that, under the equity method, inter-company profits should be eliminated until realized.   SOP 78-9.21.   Companies are also required to carefully consider substance over form in recognizing profits.   SOP 78-9.25.

79.    Also, GAAP, as set forth in FASB Interpretation ("FIN") No. 46R, addresses consolidation by companies of variable interest entities.   An entity must be consolidated if total investment at risk is not sufficient, or if the equity holders lack controlling financial interest or if voting rights are not proportional to obligations.   FIN 46R, ¶5.

80.    In its 2005 Form 10-K, the Company represented that it had complied with these standards:

Investments in Unconsolidated Senior Living Communities

Sunrise holds an interest in ventures established to develop or acquire and own senior living communities. When these ventures are considered to be variable interest entities ("VIES") in accordance with FASB Interpretation No. 46, Consolidation of Variable Interest Entities ("FIN 46R"), Sunrise consolidates the ventures if it is determined to be the primary beneficiary. When Sunrise has determined it is not the primary beneficiary or, for non-VIE's when and it [sic] determines that it owns a non-controlling interest (because other partners or members control or participate in the management decisions of these ventures), the investments are accounted for under the equity method.

81.     GAAP, as set forth in FASB Statement of Financial Accounting Standards ("SFAS") No. 66, *Accounting for Sales of Real Estate*, states that a seller's continuing involvement without the transfer of risks and rewards, such as guarantees of the return of investment, will prevent treating the transfer of the asset as a sale. *See* SFAS No. 66, ¶¶25-29.

82.     Sunrise has now admitted that certain of its partners in ventures received preference on their return of capital, such that it had not been complying with applicable accounting rules.    Sunrise was providing guarantees and commitments including construction completion, operating cash flow deficit guarantees and debt guarantees. As such, sales of real estate should not have been recognized immediately. Sunrise was able to inflate its earnings through its misaccounting for unconsolidated ventures. In 2005, Sunrise reported $13.2 million in equity earnings from unconsolidated ventures. Yet those ventures' total income was $19.2 million. It is incongruous that Sunrise could recognize 69% of the income from the ventures when it presumably owns less than 50% of the ventures. In fact, Sunrise reported that it had much less than 50% ownership interest. In the 2005 Form 10-K it stated:

- 56 -

We generally have ownership interests in these unconsolidated ventures ranging from five to 25%. We will manage these communities pursuant to long-term management contracts.

83.    Sunrise will restate its results from 2003 through 2005 and prior years. Sunrise has recently estimated the input of its pending restatement:

The cumulative impact of the restatement is currently expected to reduce net income for all periods impacted, including 1999 through 2005, by an estimated $65 million to $100 million.

84.    Significantly, Sunrise has now mentioned the accounting standard at issue involves SOP 78-9, a standard in effect for more than 27 years. This long-standing accounting pronouncement, which controlled a significant aspect of Sunrise's financial reporting, was something with which the Individual Defendants would have been familiar.

85.    As a result of Sunrise's improper accounting practices, it will restate at least its 2003-2005 financial statements. The fact that Sunrise will restate its financial statements is an admission that:

(a)    the financial results originally issued during the Class Period and its public statements regarding those results were materially false and misleading;

(b)    the financial statements reported prior to and during the Class Period were incorrect based on information available to defendants at the time the results were originally reported; and

(c)    the financial statements can no longer be relied upon as being accurate.

86.    The SEC has reiterated its position regarding statements:

[T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia, to prove the falsity and*

- 57 -

> *materiality of the original financial statements [and] to demonstrate that*
> *persons responsible for the original misstatements acted with scienter . . . .*

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Feb. 22, 2002).

87.    The fact that Sunrise will restate its past financial statements and that it has indicated that such financial statements should no longer be relied upon is an admission that the financial statements originally issued were false and that the overstatement of net income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Sunrise was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, ¶25, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. Sunrise's restatement is due to an error. Thus, the restatement is an admission by Sunrise that its previously issued financial results and its public statements regarding those results were false.

**Improper Accounting for Stock Options**

88.    Sunrise violated GAAP by failing to properly report compensation expense and understated its tax liabilities by misdating the option grants.

- 58 -

89.    GAAP, as set forth in APB No. 25, *Accounting for Stock Issued to Employees* –

the standard for accounting for employee stock options in effect until 1995 – required that

any difference between the market price on the measurement date and the exercise price be

accorded as compensation expense.  APB No. 25, ¶10, stated in part:

> Compensation for services that a corporation receives as consideration for
> stock issued through employee stock option, purchase, and award plans should
> be measured by the quoted market price of the stock at the measurement date
> less the amount, if any, that the employee is required to pay.

*    *    *

> Thus a corporation recognizes compensation cost for stock issued
> through compensatory plans unless the employee pays an amount that is at
> least equal to the quoted market price of the stock at the measurement date.

90.    In 1995, SFAS No. 123, *Accounting for Stock-Based Compensation*, became

effective.  The new standard set forth "fair value" as the method for accounting for stock-

based compensation plans.  This method was deemed preferable to APB No. 25.  However,

companies were permitted to continue to use APB No. 25 but with added disclosure

requirements.  SFAS No. 123, ¶11, stated in part:

> This Statement provides a choice of accounting methods for transactions with
> employees that are within the scope of Opinion 25. Paragraphs 16-44 of this
> Statement describe a method of accounting based on the fair value, rather than
> the *intrinsic value*, of an employee stock option or a similar equity instrument.
> The Board encourages entities to adopt the fair value based method of
> accounting, which is preferable to the Opinion 25 method for purposes of
> justifying a change in accounting principle under APB Opinion No. 20,
> *Accounting Changes*. However, an entity may continue to apply Opinion 25
> in accounting for its stock-based employee compensation arrangements. An
> entity that does so shall disclose pro forma net income and, if presented,
> earnings per share, determined as if the fair value based method had been
> applied in measuring compensation cost (paragraph 45).

(Emphasis in original, footnote omitted.)

91.    In 12/04, SFAS No. 123 was revised.  The new standard, SFAS No. 123R, required recognition of the cost of options (as per the fair value method) in the financial statements:

> 10.    An entity shall account for the compensation cost from share-based payment transactions with employees in accordance with the fair-value-based method set forth in paragraphs 11-63 of this Statement.

92.    Each of these standards required a company include in its calculation the fair market value of the stock on the measurement or grant date.  For a publicly traded company like Sunrise, the fair market value of the stock was the trading price of the stock on the grant date.  So long as the exercise price of the stock was the same as the quoted market price, there was no compensation cost recorded on the grant date under APB No. 25 (the standard which companies were permitted to continue to follow under SFAS No. 123) as long as they included disclosures about the pro forma impact of using the fair value method of measurement under SFAS No. 123.  However, granting options with exercise prices equal to market price on the date of grants was critical to the accounting under any of the standards.

93.    Indeed, this is what Sunrise represented that it did.  For example, the 2006 Proxy Statement makes reference to the 1991 Non-Incentive Plan and represents that: "The option exercise price will not be less than the greater of par value or the fair market value of a share of Sunrise common stock on the date of grant."  This was not true at least as to years 1999-2002, when certain of the defendants' grants had exercise prices not at fair market value on the date of grant.

94.    Sunrise represented the following about its compliance with stock option accounting rules in its 2005 Form 10-K:

Stock options are granted for a fixed number of shares to employees with an exercise price equal to the fair value of the shares at the date of grant. Sunrise accounts for stock based compensation using the intrinsic value method in accordance with Account Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), and accordingly, does not recognize compensation expense for stock option grants.

95.     A nearly identical disclosure was included in the Company's 2004 Form 10-K.

96.     In reality, Sunrise's financial statements and related disclosures were materially false and misleading because Sunrise was violating a fundamental principle for the manner in which it accounted for stock options under all the various stock option accounting standards: it was granting options with exercise prices at less than market value. In fact, it was backdating options to dates when the price was lower than the market price on the day the options were actually granted. Note the fortuitous dates Sunrise selected for its options to many of its top officers (adjusted for stock splits):



**Sunrise Senior Living**

**January 2, 1997 - December 31, 1997**

1997 Options Grants
Faeder      200,000 shares
Smick       300,000 shares
Newell      200,000 shares
Swinton     150,000 shares



**Sunrise Senior Living**

**January 2, 1998 - December 31, 1998**



**Sunrise Senior Living**

**January 4, 1999 - December 31, 1999**



**Sunrise Senior Living**

**January 3, 2000 - December 29, 2000**



**Sunrise Senior Living**

**January 2, 2001 - December 31, 2001**

97.    Sunrise has now announced a probe into its stock option practices.

## Sunrise's GAAP Violations and Restatement Were Material

98.    Sunrise's false and misleading Class Period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.[4] SEC SAB Topic 1M, *Materiality*, summarizes GAAP definitions of materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important." It also stresses that materiality

---

[4]    Staff Accounting Bulletin ("SAB") Topic 1M, *Materiality*, represents the codification of certain Staff Accounting Bulletins, including SAB No. 99, *Materiality*, as of May 9, 2003. SAB No. 99 was effective August 12, 1999.

requires qualitative, as well as quantitative, considerations. For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

99.    SAB Topic 1M further states:

Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –

*        *        *

- whether the misstatement masks a change in earnings or other trends

- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

*        *        *

- whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability . . . .

100.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

101.    Sunrise's misstatements, by their own admissions, satisfy these criteria and, thus, were material from both a quantitative and qualitative perspective.

102.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

- 67 -

(b)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as

- 68 -

well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

      (g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

      (h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

103.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS' CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS

104.    In Sunrise's 1stQ 05 10-Q, 2ndQ 05 10-Q and 3rdQ 05 10-Q, the following Sarbanes-Oxley certifications appeared, signed by P. Klaassen and Rush:

I, [Paul J. Klaassen/Bradley B. Rush], certify that:

1.    I have reviewed this quarterly report on Form 10-Q of Sunrise Senior Living, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*    *    *

Date: [_____]                    [Paul J. Klaassen
                                 Chief Executive Officer

                                 Bradley B. Bush
                                 Chief Financial Officer]

*    *    *

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002 (18 U.S.C. SECTION 1350)

The undersigned, the Chief Executive Officer and the Chief Financial Officer of Sunrise Senior Living, Inc. (the "Company"), each hereby certifies that, to his knowledge on the date hereof:

(a)    the Quarterly Report on Form 10-Q of the Company for the Period Ended [_____] filed on the date hereof with the Securities and Exchange Commission (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(b)    information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

                            /s/ Paul J. Klaassen
                            Paul J. Klaassen
                            Chief Executive Officer
                            Date: [_____]

                            /s/ Bradley B. Rush
                            Bradley B. Rush
                            Chief Financial Officer
                            Date: [_____]

105.    Identical certificates covering Sunrise's financial statements were contained in

Sunrise's 2003, 2004 and 2005 10-Ks filed 3/04, 3/05 and 3/16/06, signed by P. Klaassen.

Rush signed the 2005 Form 10-K.

- 71 -

106.    Defendants P. Klaassen and Rush knowingly certified false and misleading financial statements. Defendants P. Klaassen and Rush certified the following financial statements during the Class Period:

### SCHEDULE OF CERTIFIED FINANCIAL STATEMENTS

| Financial Statement Filed | Filing Period | Filing Date | Signed/Certified by | |
|---|---|---|---|---|
| | | | CEO | CFO |
| Form 10-Q | 06/30/05 | 08/09/05 | P. Klaassen | Rush |
| Form 10-Q | 09/30/05 | 11/09/05 | P. Klaassen | Rush |
| Form 10-K | 12/31/05 | 03/16/06 | P. Klaassen | Rush |

107.    These financial statements were not in accordance with GAAP and SEC rules. Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and SEC Rules 13a-14(a) and 15d-14(a) of the Exchange Act requires defendants P. Klaassen, as CEO, and Rush, as CFO, to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report. Defendants P. Klaassen and Rush were required to certify that the financial statements and other financial information included in the reports were fairly presented in all material respects. Defendants P. Klaassen and Rush also stated that the reports did not contain any untrue statement of material fact or omit to state a material fact. In addition, defendants P. Klaassen and Rush stated that Sunrise has established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.

108.    Defendants P. Klaassen and Rush knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules. In accordance with §906 of Sarbanes-Oxley and 18 U.S.C. §1350, defendants P. Klaassen and Rush were required to certify each periodic report that includes financial statements. Their

signed certifications falsely stated that: (i) the report fully complied with the requirements of §13(a) or §15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of Sunrise.

109.   On the dates noted in the Schedule of Certified Financial Statements above, defendants P. Klaassen and Rush signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the Exchange Act and §906 of Sarbanes-Oxley attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for Sunrise. At the time P. Klaassen and Rush signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

### SUNRISE FAILED TO MAKE REQUIRED DISCLOSURES

110.   The SEC requires that, as to annual financial statements filed with the SEC, registrants include a management's discussion and analysis section which provides information with respect to the results of operations and "also shall provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." *See* Regulation S-K, 17 C.F.R. §229.303(a). Regulation S-K states that, as to annual results, the management's discussion and analysis section shall:

> (3)   Results of operations. (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii)    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. §229.303(a)(3)(i)-(ii).

111.    The SEC also requires that interim period financial statements filed with the SEC include a management's discussion and analysis of the financial condition and results of operations so as to enable the reader to assess material changes in financial condition and results of operations. Regulation S-K, 17 C.F.R. §229.303(b) states that: "The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item [as set forth above], except that the impact of inflation and changing prices on operations for interim periods need not be addressed."

112.    During the Class Period, Sunrise failed to truthfully disclose its accounting policies and practices related to income from investments and related to improper stock option grants in prior years.

113.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASB Statement of Concepts ("FASCON") No. 1, ¶7. For this reason, in addition to Sunrise's failure to make the required disclosures in its financial statements and in its SEC filings, Sunrise also shirked its duty to make such disclosures in its conference calls, its press releases, its quarterly financial reports and its Annual Reports.

## SUNRISE LACKED ADEQUATE INTERNAL CONTROLS

114.    Defendants were able to scheme Sunrise shareholders and inflate Sunrise stock prices through accounting improprieties which results in materially misstated financial statements by means of circumventing and failing to establish and maintain adequate internal accounting control over financial reporting relating to real estate sales, investments and stock options.

115.    Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must:

> (A)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (B)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> *    *    *
>
> (ii)    transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP] . . . .

15 U.S.C. §78m(b)(2)(A)-(B).

116.    These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

117.    Defendants caused Sunrise to violate §13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its accounting for stock options. Sunrise's inaccurate and false records were not isolated or unique instances because they were

improperly maintained for multiple reporting periods. Accordingly, Sunrise violated §13(b)(2)(A) of the Exchange Act.

118.    In addition, defendants caused Sunrise to violate §13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Sunrise failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting investments and for stock options. In fact, despite knowing the Company's true dismal state and lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period, without ever disclosing the deficiencies in Sunrise's internal accounting controls and falsely asserted that its financial statements complied with GAAP.

119.    Financial reporting includes not only financial statements, but also other means of communicating information that relates directly or indirectly to the information in the financial statements. *See* FASCON No. 1, ¶7. For this reason, in addition to Sunrise's failure to make the required disclosures in its financial statements and in its SEC filings, Sunrise also shirked its duty to make such disclosures in its conference calls, its press releases and its Annual Reports.

120.    As defendants allowed and were responsible for initiating a gross lack of internal controls over financial reporting, defendants were able to scheme Sunrise shareholders and inflate stock prices through accounting improprieties which resulted in materially misstated publicly filed financial statements.

## LOSS CAUSATION/ECONOMIC LOSS

121.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Sunrise's stock price and operated as a fraud or deceit on Class Period purchasers of Sunrise stock by misrepresenting the Company's financial results, business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's accounting and falsifying the Company's financial statements. Later, however, when defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Sunrise stock fell precipitously as the prior artificial inflation came out of Sunrise's stock price. As a result of their purchases of Sunrise stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

122.    By misrepresenting Sunrise's financial statements and its future earnings, the defendants presented a misleading picture of Sunrise's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Sunrise's business was not as healthy as represented, Sunrise falsely overstated its net income.

123.    These claims of profitability caused and maintained the artificial inflation in Sunrise's stock price throughout the Class Period and until the truth was revealed to the market.

124.    Defendants' false and misleading statements had the intended effect and caused Sunrise stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $39.49 per share.

- 77 -

125.   On 5/9/06, Sunrise revealed that it needed to reschedule its 1stQ 06 earnings release and needed additional time to complete a review of its Form 10-Q for its 1stQ 06. As investors and the market became aware that Sunrise's prior financial statements had been falsified, the prior artificial inflation came out of Sunrise's stock price, damaging investors.

126.   As a direct result of defendants' admissions and the public revelations regarding the truth about Sunrise's misstatements and its actual prospects going forward, Sunrise's stock price plummeted from $39.30 on 5/8/06 to $28.50 per share by 6/16/06, a drop of $10.80 per share, and fell to as low as $24.40 when the restatement of Sunrise's earnings was revealed on 7/31/06. This drop removed some of the inflation from Sunrise's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.   In sum, as the truth about defendants' fraud and Sunrise's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged, suffering economic losses of at least $10.80 per share.

127.   The decline in Sunrise's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Sunrise's stock price declines negate any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

## DEFENDANTS' INSIDER TRADING

128.    While Sunrise's stock price was artificially inflated by defendants' false statements, the Insider Selling Defendants personally profited from their wrongful conduct and scheme by selling $34.8 million worth of their individual Sunrise holdings based on inside information.

| Insider | Date | Shares Sold | Price | Proceeds | % of Stock Actually Owned and Sold |
|---|---|---|---|---|---|
| J. Barron Anschutz | 21-Nov-05 | 3,000 | $33.00 | $99,000 | |
| | 21-Nov-05 | 2,000 | $33.04 | $66,080 | |
| | 3-Jan-06 | 826 | $32.06 | $26,482 | |
| | 3-Jan-06 | 100 | $32.05 | $3,205 | |
| | | 5,926 | | $194,767 | 100.0% |
| Ronald V. Aprahamian | 18-Apr-06 | 20,000 | $37.85 | $757,000 | 90.9% |
| Thomas J. Donohue | 21-Nov-05 | 32,000 | $33.04 | $1,057,280 | |
| | 21-Nov-05 | 30,000 | $33.04 | $991,200 | |
| | 21-Nov-05 | 24,000 | $33.04 | $792,960 | |
| | 21-Nov-05 | 10,000 | $33.04 | $330,400 | |
| | 21-Nov-05 | 6,666 | $33.04 | $220,245 | |
| | | 102,666 | | $3,392,085 | 71.2% |
| J. Douglas Holladay | 23-Sep-05 | 10,000 | $32.00 | $320,000 | |
| | 3-Oct-05 | 8,000 | $33.50 | $268,000 | |
| | 7-Nov-05 | 2,300 | $35.00 | $80,500 | |
| | 6-Dec-05 | 1,700 | $35.00 | $59,500 | |
| | 12-Dec-05 | 6,000 | $36.50 | $219,000 | |
| | 21-Mar-06 | 8,000 | $39.00 | $312,000 | |
| | | 36,000 | | $1,259,000 | 100.0% |
| Paul J. Klaassen/ Teresa M. Klaassen | 19-Dec-05 | 50,000 | $34.78 | $1,739,000 | |
| | 20-Dec-05 | 50,000 | $34.58 | $1,729,000 | |
| | 3-Jan-06 | 50,000 | $32.11 | $1,605,500 | |
| | 4-Jan-06 | 50,000 | $34.39 | $1,719,500 | |
| | 1-Feb-06 | 50,000 | $36.27 | $1,813,500 | |
| | 2-Feb-06 | 50,000 | $36.14 | $1,807,000 | |
| | 1-Mar-06 | 50,000 | $34.76 | $1,738,000 | |
| | 2-Mar-06 | 50,000 | $34.36 | $1,718,000 | |
| | 3-Apr-06 | 50,000 | $38.82 | $1,941,000 | |

| | | | | |
|---|---|---|---|---|
| | 4-Apr-06 | 50,000 | $38.50 | $1,925,000 |
| | 1-May-06 | 50,000 | $37.04 | $1,852,000 |
| | 2-May-06 | 50,000 | $36.77 | $1,838,500 |
| | | 600,000 | | $21,426,000 | 10.4% |
| | | | | |
| Thomas B. Newell | 22-Aug-05 | 24,000 | $30.05 | $721,200 |
| | 22-Sep-05 | 13,272 | $31.51 | $418,134 |
| | 22-Sep-05 | 10,728 | $31.51 | $337,986 |
| | 24-Oct-05 | 24,000 | $32.52 | $780,480 |
| | 22-Nov-05 | 24,000 | $33.68 | $808,320 |
| | 22-Dec-05 | 24,000 | $34.66 | $831,840 |
| | 23-Jan-06 | 24,000 | $35.29 | $846,960 |
| | 22-Feb-06 | 24,000 | $34.20 | $820,800 |
| | 22-Mar-06 | 24,000 | $38.27 | $918,480 |
| | 24-Apr-06 | 24,000 | $38.12 | $914,880 |
| | | 216,000 | | $7,399,080 | 46.0% |
| | | | | |
| Bradley B. Rush | 8-Sep-05 | 1,374 | $29.76 | $40,883 |
| | 12-Sep-05 | 6,000 | $31.30 | $187,770 |
| | 12-Sep-05 | 4,000 | $31.30 | $125,200 |
| | 12-Sep-05 | 2,300 | $31.32 | $72,025 |
| | 12-Sep-05 | 200 | $31.33 | $6,266 |
| | | 13,874 | | $432,144 | 29.2% |
| | | | | |
| | **Totals:** | **994,466** | | **$34,860,075** |

129.    To the extent any of the insider stock sales were pursuant to Rule 10b5-1 plans, those plans do not protect those sales from legal liability or from raising an inference of scienter because either (i) when the plan was put in place the defendants had knowledge of the ongoing fraudulent conduct and/or (ii) the plan allowed the defendants discretion as to how stock sales under the plan would occur.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

130.    At all relevant times, the market for Sunrise's securities on the New York Stock Exchange was an efficient market for the following reasons, among others:

(a)    Sunrise's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Sunrise filed periodic public reports with the SEC and the NYSE;

(c)    Sunrise regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Sunrise was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

131.    As a result of the foregoing, the market for Sunrise's securities efficiently digested current information regarding Sunrise from all publicly available sources and reflected such information in the prices of Sunrise's securities. Under these circumstances, all purchasers of Sunrise's securities during the Class Period suffered similar injury through their purchase of Sunrise securities at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF THE *AFFILIATED UTE*
## PRESUMPTION OF RELIANCE

132.    Plaintiffs are also entitled to the *Affiliated Ute* presumption of reliance because defendants' fraudulent scheme primarily involved a failure to disclose and/or concealment of the material facts, which information plaintiffs would have wanted to have known and which

would have caused investors to not have purchased shares of Sunrise at the prices they traded at during the Class Period.

## NO SAFE HARBOR

133.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sunrise who knew that those statements were false when made.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

134.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired the publicly traded securities of Sunrise during the Class Period and who were damaged thereby (the "Class"), including those who held common shares of Sunrise's stock at the time its 2000-2006 Proxy Statements were circulated to stockholders to solicit their votes on various matters. Excluded from the Class are defendants, the officers and

- 82 -

directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

135.    The members of the Class are so numerous that joinder of all members is impracticable. Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

136.    Throughout the Class Period, Sunrise's common stock was actively traded on the NYSE, in an active and efficient market. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sunrise or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

137.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

138.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

139.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether defendants acted with negligence or with scienter;

(c)     whether statements made by defendants to the investing public during the Class Period and in the 2000-2006 Proxy Statements misrepresented or failed to disclose material facts about the business and operations of Sunrise;

(d)     whether the prices of Sunrise common stock and other publicly traded securities were artificially inflated during the Class Period;

(e)     whether the ownership share of public stockholders in Sunrise stock was improperly diluted as a result of Sunrise's stock option grants;

(f)     whether equitable remedies are available to remedy defendants' allegedly negligent, improper and/or fraudulent conduct, and to what extent these equitable remedies should be applied and how they should be fashioned;

(g)     to what extent the members of the Class have sustained economic loss and/or damages and the proper measure of damages;

(h)     whether the Insider Selling Defendants should be required to disgorge their trading profits to contemporaneous purchasers of Sunrise stock; and

(i)     how to define contemporaneous purchasers for purposes of the Exchange Act.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small,

the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Defendants Sunrise, Anschutz, Aprahamian, Donohue, Holladay, P. Klaassen, T. Klaassen, Newell and Rush

141. Plaintiffs incorporate ¶¶1-140 by reference.

142. The defendants named herein are liable for: (i) making false statements; (ii) failing to disclose adverse facts known to them about Sunrise; or (iii) participating in, permitting or causing contrivances and manipulative acts regarding Sunrise's stock option plans and its financial statements. Defendants' fraudulent scheme and course of business operated as a fraud or deceit on purchasers of Sunrise stock, as it: (i) deceived the investing public regarding Sunrise's business, compensation practices and finances; (ii) artificially inflated the prices of Sunrise's publicly traded securities; (iii) allowed Sunrise executives, including those named as defendants herein, to obtain undeserved and/or illegal options at low option exercise prices, and inflated bonuses which were directly tied to the reported performance of Sunrise; (iv) allowed Sunrise executives to insider trade by getting options based on non-public information and allowed the Insider Selling Defendants to sell millions of dollars worth of their own Sunrise stock at artificially inflated prices; and (v) caused plaintiffs and other members of the Class to purchase Sunrise securities at inflated prices, and suffer economic loss and damage, and also to unlawfully and improperly dilute their holdings in Sunrise.

143.    During the Class Period, these defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144.    During the Class Period, each of the defendants named in this Claim occupied a position at Sunrise and was privy to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose these facts. Notwithstanding their duty to refrain from selling Sunrise stock while in possession of material, adverse, non-public information concerning the Company, the Insider Selling Defendants sold millions of shares of Sunrise stock at inflated prices, improperly personally profiting and benefiting from their wrongful course of conduct and false and misleading statements.

145.    While Sunrise's top insiders and directors were issuing favorable, yet false and misleading, statements about Sunrise, the Insider Selling Defendants sold shares of their Sunrise stock for more than $34 million to personally profit from the artificial inflation in Sunrise's stock price. Notwithstanding their access to material non-public information and their duty to disclose same before acquiring or selling Sunrise stock, certain of the defendants obtained option grants at artificially low prices or knew positive corporate news was coming which would boost the stock price and they also sold significant amounts of their Sunrise stock at artificially inflated prices and at highly suspicious times. This insider selling by the Insider Selling Defendants was highly unusual, both in its timing and in its

- 86 -

amount and occurred when these defendants knew Sunrise's publicly reported financial results were overstated and of their illicit stock option contrivances and manipulations.

146.    Public investors who purchased Sunrise stock at prices inflated by the false representations and omissions have suffered millions in damages. Sunrise's insiders who knew the truth fared much better. Also, before the truth was revealed and Sunrise's stock price collapsed, these defendants sold their shares of Sunrise common stock on the open market.

147.    These defendants pursued a scheme and course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing insiders to manipulate its stock option plan and was misrepresenting its financial results; (ii) maintain defendants' executive and directorial positions at Sunrise and the profits, power and prestige which defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Sunrise, regarding defendants' compensation practices and Sunrise's financial performance. Each of the defendants was a direct, necessary and substantial participant in the scheme, common enterprise and/or common course of conduct complained of herein.

148.    The purpose and effect of defendants' scheme and common course of conduct was, among other things, to disguise defendants' violations of law, abuse of control and unjust enrichment, to conceal adverse information concerning the Company's operations and financial condition, and to artificially inflate the price of Sunrise common stock so they could dispose of millions of dollars of their own Sunrise stock, and enhance their executive

and directorial positions and receive the substantial compensation they obtained as a result thereof.

149.    In taking such actions to substantially engage in the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

150.    Defendants named in this Complaint acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

151.    These defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business alleged herein because they were senior officials of Sunrise and issued statements and press releases on behalf of the Company, and had the opportunity to commit the fraud alleged herein.

152.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Sunrise publicly traded securities during the Class Period.

153.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sunrise publicly traded securities. Plaintiffs and the Class would not have purchased Sunrise publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements and/or failure to disclose material facts.

154.    By misrepresenting the Company's financial statements, failing to inform the market of the improper and manipulative options backdating scheme and the resulting impact it was having on the Company's financial results and profits, and making other false statements, these defendants presented a misleading picture of Sunrise's business, compensation practices, financial results and prospects. This caused and maintained artificial inflation in the trading prices of Sunrise's securities throughout the Class Period and until the truth came out.

155.    Defendants' false and misleading statements had the intended effect and caused Sunrise stock to trade at artificially inflated levels throughout the Class Period. As the truth about the extent and severity of Sunrise's prior overstatement of income and the extent of the harm to its reputation and credibility in the market was disclosed and became apparent to the market, Sunrise's common stock price plummeted as the prior artificial inflation came out of the Company's stock price, falling from its Class Period high. All or a

significant portion of the decrease in Sunrise's stock price was due to the disclosure, revelation and/or leakage of information inconsistent with defendants' prior financial disclosures and Company releases. This drop removed the inflation from Sunrise's stock price, causing real economic loss and damage to investors who had purchased the stock during the Class Period.

156.    As a result of their purchases of Sunrise securities during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

157.    As investors and the market became aware that Sunrise's prior financial results had been falsified and that Sunrise's actual financial results, which had long been obfuscated by defendants' manipulative conduct, scheme to inflate its stock price and false statements regarding Sunrise's financial results, the prior artificial inflation came out of Sunrise's stock price, damaging investors.

158.    As a direct result of defendants' admissions and the public revelations regarding the truth about Sunrise's improper options backdating practices, false financial results and its actual earnings prospects going forward, the price of Sunrise shares plummeted, causing damage to plaintiffs and the Class. This decline in response to these revelations removed the inflation from the price of Sunrise's shares, causing real economic loss to investors who had purchased Sunrise shares during the Class Period.

159.    The timing and magnitude of Sunrise's stock price declines negate any inference that the losses suffered by plaintiffs and other Class members were caused by changed market

conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

160.    As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Sunrise publicly traded securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of §20A of the Exchange Act
### Against the Insider Selling Defendants

161.    Plaintiffs incorporate by reference ¶¶1-160.

162.    The defendants named in this Claim for Relief are the defendants that sold Sunrise stock during the Class Period.

163.    Certain plaintiffs purchased Sunrise stock contemporaneously with sales of Sunrise stock by certain of the defendants named in this Claim.

164.    By virtue of their positions as senior insiders of Sunrise, the defendants named in this Claim were in possession of material, non-public information about Sunrise at the time of their collective sales of more than $34 million of their own Sunrise stock to plaintiffs and members of the Class at artificially inflated prices.

165.    By virtue of their participation in the scheme to defraud investors described herein, and/or their sales of stock while in possession of material, non-public information about the adverse information detailed herein, these defendants violated the Exchange Act and applicable rules and regulations thereunder.

166.    Plaintiffs and all other members of the Class who purchased shares of Sunrise stock contemporaneously with the sales of Sunrise stock by the Insider Selling Defendants:

- 91 -

(i) have suffered substantial damages in that they paid artificially inflated prices for Sunrise stock as a result of the violations of §§10(b) and 20(a) and Rule 10b-5 herein described; and (ii) would not have purchased Sunrise stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by defendants' false and misleading statements.

### THIRD CLAIM FOR RELIEF

#### For Violation of §14(a) of the Exchange Act Against the Director Defendants

167.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein, except allegations of fraud or intent which are not necessary to assert this Claim for Relief.

168.    In 4/00, Sunrise circulated its 2000 Proxy Statement to shareholders. As a result, Donohue and David W. Faeder were elected as directors. The 4/00 Proxy also stated:

**STOCK OPTIONS**

Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the stock option committee at an exercise price equal to the market price of the common stock at the date of the grant. . . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

169.    In 3/01, Sunrise circulated its 2001 Proxy Statement to its shareholders. As a result, P. Klaassen, Callen and Peter A. Klisares were elected as directors. The 2001 Proxy stated:

Audit Committee. The members of the audit committee are Messrs. Aprahamian, Donohue and Holladay, all of whom are independent directors. The audit committee makes recommendations concerning the engagement of Sunrise's independent auditors, reviews the results and scope of the annual

audit and other services provided by Sunrise's independent auditors and reviews the adequacy of Sunrise's internal accounting controls. . . .

Compensation Committee. The members of the compensation committee are Messrs. Aprahamian, Callen and Donohue. The compensation committee makes recommendations to the full board of directors concerning salary and bonus compensation and benefits for the five most highly compensated executive officers of Sunrise. . . .

Stock Option Committee. The members of the stock option committee are Messrs. Bradley, Callen and Donohue. The stock option committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

170.    The 2001 Proxy stated:

COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to enable Sunrise to attract, motivate and retain experienced and qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. Sunrise believes that grants of stock options to executives, as well as to employees generally, help align the interests of these persons with the interests of Company's stockholders.

The following describes in more specific terms the elements of compensation of executive officers for 2000:

*    *    *

BONUSES

In 2000, bonuses were used to reward and compensate some employees for achieving certain goals set by Sunrise's management. Sunrise may use cash incentives from time to time to help motivate the attainment of management objectives.

STOCK OPTIONS

Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. ***Stock options are granted by the stock option committee at an exercise price equal to the market price of the common stock at the date of the grant.***

171.    In 4/02, Sunrise circulated its 2002 Proxy Statement to its shareholders. As a result, Aprahamian, David G. Bradley and T. Klaassen were elected as directors. The 2002 Proxy stated:

Executive Committee.  The members of the executive committee are Messrs. Klaassen and Faeder and Ms. Klaassen. The executive committee has been delegated all of the powers of the board of directors, when the board of directors is not in session, to the extent permitted under the Delaware General Corporation Law. Mr. Klaassen chairs the committee. . . .

Audit Committee.  The members of the audit committee are Messrs. Aprahamian, Donohue and Bradley, all of whom are independent directors. Mr. Aprahamian chairs the committee. The duties and responsibilities of the audit committee are set forth in the written audit committee charter adopted by the board of directors. Among other duties and responsibilities, the audit committee makes recommendations to the full board concerning the engagement of Sunrise's independent auditors, reviews the results and scope of the annual audit and other services provided by Sunrise's independent auditors and reviews the adequacy of Sunrise's internal accounting controls. . . .

Compensation Committee.    The members of the compensation committee are Messrs. Aprahamian, Callen and Donohue. Mr. Donohue chairs the committee. The compensation committee makes recommendations to the full board of directors concerning salary and bonus compensation and benefits for the five most highly compensated executive officers of Sunrise. . . .

Stock Option Committee. The members of the stock option committee are Messrs. Bradley, Callen and Donohue. Mr. Donohue chairs the committee. The stock option committee has the power and authority to take all actions and make all determinations under Sunrise's stock option plans, including the grant of options.

*       *       *

OPTION REPRICING TABLE

As required by SEC rules, the following table sets forth information with respect to all repricings of options held by any executive officer since Sunrise became a public company in June 1996.

TEN-YEAR OPTIONS REPRICING

| NAME | DATE | SHARES OF COMMON UNDERLYING OPTIONS REPRICED (#) | MARKET PRICE OF STOCK AT TIME OF REPRICING ($) | EXERCISE PRICE AT TIME OF REPRICING ($/SH) | NEW EXERCISE PRICE ($/SH) | LENGTH OF ORIGINAL OPTION TERM REMAINING AT TIME OF REPRICING |
|---|---|---|---|---|---|---|
| Christopher B.A. Slavin | 11/24/00 | 75,000 | $26.3125 | $37.625 | $26.3125 | 100 months |
| David W. Faeder | 9/14/98 | 200,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| Thomas B. Newell | 9/14/98 | 200,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| Tiffany Tomasso | 9/14/98 | 100,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| | 9/14/98 | 100,000 | $24.1875 | $43.50 | $25.00 | 113 months |
| | 9/14/98 | 30,000 | $24.1875 | $30.75 | $25.00 | 106 months |
| Brian C. Swinton | 9/14/98 | 100,000 | $24.1875 | $43.50 | $25.00 | 113 months |

\*       \*       \*

## REPORT ON EXECUTIVE COMPENSATION

The board of directors and its compensation and stock option committees have prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2001.

\*       \*       \*

## COMPENSATION OF EXECUTIVE OFFICERS

The compensation policies of Sunrise are designed to enable Sunrise to attract, motivate and retain experienced and qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. *Sunrise believes that grants of stock options to executives, as well as to employees generally, help align the interests of these persons with the interests of Company's stockholders*.

The following describes in more specific terms the elements of compensation of executive officers for 2001:

\*       \*       \*

## BONUSES

In 2001, bonuses were used to reward and compensate some employees for achieving certain goals set by Sunrise's management. Sunrise may use cash incentives from time to time to help motivate the attainment of management objectives.

- 95 -

172.    In 4/03, Sunrise circulated its 2003 Proxy Statement to shareholders by which

Donohue, Faeder and Holladay were elected as directors.  It also stated:

Executive Committee. The members of the executive committee are Messrs. Klaassen and Faeder and Ms. Klaassen. The executive committee has been delegated all of the powers of the board of directors, when the board of directors is not in session, to the extent permitted under the Delaware General Corporation Law. Mr. Klaassen chairs the committee. . . .

Audit Committee. The members of the audit committee are Messrs. Aprahamian, Donohue and Bradley, all of whom are independent directors. Mr. Aprahamian chairs the committee. The duties and responsibilities of the audit committee are set forth in the written audit committee charter adopted by the board of directors. Among other duties and responsibilities, the audit committee makes recommendations to the full board concerning the engagement of Sunrise's independent auditors, reviews the results and scope of the annual audit and other services provided by Sunrise's independent auditors and reviews the adequacy of Sunrise's internal accounting controls. . . .

Compensation Committee. On August 23, 2002, the board of directors reconstituted the then existing compensation and stock option committees into one committee designated *as the compensation committee*. Prior to its reconstitution, the members of the compensation committee were Messrs. *Aprahamian*, *Callen* and *Donohue* and the members of the stock option committee were Messrs. *Bradley*, *Callen* and *Donohue*. *Mr. Donohue chaired both committees*. The former compensation committee met once in 2002. The former stock option committee met twice in 2002. The members of the reconstituted compensation committee are Messrs. *Aprahamian*, *Bradley and Donohue*. *Mr. Donohue is the chairman of the reconstituted compensation committee*. Among other duties and responsibilities, the compensation committee is responsible for reviewing and approving annual base salary and bonus amounts, any long-term incentive compensation, any employment agreements, severance agreements, change in control and similar agreements and any perquisites for executive officers. The compensation committee is also responsible for reviewing and approving special or supplemental benefits for the Chief Executive Officer and the other executive officers and for administering and implementing Sunrise's compensation plans and equity-based plans in which directors, the Chief Executive Officer, other executive officers and other employees of Sunrise and its subsidiaries may be participants.

*        *        *

**Compensation of Executive Officers**

The compensation policies of Sunrise are designed to enable Sunrise to attract, motivate and retain experienced and qualified executives. Sunrise seeks to provide competitive compensation. Sunrise's policy has been to provide a significant component of an executive officer's compensation through the grant of stock options. In 2002, Sunrise also added grants of restricted stock as an incentive to key executives. Sunrise believes that grants of stock options and restricted stock to executives, and grants of stock options to employees generally, help align the interests of these persons with the interests of Sunrise's stockholders.

The following describes in more specific terms the elements ·of compensation of executive officers for 2002:

\*       \*       \*

*Bonuses*

In 2002, bonuses were used to reward and compensate some employees for achieving certain goals set by Sunrise's management. Sunrise may use cash incentives from time to time to help motivate the attainment of management objectives.

*Stock Options*

Stock options are considered an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options were granted by the stock option committee, and are now granted by the compensation committee, at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

173.    The 2003 Proxy also stated:

## REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the financial statements and the reporting process, including the systems of internal controls. In fulfilling its oversight responsibilities, the audit committee reviewed the audited financial statements in the Annual Report on Form 10-K for the year ended December 31, 2002 with management, including a discussion of the quality, not just the acceptability, of the accounting

principles, the reasonableness of significant judgments, and the clarity of disclosures in the financial statements.

The audit committee has reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the quality, not just the acceptability, of Sunrise's accounting principles and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from management and Sunrise, including the matters in the written disclosure required by the Independent Standards Board and considered the compatibility of nonaudit services with the auditors' independence.

The audit committee discussed with Sunrise's independent auditors the overall scope and plans for their respective audits. The audit committee meets with the independent auditors, with and without management present, to discuss the results of their examinations, their evaluations of the Sunrise's internal controls, and the overall quality of Sunrise's financial reporting. The audit committee held four meetings during fiscal year 2002.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2002 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
David G. Bradley

174.    In 4/04, Sunrise circulated its 2004 Proxy Statement to shareholders. It sought and secured the election of Callen and P. Klaassen to the board. The 2004 Proxy also stated:

Sunrise has the following standing committees of its board of directors:

Executive Committee. The executive committee was reconstituted in May 2003 and the members of the executive committee are Messrs. Klaassen, Donohue and Holladay. The executive committee has been delegated all of the powers of the board of directors, when the board of directors is not in session
. . . .

- 98 -

Audit Committee. The members of the audit committee are Messrs. Aprahamian, Donohue and Bradley, all of whom are independent, as defined in the NYSE listing standards and applicable SEC rules. Mr. Aprahamian chairs the committee.

*    *    *

The audit committee charter requires that all members of the audit committee be financially literate.

The duties and responsibilities of the audit committee are set forth in the audit committee charter and include, among other duties and responsibilities, making recommendations to the full board concerning the engagement of Sunrise's independent auditors, reviewing the results and scope of the annual audit and other services provided by Sunrise's independent auditors and reviewing and monitoring Sunrise's system of internal accounting controls. A report of the audit committee is included in this annual proxy statement. . . .

Compensation Committee. The members of the compensation committee are Messrs. Donohue, Aprahamian and Bradley, all of whom are independent, as defined in the NYSE listing standards. Mr. Donohue is the chairman of the compensation committee. . . .

The duties and responsibilities of the compensation committee are set forth in the compensation committee charter and include, among other duties and responsibilities, reviewing and approving annual base salary and bonus amounts, any long-term incentive compensation, any employment agreements, severance agreements, change in control and similar agreements and any perquisites for executive officers. The compensation committee is also responsible for reviewing and approving special or supplemental benefits for the chief executive officer and the other executive officers and for administering and implementing Sunrise's incentive compensation plans and equity-based plans in which directors, the chief executive officer, other executive officers and other employees of Sunrise and its subsidiaries may be participants.

175.    Elsewhere the 2004 Proxy stated:

**Compensation of Executive Officers**

Sunrise's compensation policies are designed to enable the company to attract, motivate and retain experienced and qualified executives. The committee's key objective with respect to the compensation of executive officers is to build a strong relationship between the creation of stockholder value and executive compensation, providing incentives to achieve both short

and long-term goals, and providing an overall level of remuneration which is competitive and reflective of performance. With this objective in mind, the compensation committee has designed the company's executive compensation program to (1) be competitive with the compensation policies of other companies of comparable size and complexity; (2) provide significant incentives directly linked to increases in specified measures of stockholder value; and (3) reward superior performance as measured by financial and non-financial factors.

The company's executive compensation program consists of cash payments in the form of salary and annual bonus for performance during the current year and stock-based incentive compensation for performance over the long term. . . .

The following describes in more specific terms the elements of compensation of executive officers for 2003:

*        *        *

### Bonuses

Bonuses are used to reward and compensate the chief executive officer and other executive officers for achieving certain goals set by the compensation committee and to reward superior performance. . . .

### Stock-Based Incentive Compensation

The compensation committee considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the compensation committee, at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

176.    The 2004 Proxy also stated:

## REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit

- 100 -

committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2003.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2003 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
David G. Bradley

177. In 4/05, Sunrise circulated its 2005 Proxy Statement. It sought and secured the election of Aprahamian and T. Klaassen as directors. It also identified the following board committees:

| Director | Audit Committee | Compensation Committee | Nominating and Corporate Governance Committee | Executive Committee |
|---|---|---|---|---|
| Ronald V. Aprahamian | X* | X | X | |
| Craig R. Callen | X | X | | |
| Thomas J. Donohue | X | X* | X | X |
| J. Douglas Holladay | | | X* | X |
| Paul J. Klaassen | | | | X* |

* Chairman.

178.    The 2005 Proxy also stated:

Audit Committee.

The audit committee assists the board of directors in its oversight of our financial statements, our compliance with legal and regulatory requirements, our independent auditor's qualifications and independence and the performance of our internal audit function and internal auditor. Among its responsibilities, the audit committee is directly responsible for the appointment, compensation and oversight of the work of the independent auditor.

Pursuant to the audit committee's charter, all members of the audit committee must meet the independence requirements of the NYSE and the rules of the SEC. Each member of the audit committee must also be financially literate as determined under NYSE rules. The board of directors has determined that each member of the audit committee is independent within the meaning of the requirements of the NYSE's listing standards and the rules of the SEC and is financially literate. At least one member of the audit committee also must have accounting or financial management expertise as determined under NYSE rules.

\*      \*      \*

Compensation Committee.

The duties and responsibilities of the compensation committee are set forth in the compensation committee charter and include, among other duties and responsibilities, reviewing and approving annual base salary and bonus amounts, any long-term incentive compensation, any employment agreements, severance agreements, change in control and similar agreements and any perquisites for executive officers. The compensation committee is also responsible for reviewing and approving special or supplemental benefits for the chief executive officer and the other executive officers and for administering and implementing Sunrise's incentive compensation plans and equity-based plans that are subject to board of directors approval in which directors, the chief executive officer, other executive officers and other employees of Sunrise and its subsidiaries may be participants.

The board of directors has determined that each member of the compensation committee is independent under the rules of the NYSE.

179.    Elsewhere the 2005 Proxy stated:

## REPORT ON EXECUTIVE COMPENSATION

The compensation committee has prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2004.

The compensation committee has been delegated the authority to discharge the board of director's responsibilities relating to compensation for the chief executive officer and other executive officers. The compensation committee's responsibilities include the annual review and approval of base salaries, bonus amounts, long-term incentive compensation, any employment, severance, and change in control agreements (including any amendments, supplements or waivers to these agreements), perquisites, and special or supplemental benefits for the chief executive officer and other executive officers.

The compensation committee has also been delegated the authority to administer and implement Sunrise's incentive compensation plans and equity-based plans that are subject to board of directors approval, including approving option grants and restricted stock or other awards to the chief executive officer, other executive officers and Sunrise employees.

### Compensation of Executive Officers

Sunrise's compensation policies are designed to enable the company to attract, motivate and retain experienced and qualified executives. The committee's key objective with respect to the compensation of executive officers is to build a strong relationship between the creation of stockholder value and executive compensation, providing incentives to achieve both short and long-term goals, and providing an overall level of remuneration which is competitive and reflective of performance. With this objective in mind, the compensation committee has designed the company's executive compensation program to (1) be competitive with the compensation policies of other companies of comparable size and complexity; (2) provide significant incentives directly linked to increases in specified measures of stockholder value; and (3) reward superior performance as measured by financial and non-financial factors.

The company's executive compensation program consists of cash payments in the form of salary and annual bonus for performance during the current year and stock-based incentive compensation for performance over the long term. . .

In setting each of the elements of compensation, the committee considers the total value of the annual compensation for each executive and all

- 103 -

executives as a group. The following describes in more specific terms the elements of compensation of executive officers for 2004:

\*     \*     \*

### Bonuses

Bonuses are typically used to reward and compensate the chief executive officer and other executive officers for achieving certain goals set by the compensation committee and to reward superior performance. For 2004, such goals, which were substantially achieved by the chief executive officer and the other executive officers, included quantitative and qualitative objectives relating to, among other things, the company's earnings, expense control, development pace, growth in revenue under management and team member development. . . .

\*     \*     \*

### Stock-Based Incentive Compensation

The compensation committee considers restricted stock and restricted stock units to be an effective long-term incentive for individuals as it provides them with an opportunity to acquire or increase their proprietary interest in the company and encourages key individuals to continue to serve the company long-term. The full benefit of the restricted stock or restricted stock unit grant is realized upon the appreciation of Sunrise's stock price, providing an incentive for key employees to create value for Sunrise's stockholders through their service to Sunrise. The compensation committee believes that restricted stock and restricted stock units have and will continue to be helpful in attracting and retaining skilled executive personnel.

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. Stock options are granted by the compensation committee at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value to Sunrise's stockholders through appreciation of the stock price.

180.    Elsewhere the 2005 Proxy stated:

## REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility

for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2004.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2004 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
Craig R. Callen

181.  In 4/06, Sunrise circulated its 2006 Proxy Statement to shareholders. It supported and secured the election of Donohue, Holladay and Little as directors.

182.  According to the 2006 Proxy, the Sunrise Board had the following committees:

| Director | Audit Committee | Compensation Committee | Nominating and Corporate Governance Committee | Executive Committee |
|---|---|---|---|---|
| Ronald V. Aprahamian | X* | X | | |
| Craig R. Callen | X | X | | |
| Thomas J. Donohue | X | X* | X | X |
| J. Douglas Holladay | | | X* | X |
| Paul J. Klaassen | | | | X* |
| William G. Little | | | X | |

* Chairman.

183.    Elsewhere the 2006 Proxy stated:

### REPORT ON EXECUTIVE COMPENSATION

The compensation committee has prepared the following report on Sunrise's policies with respect to the compensation of executive officers for 2005.

The compensation committee has been delegated the authority to discharge the board of director's responsibilities relating to compensation for the chief executive officer and other executive officers. The compensation committee's responsibilities include the annual review and approval of base salaries, bonus amounts, long-term incentive compensation, any employment, severance, and change in control agreements (including any amendments, supplements or waivers to these agreements), perquisites, and special or supplemental benefits for the chief executive officer and other executive officers.

The compensation committee has also been delegated the authority to administer and implement Sunrise's incentive compensation plans and equity-based plans that are subject to board of directors approval, including approving option grants and restricted stock or other awards to the chief executive officer, other executive officers and Sunrise employees.

**Compensation of Executive Officers**

Sunrise's compensation policies are designed to enable the company to attract, motivate and retain experienced and qualified executives. The committee's key objective with respect to the compensation of executive officers is to build a strong relationship between the creation of stockholder value and executive compensation, providing incentives to achieve both short and long-term goals, and providing an overall level of remuneration which is competitive and reflective of performance. With this objective in mind, the compensation committee has designed the company's executive compensation program to (1) be competitive with the compensation policies of other companies of comparable size and complexity; (2) provide significant incentives directly linked to increases in specified measures of stockholder value; and (3) reward superior performance as measured by financial and non-financial factors.

The company's executive compensation program consists of cash payments in the form of salary and annual bonus for performance during the current year and stock-based incentive compensation for performance over the long term. . . .

- 106 -

. . . The following describes in more specific terms the elements of compensation of executive officers for 2005:

*       *       *

### Bonuses

Bonuses are typically used to reward and compensate the chief executive officer and other executive officers for achieving certain goals set by the compensation committee and to reward superior performance. For 2005, such goals, which were substantially achieved by the chief executive officer and the other executive officers, included quantitative and qualitative objectives relating to, among other things, the company's earnings, expense control, development pace, growth in revenue under management and team member development. In the first quarter of 2006, all of the executive officers were awarded cash bonuses in connection with the achievement of the goals for 2005 set by the compensation committee and other relevant criteria determined by the compensation committee.

### Stock-Based Incentive Compensation

*       *       *

The compensation committee also considers stock options to be an effective long-term incentive because gains are linked to increases in the stock value, which in turn provides stockholder gains. *Stock options are granted by the compensation committee* at an exercise price equal to the market price of the common stock at the date of the grant. . . . The full benefit of the options is realized upon appreciation of the stock price in future periods, thus providing an incentive to create value for Sunrise's stockholders through appreciation of the stock price.

184.    Elsewhere the 2006 Proxy provided:

### REPORT OF THE AUDIT COMMITTEE

The audit committee oversees Sunrise's financial reporting process on behalf of the board of directors. Management has the primary responsibility for the company's financial statements and reporting process, including its systems of internal controls. In fulfilling its oversight responsibilities, the audit committee has reviewed and discussed with management the audited financial statements in Sunrise's Annual Report on Form 10-K for the year ended December 31, 2005.

The audit committee has also reviewed with the independent auditors, who are responsible for expressing an opinion on the conformity of those

audited financial statements with generally accepted accounting principles, their judgments as to the acceptability of the audited financial statements and such other matters as are required to be discussed with the audit committee under generally accepted auditing standards. In addition, the audit committee has discussed with the independent auditors the auditors' independence from Sunrise and its management, including the matters in the written disclosure received by the audit committee as required by the Independence Standards Board, and considered the compatibility of nonaudit services with the auditors' independence.

In reliance on the reviews and discussions referred to above, the audit committee recommended to the board of directors that the audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2005 for filing with the Securities and Exchange Commission.

Respectfully Submitted,

Ronald V. Aprahamian, Chairman
Thomas J. Donohue
Craig R. Callen

185.    Sunrise's 2000, 2001, 2002 and 2003 Proxy Statements each sought and attained approval of Sunrise stockholders for its 2000-2003 Stock Option Plans. In this regard it stated:

- The board of directors had adopted the subject stock option plan, subject to approval of stockholders at the appropriate (next) annual meeting.

- The principal provisions of each stock option plan was summarized.

- The option exercise prices of options granted under the stock option plan were to be fixed by the stock option compensation committee when the options were granted. However, the per share option exercise price could not be less than the fair market value of Sunrise common stock on the date of grant.

- The purchase price of each share of stock subject to any option granted under the plans was to be fixed by the board and stated in each option agreement. "The Option Price shall be not less than 100 percent of the fair market value of a share of Stock on the date on which the Option is granted (as determined in good faith by the Board)."

- In the event that the stock is publicly traded in an established securities market, "in determining the fair market value of the Stock, the Board shall use the closing price of the Stock on such exchange in such market (the highest

such closing price if there is more than one such exchange or market) on the trading date immediately before the Option is granted."

186.    The statements in Sunrise's Proxy Statements and other SEC filings that stock options may not be granted at less than 100% of fair market value on the dates granted and that the plan was important to the Company because it was structured to ensure that the stock option compensation was tax deductible for the Company were false. The way the plan was actually run, top executives could pick the grant dates for their options – picking a date before the actual grant date to take advantage of a lower price ("backdating") or picking a date just before they knew the Company was about to release positive news which would boost the stock price ("spring-loading"). Thus, options were granted at less than fair market value on the date of the grant or by executives to themselves based on non-public corporate information. As a result, the stock option program exposed Sunrise to large tax liabilities and unrecorded and unreported employee compensation expense that caused its financial statements to be false.

187.    The statement that executives were awarded options at an exercise price which was the fair market value of the stock on the grant date was also false and misleading, as it failed to disclose that award dates were picked to coincide with a low stock price by way of "backdating" or "spring-loading." Furthermore, this statement was materially false and misleading because it failed to disclose that top insiders had authority to pick the grant date, *i.e.*, exercise price of their options in violation of the stock option plans.

188.    The statements were also materially misleading because they failed to disclose that the options were priced at or near the lowest price possible. When an option is priced at an artificially low price, by "backdating" or "spring-loading," those granted options receive

windfall compensation even if performance goals are not met. They were also misleading because the executives' interests are not aligned with shareholders, as options granted with artificially low exercise prices by design are not contingent upon the long-term performance of the Company.

189.    The statements in the Proxy Statements were materially false and misleading because when the Company allowed the top officers to manipulate the exercise price for options, it did not align their interests with the shareholders at all. Nor did it provide them with an incentive to act in the *long-term* best interest of the Company. When options are granted at artificially low prices or just before good corporate news is announced, the Company does not need long-term success for the option holder to prosper. Indeed, they stood to make hundreds of millions if the stock price simply returned to the price it was at before the price decline or moved up as expected on good news they knew was coming, which they took full advantage of.

190.    The statements were also materially false and misleading to the extent that they did not disclose that option grants were backdated or spring-loaded. Furthermore, these statements were false and misleading because the Company failed to disclose that the top officers were permitted to manipulate the option grant process and had picked grant dates that were best for them and hurt the other shareholders.

191.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

192.    The Proxy Statements violated § 14(a) and Rule 14a-9 because they omitted material facts, including the fact that defendants were causing Sunrise to engage in an option backdating scheme, a fact which defendants were aware of and participated in from at least 1997.

193.    In the exercise of reasonable care, the Director Defendants should have known that the Proxy Statements were materially false and misleading.

194.    The misrepresentations and omissions in the Proxy Statements were material to plaintiffs in voting on each Proxy Statement. The Proxy Statements were an essential link in the accomplishment of the continuation of defendants' unlawful stock option manipulation scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies, including approval or ratification of the stock option plans.

195.    Sunrise shareholders were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

### FOURTH CLAIM FOR RELIEF

#### For Violation of §20(a) of the Exchange Act Against Defendants P. Klaassen, T. Klaassen and Sunrise

196.    Plaintiffs incorporate ¶¶1-195 by reference.

197.    Defendants P. Klaassen and T. Klaassen acted as controlling persons of Sunrise within the meaning of §20(a) of the Exchange Act. By reason of their positions with the

Company, and their ownership of Sunrise stock, P. Klaassen and T. Klaassen had the power and authority to cause Sunrise to engage in the wrongful conduct complained of herein. Sunrise controlled all of its officers. By reason of such conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding compensatory and punitive money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure defendants do not participate therein or benefit thereby;

C.     Awarding preliminary and permanent injunctive relief in favor of plaintiffs and the Class against defendants and all persons acting under, in concert with, or for them, including an accounting for and the imposition of a constructive trust and/or an asset freeze on defendants' ill-gotten gains;

D.     Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

E.     Ordering an accounting to force a complete accounting of all the stock options granted to Sunrise executives, the disposition and/or exercise of those options, and proceeds and profits obtained;

F.   Ordering the disgorgement of all stock option proceeds and/or profits obtained by Sunrise executives relating to all options issued pursuant to the polluted stock-option plans and which were improperly backdated;

G.   Ordering that all outstanding unexercised stock options held by defendants be cancelled or rescinded;

H.   Voiding all existing stock option plans, including all options, vested or unvested, which were issued pursuant to such plans;

I.   Ordering the implementation of an increased disclosure mechanism for the transparency of Sunrise's stock option practices, including semi-annual or annual disclosure of all options granted and exercised detailing the grant and exercise prices, dates, etc.;

J.   Ordering that the defendants personally bear their own legal fees in defending any and all claims arising out of these matters, whether asserted by stockholders or the government, and not be indemnified by the corporation or any insurance;

K.   Awarding plaintiffs reasonable costs and attorneys' fees; and

L.   Awarding such equitable, injunctive and/or other relief as the Court may deem just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: January 16, 2007

CUNEO GILBERT & LaDUCA, LLP
JONATHAN W. CUNEO(DC Bar # 939389)
PAMELA GILBERT (DC Bar # 418207)

_____
JONATHAN W. CUNEO

507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-0489 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
MATTHEW P. SIBEN
THOMAS G. WILHELM

_____
WILLIAM S. LERACH

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
NANCY M. JUDA (DC Bar # 445487)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/828-8528 (fax)

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Avenue, NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

SCHWARZWALD & McNAIR LLP
EBEN O. McNAIR IV
616 Penton Media Building
1300 East Ninth Street
Cleveland, OH 44114-1503
Telephone: 216/566-1600
216/566-1814 (fax)

Counsel for Plaintiffs

S:\CptDraft\Securities\cpt Sunrise Senior.doc

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 880 – RETAIL FOOD EMPLOYERS JOINT PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*UFCW Local 880 – Retail Food v. Newmont Mining Corp., et al.*, No. 05-CV-1046-MSK-BNB (D. Colo.)
*Charatz v. Avaya, Inc., et al.*, No. 3:05-cv-02319-MLC-TJB (D.N.J.)
*In re Cooper Companies, Inc. Sec. Litig.*, No. SACV-06-00169-CJC(RNBx) (C.D. Cal.)

07  0102  **FILED**

JAN 1 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SUNRISE SENIOR LIVING

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _12th_ day of _December_, 2006.

By: _Robert W. Gransogh_

Its: Trustee, United Food and Commercial Workers Union Local 880 - Retail Food Employers Joint Pension Fund

SUNRISE SENIOR LIVING

## SCHEDULE A

### SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/16/2005 | 400 | $31.48 |
| 09/19/2005 | 1,000 | $31.64 |
| 09/20/2005 | 800 | $31.45 |
| 09/22/2005 | 800 | $31.46 |
| 09/26/2005 | 400 | $31.98 |
| 09/27/2005 | 800 | $31.99 |
| 09/28/2005 | 400 | $31.97 |
| 10/03/2005 | 400 | $33.79 |
| 10/06/2005 | 1,900 | $31.91 |
| 11/03/2005 | 2,700 | $34.67 |
| 12/08/2005 | 1,100 | $35.05 |

*Opening position of 13,600 shares.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

UNITED FOOD AND COMMERCIAL WORKERS UNION–EMPLOYER PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

See attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Charatz v. Avaya, Inc., et al.*, No. 3:05-cv-02319-MLC-TJB (D.N.J.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SUNRISE SENIOR LIVING

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this /2*TH* day of *December*, 2006.

By: _Robert W. Sauvage_

Its: Trustee, United Food and Commercial Workers Union-Employer Pension Fund

- 2 -

SUNRISE SENIOR LIVING

## SCHEDULE A

## SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/16/2005 | 200 | $31.51 |
| 09/19/2005 | 600 | $31.67 |
| 09/20/2005 | 600 | $31.47 |
| 09/22/2005 | 400 | $31.49 |
| 09/26/2005 | 200 | $32.00 |
| 09/27/2005 | 600 | $32.01 |
| 09/28/2005 | 200 | $32.00 |
| 10/03/2005 | 400 | $33.82 |
| 10/06/2005 | 1,400 | $31.96 |
| 12/08/2005 | 800 | $35.10 |

E 07-102 RBW

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS**

United Food and Commercial Workers Union 880 - Retail Food Employers Joint Pension Fund
& United Food and Commercial Workers Union-Employer Pension Fund, et al.

**DEFENDANTS**

Sunrise Senior Living, Inc., et al.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    Cleveland, OH
(EXCEPT IN U.S. PLAINTIFF CASES)                      88888

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Fairfax Va
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Jonathan W. Cuneo, Esquire
Cuneo Gilbert & LaDuca, LLP
507 C Street, NE
Wash., DC 20002

ATTORNEYS

CASE NUMBER   1:07CV00102

JUDGE: Reggie B. Walton

DECK TYPE: General Civil

DATE STAMP: 01/16/2007

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
◉ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF FOR PLAINTIFF AND ONL**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

◉ **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(11)

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Alleged Violations of the Federal Securities Laws   18 USC § 1350

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☒ ACTION UNDER F.R.C.P. 23    DEMAND $ above $100,000   Check YES only if demanded in complaint    **JURY DEMAND:**    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐  /NO ☒    If yes, please complete related case form.

DATE 1/16/2007    SIGNATURE OF ATTORNEY OF RECORD *Johnson W. Cur*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.