# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUNRISE SENIOR LIVING SECURITIES LITIGATION | ) ) ) ) |
| | |
| This Document Relates to: All Cases | ) ) ) ) |

MASTER FILE
07-CV-00102 (RBW)

**JURY TRIAL**
**DEMANDED**

## CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT OF LEAD PLAINTIFFS OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM AND CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST

**BERMAN DEVALERIO PEASE
  TABACCO BURT & PUCILLO**
Michael J. Pucillo
Jay W. Eng
Esperante Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Phone: (561) 835-9400

*Attorneys for Oklahoma Firefighters
Pension and Retirement System*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
William C. Fredericks
Laura H. Gundersheim
1285 Avenue of the Americas
New York, NY 10019
Phone: (212) 554-1400

*Attorneys for City of Miami General
General Employees' & Sanitation
Employees' Retirement Trust*

*Co-Lead Counsel for Lead Plaintiffs and the Class*

**TABLE OF CONTENTS**

**Pages**

I.  INTRODUCTION ................................................................................................. 1

II. JURISDICTION AND VENUE ........................................................................... 5

III. THE PARTIES .................................................................................................... 6

    A.  LEAD PLAINTIFFS ................................................................................ 6

    B.  DEFENDANTS ........................................................................................ 7

        1.  The Company ............................................................................... 7

        2.  The Individual Defendants ........................................................... 7

IV. CLASS ACTION ALLEGATIONS .................................................................. 10

V.  BACKGROUND FACTS AND THE NATURE OF THE FRAUD AT SUNRISE ........ 12

    A.  THE COMPANY'S GROWTH PLAN AND TRANSITION TO A MANAGEMENT SERVICES COMPANY ........................................................ 13

    B.  SUNRISE'S FRAUDULENT ACCOUNTING AND SUBSEQUENT RESTATEMENT ........................................................ 16

    C.  SUNRISE'S MYRIAD ACCOUNTING VIOLATIONS AND DEFENDANTS' PARTICIPATION AND KNOWLEDGE OF THOSE VIOLATIONS ........................................................ 24

        1.  Sunrise's Fraudulent Manipulation Of Insurance Reserves ...................... 24

        2.  Sunrise's Fraudulent Inflation Of Joint Venture Income .......................... 27

        3.  Sunrise's Fraudulent Recognition Of Revenue From Real Estate Sales ........................................................ 30

        4.  Sunrise's Fraudulent Capitalization Of Expenses And Manipulation Of Earnings ........................................................ 32

        5.  Sunrise's Fraudulent Recording Of Unearned Professional Fees ............ 34

        6.  Sunrise's Improper Accounting For Stock Option Compensation .......... 35

    D.  SUNRISE'S UTTER LACK OF INTERNAL CONTROLS ................................ 37

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .................................................................. 39

    A.    DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS ........................................................................................................... 72

VII.    THE TRUTH ABOUT SUNRISE'S FINANCIAL CONDITION BEGINS TO EMERGE ............................................................................................................... 75

VIII.    ADDITIONAL *SCIENTER* ALLEGATIONS ................................................ 88

    A.    THE COMPANY'S ADMISSIONS AND RECENT ACTIONS ........................ 89

    B.    THE DEFENDANTS' TERMINATION OF WHISTLEBLOWER RUSH ........ 90

    C.    THE DEFENDANTS' PERSONAL ENRICHMENT THROUGH INSIDER SELLING OF SUNRISE SHARES DURING THE CLASS PERIOD ........................................................................................................... 93

    D.    THE DEFENDANTS' SPECIFIC PARTICIPATION IN, AND PERSONAL ENRICHMENT AS A RESULT OF, SUNRISE'S OPTIONS BACKDATING ................................................................................ 97

    E.    THE PERVASIVENESS OF THE FRAUDULENT CONDUCT AND THE NATURE OF THE ACCOUNTING RULES AT ISSUE ........................ 105

IX.    LOSS CAUSATION ................................................................................................ 106

X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR ............................................ 108

XI.    PRESUMPTION OF RELIANCE ............................................................................ 109

XII.    CLAIMS FOR RELIEF ........................................................................................... 110

XIII.    PRAYER FOR RELIEF .......................................................................................... 116

XIV.    JURY TRIAL DEMAND ......................................................................................... 116

Court-appointed Lead Plaintiffs, Oklahoma Firefighters Pension and Retirement System and City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Lead Plaintiffs"), bring this federal securities law class action on behalf of themselves and all other persons or entities, other than Defendants and their affiliates, who purchased or acquired the common stock of Sunrise Senior Living, Inc. ("Sunrise" or the "Company") between February 26, 2004 and July 28, 2006, inclusive (the "Class Period"), and were damaged by the conduct asserted herein. Lead Plaintiffs allege the following facts upon personal knowledge, with respect to their own acts, and, with respect to all other facts, based upon an investigation conducted by their counsel, including evidence obtained from public filings with the United States Securities and Exchange Commission ("SEC") and from various confidential witnesses, including former employees of Sunrise.

## I.      INTRODUCTION

1.        This is a case of egregious accounting fraud covering a multi-year period which forced Sunrise to restate its previously filed financial statements for fiscal years 2003 through 2005 by over $141 million in a Form 10-K filed with the SEC on March 24, 2008 (the "Restatement").[1] A formal SEC investigation into the scandal is ongoing and, based on publicly-filed documents in a Virginia state court wrongful termination action, it appears that at least one former Sunrise senior officer, former Chief Financial Officer ("CFO") Bradley Rush ("Rush"), was fired by the Defendants for his role in actively cooperating with the federal investigation and facilitating the Restatement. Meanwhile, while Sunrise investors saw the value of their shares of Sunrise stock plummet as the truth concerning Defendants' fraudulent accounting finally

---

[1] Sunrise also admitted that its financial statements for the fiscal years from 2000 through the year-end 2002, and quarterly financial statements through the third quarter of 2003, were materially misstated.

emerged, the Individual Defendants cashed in on their fraud by selling thousands of shares of Sunrise stock reaping illegal insider trading proceeds of over $31 million during the Class Period. Tellingly, the vast majority of these insider sales occurred in the six months immediately preceding the Company's initial partial disclosures of the accounting manipulations alleged herein. These same Individual Defendants also pocketed additional millions from improperly "backdated" and "spring loaded" stock option grants, and from unjustified bonus payments based largely on Sunrise's fraudulently inflated profits.

2.      Sunrise is a Delaware company that, throughout the Class Period, claimed to be the foremost assisted living facility provider in the United States. During the Class Period, Sunrise and its senior officers publicly reported financial results that created the false impression that the Company was achieving record earnings, "core" earnings, operating income and revenue growth. As Sunrise reported these financial results, Sunrise's Chief Executive Officer, Paul Klaassen, repeatedly touted the Company's "record" results; for example, during one earnings conference call he boasted that "[w]e have now met or exceeded expectations every quarter for the past six years, and we continue that unbroken streak in the second quarter [of 2005] . . ." The Company's self proclaimed "excellent results" propelled Sunrise's stock price to a high of more than $39.49 per share on March 29, 2006, an increase of more than 109% from the price at which the stock was trading just two years earlier at the start of the Class Period.

3.      However, as the Company has now admitted, its purportedly strong financial results during the Class Period were materially false and the product of various accounting machinations. The Company's fraudulent accounting, *inter alia*, included:

- intentionally manipulating insurance reserves to cover earnings shortfalls;

- improperly recording income from real estate sales and joint venture arrangements;

- improperly capitalizing expenses to inflate reported earnings;

- improperly recognizing revenue from unearned professional fees; and

- improperly accounting for backdated stock option grants.

4.      As a result of Defendants' false statements and fraudulent accounting, Sunrise's common stock traded at artificially inflated prices during the Class Period.  When the truth about the Company's fraud was finally disclosed beginning in May 2006, the price of Sunrise's stock fell sharply from $39 per share to approximately $25 per share.  For example, on May 9, 2006, the day after Sunrise announced that an internal accounting review would require it to delay the issuance of its first quarter 2006 earnings release, the Company's stock fell 17.7% on heavy volume.  Shares fell an additional 5.1% on July 31, 2006, when the Company disclosed that it would be forced to restate its previously reported financial statements for 2003 through 2005.  In addition, the SEC began investigating the Company's accounting practices, insider selling and stock option grants.  Ultimately, the fraud at Sunrise was so massive that it was not until March 24, 2008, nearly two years after the May 9, 2006 announcement, that Sunrise actually completed its Restatement and filed its restated financial statements with the SEC for fiscal years 2003 through 2005.

5.      That Sunrise's false accounting was the product of knowing and intentional fraudulent conduct by senior Sunrise personnel has been substantially corroborated by, *inter alia*, information contained in a state court complaint filed by Sunrise's former CFO Bradley Rush. Rush, who had previously served as Sunrise's Chief Investment Officer, was appointed to replace Defendant Larry Hulse (who was ultimately fired for his involvement in the accounting fraud) as Sunrise's CFO on August 4, 2005.

6.        Almost immediately after his appointment as CFO, beginning in the third-quarter of 2005, Rush discovered numerous "issues and irregularities" with regard to Sunrise's accounting practices.  For example, Rush discovered that the Company had used excess insurance reserves to make up for earnings shortfalls in other areas.  This fraudulent manipulation of earnings by first creating phony reserves and later reversing those reserves in future quarters when needed to meet earnings targets was, according to a former senior Sunrise executive who was at the Company during the Class Period and has direct personal knowledge of the relevant facts, referred to internally at the Company as "harvesting the acorn."  Rush also quickly determined that the historical accounting treatment that Sunrise had given to joint ventures that contained partner preferences, and to sale accounting and the recognition of income from prior sale of real estate assets, was improper and advised senior management and the Board of Directors that the Company's financials would have to be restated.

7.        The Company's senior executives, however, were less than enthusiastic about undertaking a restatement investigation.  For example, in late 2006, while Rush was investigating additional accounting improprieties, senior management attempted to sell the Company so that the Company could be taken private, thereby eliminating the ongoing SEC investigation into the Company's financial accounting and the need to issue restated financials (while simultaneously allowing senior Sunrise management and its directors to cash out their holdings of Sunrise stock at a substantial profit).  During this period, senior management, including Defendant Paul Klaassen (Sunrise's CEO) and Defendant Thomas Newell (Sunrise's President) pressured Rush to "complete the restatement without regard to whether all accounting issues had been correctly resolved so the company could go forward with privatization."  Notwithstanding the pressure placed upon him to wrap up a whitewash investigation, in late 2006, Rush identified an

additional accounting irregularity relating to the Company's capitalization of certain costs and its treatment of its "construction in process" reserves. In the following months, Rush also learned of and reported to senior management additional evidence of fraudulent earnings manipulations at the Company. In particular, Rush determined that the status of projects under construction had been manipulated to "smooth out" Sunrise's quarterly financials.

8.    In December 2007, Sunrise was forced to disclose that an internal investigation into its accounting misstatements (necessitated by the SEC investigation) had determined that Defendants Newell (President since April 2000), Hulse (Chief Financial Officer from April 2000 to August 2005) and Carl Adams (Chief Accounting Officer from 2000 through November 2004), among others, had been involved in "inappropriate accounting" concerning the Company's insurance accruals and reserves over a two year period.

9.    Lead Plaintiffs bring this action seeking to recover damages caused by Sunrise's and the Executive Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5.

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein on behalf of the Class (defined below) arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated by the SEC.

11.    Jurisdiction exists pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

12.    Venue is proper in this district pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the preparation and

dissemination of materially false and misleading information, occurred in substantial part in this District. Sunrise filed false and misleading SEC filings in this District. Sunrise has four communities in operation or under development in Washington, D.C.

13.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

## III.    THE PARTIES

### A.    LEAD PLAINTIFFS

14.    Lead Plaintiff, City of Miami General Employees' & Sanitation Employees' Retirement Trust (the "Miami Retirement Trust"), is a public pension fund established for the benefit of current and retired employees of the City of Miami, Florida. The Miami Retirement Trust provides retirement benefits to thousands of members and their beneficiaries. As set forth in its Certification previously filed with the Court as part of its motion to be appointed lead plaintiff, the Miami Retirement Trust acquired Sunrise publicly traded common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

15.    Lead Plaintiff, Oklahoma Firefighters Pension and Retirement System (the "Oklahoma Firefighters"), is a public pension fund created by the Oklahoma State Legislature. The Oklahoma Fund provides pension benefits to all participating firefighters. As set forth in its Certification previously filed with the Court as part of its motion to be appointed lead plaintiff, Oklahoma Firefighters acquired Sunrise publicly traded common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

B.    **DEFENDANTS**

1.    **The Company**

16.    Defendant Sunrise Senior Living, Inc. ("Sunrise" or the "Company") is a public company incorporated in the State of Delaware with its headquarters located in McLean, Virginia.  Sunrise offers senior living services, including independent living and assisted living care for individuals with Alzheimer's, as well as nursing and rehabilitative care.  Sunrise operates communities in the United States, Canada, Germany, and the United Kingdom.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "SRZ."

2.    **The Individual Defendants**

17.    Defendant Paul J. Klaassen ("Klaassen") is a co-founder of the Company and has served on the Board of Directors of the Company since 1981.  Klaassen has served as Chairman of the Board and Chief Executive Officer ("CEO") of the Company since 1991.  On March 18, 2008, the Board of Directors announced that it had separated the positions of CEO and Chairman of the Board.  Klaassen is currently CEO and remains a director.  Klaassen received at least 700,000 backdated stock options (split-adjusted) and, during the Class Period, he sold at least 600,000 shares of Sunrise common stock that he jointly owned with his wife, resulting in illicit insider selling proceeds of $21,423,500 based on his knowledge of material non-public information concerning Sunrise's improper accounting manipulations and stock option grant practices.

18.    Defendant Teresa M. Klaassen ("T. Klaassen"), Klaassen's wife, is a co-founder of the Company and has served on the Board of Directors of the Company since 1981.  T. Klaassen has served as Chief Cultural Officer of the Company since 2001, and previously served as Secretary from 1981 to 2005 and as Executive Vice President from 1981 to November 2003.

T. Klaassen and her husband sold at least 600,000 of their personally held shares of Sunrise common stock during the Class Period resulting in illicit insider selling proceeds of $21,423,500 based on their knowledge of material non-public information concerning Sunrise's improper accounting manipulations and stock option grant practices.

19.     Defendant Thomas B. Newell ("Newell") served as the Company's President from April 2000 until he was fired for his role in Sunrise's accounting manipulations in December 2007. Previously Newell served as Executive Vice President from May 1996 to April 2000, as President of Sunrise Development, Inc. (the Company's real estate development subsidiary), and as Sunrise's General Counsel from January 1996 to April 2000. From 1989 to January 1996, Newell was a partner at a law firm where his practice concentrated on commercial and real estate development transactions. Newell received at least 900,000 backdated stock options (split-adjusted), and sold at least 215,319 of his personally held shares of Sunrise common stock during the Class Period resulting in illicit insider selling proceeds of $7,898,120 based on his knowledge of material non-public information concerning Sunrise's improper accounting manipulations and stock option grant practices. On December 20, 2007, the Company announced that, based on the results of the Special Committee's investigation related to the Company's accounting Restatement, the Board of Directors was terminating Newell.

20.     Defendant Tiffany L. Tomasso ("Tomasso") has served as the Company's Chief Operating Officer since November 2003. Previously, Tomasso served as Executive Vice President from March 1998 to November 2003, as President of Sunrise Management Services from April 2000 to November 2003, as Senior Vice President from 1994 to 1998, and as a regional vice president from 1993 to 1994. Tomasso received at least 790,000 backdated stock options (split-adjusted).

21.       Defendant Larry E. Hulse ("Hulse") served as the chief executive officer of Sunrise's insurance captive subsidiary from August 2005 until he was fired for his role in Sunrise's accounting manipulations in December 2007. Previously, Hulse had served as the Company's Chief Financial Officer and Senior Vice President from April 2000 to 2005, and as its Chief Accounting Officer from 1995 to March 2000. Hulse previously served as a partner at Ernst & Young and is a certified public accountant. Hulse received at least 307,444 backdated stock options (split-adjusted), and sold at least 36,973 of his personally held shares of Sunrise common stock during the Class Period for illicit insider selling proceeds of $2,209,706 based on his knowledge of material non-public information concerning Sunrise's improper accounting manipulations and stock option grant practices. On December 20, 2007, the Company announced that, based on the results of the Special Committee's investigation related to the Company's accounting Restatement, the Board of Directors was terminating Hulse.

22.       Defendant Carl G. Adams ("Adams") has served as Senior Vice President and Treasurer from December 2005 until he was fired for his role in Sunrise's accounting manipulations in December 2007. Previously, Adams served as Senior Vice President of Sunrise Capital Group from November 2004 to December 2005, and as Sunrise's Chief Accounting Officer from May 2000 to November 2004. On December 20, 2007, the Company announced that, based on the results of the Special Committee's investigation related to the Company's accounting Restatement, the Board of Directors was terminating Adams.

23.       Defendant J. Barron Anschutz ("Anschutz") served as Sunrise's Chief Accounting Officer from November 2004 through April 2006. Previously, Anschutz was a senior manager at Ernst & Young and is a certified public accountant. Anschutz sold at least 5,926 of his personally held shares of Sunrise common stock during the Class Period reaping illicit insider

selling proceeds of $194,766 based on his knowledge of material non-public information concerning Sunrise's improper accounting manipulations and stock option grant practices.

24.    Defendant Kenneth J. Abod ("Abod") served as Senior Vice President and Treasurer of Sunrise from 2001 until he was told to leave the Company in 2005. Previously, Abod served as Chief Financial Officer of Sunrise's Management Services Division from 2000 to 2001, and as Sunrise's controller from 1996 to 2000. According to former CFO Rush's state court complaint, Rush terminated Abod because of his suspected involvement in improperly "manipulating accounting figures" at the Company. Abod is a certified public accountant.

25.    Defendants Klaassen, T. Klaassen, Newell, Tomasso, Hulse, Adams, Anschutz and Abod are referred to herein as the "Individual Defendants."

26.    As officers and controlling persons of a publicly-held company, registered with the SEC and traded on the NYSE, the Individual Defendants each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition, liabilities, interests, earnings and present and future business prospects, and to correct any previously issued statements that were erroneous.

27.    The Individual Defendants, because of their positions as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public filings, press releases and other Company statements as detailed herein and is personally liable for the misrepresentations and omissions contained therein.

## IV.    CLASS ACTION ALLEGATIONS

28.    Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired the

common stock of Sunrise between February 26, 2004 and July 28, 2006, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder of all members is impracticable.  Disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, Sunrise's common stock was actively traded on the NYSE, in an active and efficient market.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Sunrise or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  The number of shares of Sunrise common stock outstanding as of March 10, 2006 was 50,332,098.

30.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of the federal securities law as complained of herein.

31.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.    There is a well-defined commonality of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class predominate over questions that may affect individual Class members, including:

(a)     Whether Defendants violated the federal securities laws;

(b)     Whether Defendants misrepresented material facts concerning Sunrise;

(c)     Whether Defendants' public statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether certain of the Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether certain of the Defendants engaged in a fraudulent course of conduct;

(f)     Whether Sunrise's SEC filings issued during the Class Period which contained financial information contained untrue or materially misleading statements;

(g)     Whether the prices of Sunrise's publicly traded securities were artificially inflated; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     BACKGROUND FACTS AND THE NATURE OF THE FRAUD AT SUNRISE

34.     Sunrise was founded in 1981 by Defendants Klaassen and T. Klaassen, and conducted its initial public offering in 1996.  Sunrise provides residential and other services to

retirees and elderly persons through facilities it develops and constructs and then manages, often through joint ventures.  Traditionally, the assisted-living business has been viewed as both a real estate business and a healthcare services business.  Sunrise followed this traditional model in its earlier years.  However, this model has significant limitations in that the Company's capital can be tied up in its real estate properties, thereby limiting the Company's ability to grow aggressively.

## A.    THE COMPANY'S GROWTH PLAN AND TRANSITION TO A MANAGEMENT SERVICES COMPANY

35.    At the beginning of 2000, Sunrise reorganized into two major operating divisions, Sunrise Properties and Sunrise Management Services.  Sunrise Properties is responsible for all Sunrise real estate operations, including development, construction, project financing, permanent financing, and real estate sales.  Sunrise Management Services provides full-service assisted living management services, in the U.S. and internationally, for all communities owned or managed by Sunrise.  Sunrise Management Services division also provides management and consulting services to third parties on market and site selection, pre-opening sales and marketing, start up training, and management services for properties under development and construction. The purpose of this division was to accelerate the transformation of the Company from a real estate/healthcare services company to a management services company, which would permit the Company as a whole to grow more rapidly.

36.    In a January 3, 2006 report, an analyst from Citigroup commented that the benefit of the "'management' model is that it is less capital intensive than an ownership model, provides a higher degree of revenue and earnings stability and reduce[s] the risk profile of the business." The Citigroup analyst stated that the "management model has minimal capital requirements,

which has allowed Sunrise to materially accelerate new development in recent years and maintain a strong balance sheet."

37.    From 2000 through the end of the Class Period, Sunrise pursued an aggressive growth strategy and expansion program, quickly amassing more than 420 senior living communities in 37 states, the District of Columbia, Canada, the United Kingdom and Germany with a combined resident capacity of more than 52,000.  In furtherance of its growth strategy, Sunrise also had over 46 communities under construction as of the end of 2006.

38.    Sunrise generates income in four different ways: (i) before a community is opened, Sunrise generates fees by providing pre-opening services, including feasibility studies, site selection, architectural and interior design services, zoning, permitting, construction and project management, staffing, training; sales and marketing; (ii) after a community is opened, Sunrise earns management fees from the long-term management contracts in place; (iii) during the years of long-term management, the Company generates returns through its percentage ownership in these communities and from the incentives that it receives when those ventures exceed performance thresholds; and (iv) by selling real estate holdings, often to joint venture partners.  According to Sunrise's then-President, Defendant Newell, this business model allowed the Company to maintain and increase its pace of development of new, purpose-built communities, and freed the Company from having to make acquisitions for growth.

39.    To assess the success of the Company's transformation to management services company, Sunrise's management and the investment community focused on the income and revenues the Company was generating on a recurring basis (exclusive of "one-time" or non-recurring revenue or cost items, such as gains or losses from the sale of a property).  Thus, Sunrise reported certain non-GAAP metrics, which it referred to as "core earnings" and

"revenues under management," which purported to provide a significant measure how the Company's business was performing.

40.     During the period at Sunrise when the Company was transitioning to more of a management services company, the investment community and financial analysts closely scrutinized Sunrise's operating earnings, operating revenue, "core earnings" and "revenues under management" instead of its net income, which would include one-time events. For example, in a February 27, 2004 report, Legg Mason stated that "[w]e value Sunrise as a multiple of *operating EPS.*" (Emphasis added).

41.     Sunrise's reporting of "core earnings" was intended to provide the investing community with a metric to assess the performance and profitability of the Company's management services business. For example, during the Class Period, Sunrise stated that it "believe[d] earnings per share excluding income from property sales and transition expenses is a helpful measure in understanding its operating results in light of the Company's management services transformation and the non-recurring nature of the transition expenses." Sunrise also stated that "[m]anagement does not believe that transition costs associated with acquisitions are indicative of the profitability of Sunrise's continuing operations and therefore excludes these costs to assist investors in evaluating the company's ongoing performance. In addition, management believes the exclusion of non-recurring and unusual items is useful to investors in assessing the past and future performance of the company's ongoing operations."

42.     Like core earnings, Sunrise also reported "revenues under management" to the investing community as an important measure of the Company's success in growing its management services business. Sunrise stated that "[r]evenues under management include revenues generated by Sunrise's consolidated communities, communities owned in joint ventures

and communities owned by third parties that are managed by Sunrise." The Company also noted that it "believes that revenues under management is an important measure in evaluating the Company's financial performance."

43.     Both prior to and during the Class Period, Sunrise publicly reported financial results, including operating earnings and operating revenue, that created the false impression that its business model was working well, that the Company was rapidly growing, and that it was successfully developing and operating highly profitable senior living facilities throughout the United States and Europe. Indeed, for the years ended 2000 through 2005, Sunrise originally reported net income of $24.3 million, $49.1 million, $54.7 million, $62.2 million, $50.7 million, and $79.7 million – *a compound annual growth rate of almost 27%*. During this same period, Sunrise's reported operating revenue more than quintupled, increasing from $344.8 million in 2000 to $1.819 billion in 2005 – *a compound annual growth rate of almost 39%*.

44.     Fueled by these purportedly strong financial results, the price of Sunrise stock increased dramatically during the Class Period, from $18.91 (split adjusted) on February 26, 2004 to $39.49 on March 29, 2006 – an increase of more than 109%.

45.     Sunrise's purported financial performance also enabled the Company to attract joint venture partners to develop and build residential communities. This was critical to Sunrise because, as discussed more fully below, it could not fund its own development pipeline with its own internally-generated cash flow.

   **B.     SUNRISE'S FRAUDULENT ACCOUNTING AND SUBSEQUENT RESTATEMENT**

46.     In sum, by all outward appearances during the Class Period, Sunrise was performing extremely well – the Company was growing its portfolio of properties and reporting

ever-increasing operating revenue and income. However, as was ultimately revealed, the Company's purportedly strong financial results were a sham.

47.    In reality, throughout the Class Period, Sunrise engaged in a host of accounting improprieties designed to create the false impression that the Company was strong, healthy and profitable. The Company has now acknowledged that the financial results it publicly reported for fiscal-year 2000 through fiscal year 2005 – *6 full years, or 24 consecutive quarters* – were materially false and misleading and violated GAAP. The Company has also acknowledged that these accounting improprieties impacted multiple areas of the Company's financial statements, and that Sunrise violated basic and longstanding accounting rules to report, *inter alia*, phantom income and revenue before it was earned.

48.    Similarly, Sunrise has now admitted that it overstated shareholders' equity from as early as 1996 through and including the end of fiscal year 2005. Of particular relevance here, the Restatement reduced shareholders' equity by $101.082 million for all prior periods up to January 1, 2004 – essentially wiping out all of the Company's reported net income for both fiscal years 2001 and 2002 – and reduced shareholder equity by a further $153.8 million (or 29.38%) in 2004 and $140.3 million (or 22.17%) in 2005.

49.    The Restatement also reduced previously reported operating income for fiscal years 2003 through 2005 by $130.176 million (from $156.589 million to $26.413 million), *a reduction of nearly 83%*, and operating revenue for fiscal years 2003 through 2005 by $687 million (from $4.362 billion to $3.775 billion), a reduction of nearly 14%.

50.    As set forth in the tables below, these overstatements of GAAP operating income rendered the overwhelming majority of the Company's reported income between 2003 and 2005 fictitious:

17

**Restatement Impact to Operating Income**
**(in thousands)**

|  | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|
| Operating Income As Originally Reported | $23,809 | $35,615 | $97,165 |
| ***Amount By Which Operating Income Was Overstated*** | ***($29,025)*** | ***($45,249)*** | ***($55,902)*** |
| Restated Operating Income | ($5,216) | ($9,634) | $41,263 |
| Overstatement As A Percentage Of Original Operating Income | 121.9% | 127.0% | 57.5% |

51.    Likewise, Sunrise overstated GAAP operating revenue during the Class Period:

**Restatement Impact to Operating Revenue**
**(in thousands)**

|  | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|
| Operating Revenue As Originally Reported | $1,096,260 | $1,446,471 | $1,819,479 |
| ***Amount By Which Operating Revenue Was Overstated*** | ***($97,977)*** | ***($178,831)*** | ***($310,041)*** |
| Restated Operating Revenue | $998,283 | $1,267,640 | $1,509,438 |
| Overstatement As A Percentage Of Original Operating Revenue | 8.94% | 12.36% | 17.04% |

52.    Based on the Company's Restatement, Sunrise also materially overstated its reported "core" earnings by as much as 114% during the Class Period:

**Core Earnings Per Share**
**(in thousands)**

|  | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|
| Original Core EPS | $1.00 | $1.62 | $1.00 |
| ***Decrease In Income From Operations Due To Restatement*** | ***($29,025)*** | ***($4,078)*** | ***($55,902)*** |
| Number Of Diluted Shares Outstanding | 25,374 | 24,629 | 50,385 |
| ***Increase (Decrease) To Core EPS*** | ***($1.14)*** | ***($0.17)*** | ***($1.11)*** |
| Restatement Adjusted Core EPS | ($0.14) | $1.45 | ($0.11) |
| % Of Change From Original Core To Adjusted Core | -114% | -10% | -111% |

18

53.    Sunrise also overstated "core earnings" for the 2005 quarterly periods as set forth in the chart below (Sunrise's Restatement did not restate previously reported financials on a quarter-by-quarter basis other than for 2005):

**Core Earnings Per Share**
**(in thousands)**

|  | Q1 2005 | Q2 2005 | Q3 2005 | Q4 2005 |
|---|---|---|---|---|
| Original Core EPS | $0.37 | $0.46 | $0.26 | $0.33 |
| ***Decrease In Income From Operations Due To Restatement)*** | ***($13,194)*** | ***($14,721)*** | ***($15,338)*** | ***($12,649)*** |
| Number Of Diluted Shares Outstanding | 24,789 | 24,978 | 50,529 | 50,980 |
| ***Increase (Decrease) To Core EPS*** | ***($0.53)*** | ***($0.59)*** | ***($0.30)*** | ***($0.25)*** |
| Adjusted Core EPS | ($0.16) | ($0.13) | ($0.04) | $0.08 |
| % Change From Original Core To Adjusted Core | -144% | -128% | -117% | -75% |

54.    The manipulation of the Company's "core" earnings, as graphically represented below, allowed the Company to present a wholly false picture of strong and steady earning over the Class Period:



55.    Similarly, Sunrise materially overstated its non-GAAP metric of "revenues under management" during the Class Period:

**Revenues Under Management**
**(in thousands)**

|  | FY 2003 | FY 2004 | FY 2005 |
|---|---|---|---|
| Revenues Under Management (Originally Stated) | $1,383,000 | $1,782,300 | $2,019,700 |
| Reduction To Revenues Under Management Based On Restatement | ($97,977) | ($178,831) | ($393,077) |
| Percentage Reduction To Revenues Under Management Due To Restatement | -7.08% | -10.03% | -19.46% |

56.    Sunrise also overstated revenues under management during the 2005 quarterly periods set forth in the chart below (Sunrise's Restatement did not restate previously reported financials on a quarter-by-quarter basis other than for 2005):

**Revenues Under Management**
**(in thousands)**

|  | Q1 2005 | Q2 2005 | Q3 2005 | Q4 2005 |
|---|---|---|---|---|
| Revenues Under Management (Originally Stated) | $467,000 | $482,200 | $540,800 | $529,700 |
| Reduction To Revenues Under Management Based On Restatement | ($63,023) | ($70,623) | ($84,317) | ($176,280) |
| Percentage Reduction To Revenue Under Management Due To Restatement | -13.50% | -14.65% | -15.59% | -33.28% |

57.    The manipulation of the Company's revenues under management, as graphically represented below, also similarly allowed the Company to present a false picture of strong and steady growth in earnings over the Class Period:



58.     The accounting manipulations at Sunrise did not occur by happenstance or as a result of negligence by the Company's senior management.   Instead, these accounting manipulations were knowingly directed and executed by the Individual Defendants.

59.     Indeed, Sunrise formed a Special Committee in or about December 2006 to conduct an internal investigation of its accounting improprieties and allegations of insider trading and stock option backdating.   While that investigation was clearly designed to minimize the improprieties that had occurred, even the admissions made by the Special Committee are striking.   For example, the Special Committee specifically found that *"inappropriate accounting" occurred for more than two years – from the third quarter of 2003 through the fourth quarter of 2005 – in the Company's insurance accruals and reserves, resulting in material misstatements to the Company's financial statements.*   The Special Committee also made clear that the individuals responsible for the "inappropriate accounting" were Defendants Newell, Hulse and Adams – who were ultimately fired by Sunrise in December 2007.   In other words, the Special Committee determined that Sunrise's senior management committed fraud.

60.     Lead Plaintiffs' counsel's investigation has similarly confirmed that senior Sunrise management was actively involved in manipulating numbers and had established an environment in which employees were pressured to "cook the books."

61.     For example, according to CW-1,[2] a former payroll manager and purchasing manager at Sunrise from 2001 through 2005, Defendant Hulse was known to break accepted accounting practices.   For example, in late 2003 or the beginning of 2004, it became common knowledge at the Company that the then-Controller, Jack Fritsche – at the direction of Defendant

---

[2] References to "CW-__" are to confidential witnesses interviewed in the course of Lead Plaintiffs' counsel's investigation.

Hulse – had manipulated earnings.  When it came out at the Company that the posted earnings were not correct and might have to be restated, CW-1 stated that Fritsche was forced to "take the fall" for Defendant Hulse.  Fritsche claimed that he was following Defendant Hulse's instructions and that he had been doing it that way for years.  Although Fritsche was fired, Defendant Hulse remained employed by the Company until December 2007 – when he too was fired in the wake of the Special Committee investigation.

62.      CW-2, a formerly senior executive at Sunrise from 2001 through 2004 who reported directly to Defendant Tomasso, also described intense pressure from senior management to inflate financial numbers at the Company.  CW-2 advised, "When things were not going well, you would get the hell beat out of you."  Moreover, if the numbers did not change, in the way dictated by the Individual Defendants, Defendant Tomasso would "get on" this witness immediately.  As a result, CW-2 stated that "as time passed, I began to feel like senior management was a bunch of crooks."

63.      CW-3, a former senior manager at Sunrise from 2003 through mid-2005, also described intentional accounting manipulating by senior management at Sunrise.  Specifically, CW-3 was present at various meetings with regional managers and vice presidents where "there was considerable fudging of numbers and meeting minutes" in order to incorrectly portray Sunrise as a very stable company that was growing.  For example, according to CW-3, Sunrise frequently billed tenants for things that they should not have been billed for.  As a result, CW-3's facility was "giving out credits left and right which were not accounted for."  According to CW-3, as a result of these credits, among other things, you "couldn't trust any financial reports that came out."  CW-3 consistently brought errors in the financial reports to the controller, and explained to that person that Sunrise was incorrectly billing and accounting for expenses, but no

changes were made.  Indeed, CW-3 stated that it was understood that corporate headquarters

"messed with numbers all of the time," and this witness expected that, when the financial

problems at Sunrise finally came to light, Sunrise "would be screwed."  Indeed, according to

CW-3, Sunrise's management "thought Sarbanes Oxley was the biggest joke in the world," and

"they thought it was a joke that they had to take minutes [of meetings]."

      **C.**    **SUNRISE'S MYRIAD ACCOUNTING VIOLATIONS AND
DEFENDANTS' PARTICIPATION AND KNOWLEDGE OF THOSE
VIOLATIONS**

64.      The Restatement acknowledges that during the Class Period, the Company's

artificial inflation of income was pervasive, spanning over a wide array of accounting issues.

The chart below breaks down by category the amounts of the various Restatement items that

Sunrise has admitted were falsely reported:

### SUMMARY OF RESTATEMENT
#### (in thousands)

| | FY 2003 | FY 2004 | FY 2005 | Total | % of Total Restatement |
|---|---|---|---|---|---|
| Insurance Reserves and "Other" Adjustments | ($8,369) | ($12,731) | ($11,645) | ($32,745) | 23.2% |
| Real Estate Sales | ($57,942) | ($57,259) | $48,893 | ($66,308) | 47.0% |
| Equity Method Investments with Preferences (Joint Venture) | ($4,016) | ($4,112) | ($4,024) | ($12,152) | 8.6% |
| Cost of Real Estate Project | ($2,197) | ($5,036) | ($2,336) | ($9,569) | 6.8% |
| Stock Based Compensation | ($4,224) | ($688) | ($2,255) | ($7,167) | 5.1% |
| Greystone Revenue Recognition (Professional Fees) | $0 | $0 | ($13,034) | ($13,034) | 9.3% |
| Total Adjustments Pre-tax | ($76,748) | ($79,826) | $15,599 | ($140,975) | 100% |

      **1.**    **Sunrise's Fraudulent Manipulation Of Insurance Reserves**

65.      Sunrise fraudulently used excess insurance reserves to make up for earnings

shortfalls in other areas.  Specifically, without disclosing that the Company was "making its

numbers" by converting excess reserves into income, Sunrise used its reserve accounts in order

to smooth out reported earnings by drawing upon "cookie jar" reserves in periods of lower than expected earnings, resulting in false financial statements.

66.     The creation and use of reserve accounts based upon management estimates must follow specific accounting guidelines provided by GAAP.  AU Section 342, *Auditing Accounting Estimates* (1989) states "[m]anagement is responsible for making the accounting estimates included in the financial statements."  To that end, AU Section 342 requires management to: (a) identify[] situations for which accounting estimates are required; (b) identify[] the relevant factors that may affect the accounting estimates; (c) accumulate relevant, sufficient, and reliable data on which to base the estimate; (d) develop assumptions that represent management's judgment of the most likely circumstances and events with respect to the relevant factors; (e) determine the estimated amount based on the assumptions and other relevant factors; and (f) determine that the accounting estimates is presented in conformity with applicable accounting principles and that disclosure is adequate."  Thus, under AU Section 342, the creation of phony reserves is improper in the first place, and when Sunrise management "discovered" the excess insurance reserves it should have immediately recognized all of the excess reserve and disclosed the amount in the Company's financial statements.  According to the Restatement, during the Class Period the manipulation of Sunrise's insurance reserves (combined with "other" adjustments), inflated Sunrise's reported income by $32.7 million, accounting for 23% of the overstatement of income during the Class Period.

67.     As discussed above, the Company has admitted that certain of the Individual Defendants were directly responsible for Sunrise's manipulation of its insurance reserves by stating in December 2007 that Defendants Newell, Hulse and Adams "had substantial

involvement in, or direct supervisory responsibility for the Company's insurance accruals and reserves" and subsequently firing them as a result of the Special Committee investigation.

68.      Similarly, CW-4, a former senior accountant at Sunrise between 2000 and 2001 who had responsibility for ensuring that insurance premiums were paid, confirmed that Sunrise's senior management was involved in insurance reserve manipulations.  CW-4 explained that Sunrise used Marsh & Marsh insurance for its employees.  Sunrise had to reserve both for premiums and for any claims that could arise.  On at least one occasion, however, this witness observed a journal entry that removed some of the insurance reserve dollars after the accounting review was complete for the reporting period.  CW-4 stated that this entry was made at the direction of Jack Fritsche, the Company's controller who reported to Defendant Adams.  Because CW-4 found this post-closing accounting adjustment to be highly questionable, CW-4 confronted her superior, Jack Fritsche.  Fritsche, however, refused to explain why such a large amount had been removed from the insurance reserve, and told CW-4 to mind his/her own business.  As a result of this entry, CW-4 stated that Sunrise had improper financial statements.

69.      Likewise, according to a former senior Sunrise executive who was at the Company during the Class Period and has direct personal knowledge of the relevant facts, in the third-quarter of 2005, Defendant Tomasso ordered the Company's then-CFO to "harvest the acorn" – or in common parlance, to reverse a portion of Sunrise's health insurance reserves (approximately $2 million) into income in order to make up for an earnings shortfall that Sunrise was experiencing as a result of problems with its Fox Hill venture.  Defendant Tomasso was sufficiently brazen that she brought the then-CFO a golden acorn statuette to emphasize her request that the then-CFO "harvest the acorn."

##### 2.    Sunrise's Fraudulent Inflation Of Joint Venture Income

70.    As noted earlier, during the early part of the Class Period Sunrise's limited access to the capital necessary to fund its expansion program limited its ability to get new projects off the ground.  As a result, it was forced to pursue various strategies, including utilizing joint venture arrangements with third parties, to raise the necessary capital.  At Sunrise, joint ventures were typically structured so that Sunrise owned 20% and other investors owned 80% of each project.  In 2006, approximately 15% of Sunrise's communities were held by joint ventures that contained such preferences.

71.    At the same time, it was critical during this expansionary – and capital intensive – phase of its business that Sunrise appear to be achieving strong earnings.  However, because Sunrise's business model was not yet proven, and its facilities normally suffered losses during their start-up and early operation phases, Sunrise could not attract joint venture partners unless it gave those partners preferential distributions from the operations of the joint ventures.  Similarly, in order to sell certain of its real estate holdings or facilities it was necessary for Sunrise to provide financial guarantees and preferences to entice joint venture partners into financing the sale.  Those preferences included cash flow preferences and preferential distributions on return of capital in the event of a refinancing or sale of the joint venture's properties.

72.    This joint venture structure created a problem for Sunrise.  It could not obtain the capital it needed through the joint venture arrangements, or sell real estate assets or complete facilities, without providing these preferential distribution and guarantee arrangements.  However, under FASB Statement of Financial Accounting Standards ("SFAS") No. 66, *Accounting for Sales of Real Estate* (1982), if Sunrise structured its joint ventures with such preferential guarantees and distributions to its partners, Sunrise, as the managing entity in the joint venture, was required to absorb ***100%*** of the early period or start-up losses of the new

facilities, rather than just its 20% share, and was only allowed to recoup those early period losses in a later period after the joint venture's facility was operating successfully and profitably, and/or was sold. Moreover, under GAAP, Sunrise could not record profits on sales of facilities if it provided financial guarantees, such as an income guarantee, in connection with the sale. Accounting for its joint venture operations or real estate sales properly – in accordance with GAAP and principles of fair presentation – would have negatively impacted Sunrise's reported income, depriving it of real estate sales profits, while requiring it to recognize millions and millions of dollars of current period losses from joint venture operations. This would prevent Sunrise from showing the kind of strong profitable growth which was indispensable for the success of its business plan, and necessary to allow the Individual Defendants to personally profit from large annual bonuses and large sales of their Sunrise stock at artificially inflated prices.

73.        Thus, to achieve the ends they desired, Sunrise and the other defendants cheated. Instead of following the appropriate, required – and basic – SFAS No. 66, Sunrise's top managers fraudulently accounted for Sunrise's joint venture projects by acting as if its joint venture projects had no preference or guarantees. This manipulation had an enormous fraudulent impact on Sunrise's reported earnings. For instance, in a joint venture in which Sunrise had a 20% interest and its partner an 80% interest, and where the venture suffered $1 million in losses during its start-up and early operations phase, GAAP required Sunrise to recognize 100% of these losses, or $1 million. However, by acting as if the joint venture did not have a distribution preference, Sunrise falsely reported losses of only $200,000 on such arrangement. As a result of such machinations and fraudulent accounting on joint venture projects, Sunrise overstated its reported income by $12.1 million during the Class Period.

74.     The Individual Defendants were well aware that Sunrise's accounting for its joint venture projects was improper.  According to CW-4, who also was responsible for reviewing accounting for Sunrise's managed services, senior Sunrise management – including specifically Defendant Adams – were responsible for this inflation of joint venture income.  CW-4 stated that the Company accounted for joint ventures in an *ad hoc* manner that resulted in false accounting. According to CW-4, "people would sit around the table every quarter and say 'OK, how are we going to do the accounting for these.'"  Indeed, CW-4 was present at a meeting with Defendant Adams (also attended by Jack Fritsche, the Controller and Martha Houck the assistant Controller) where they discussed the booking of one of these joint venture agreements.  CW-4 stated it was apparent from that meeting that Defendant Adams was not properly accounting for the income from joint ventures.

75.     Similarly, CW-5, a former senior regional business manager and controller at Sunrise through late 2003 with responsibility for monthly financial statements and who left Sunrise primarily because this witness disagreed with the Company's questionable business practices, confirmed that Sunrise improperly accrued accounts receivable from its joint ventures. According to CW-5, Sunrise accrued expected revenue from its joint ventures for each month to make their bottom line look better, even though the Company never knew how much money it was going to actually receive.

76.     In fact, Sunrise's fraudulent accounting for its joint venture income was so blatantly improper that CW-6, a manager at Sunrise headquarters from 2001 to 2003 who attended staff meetings at the Company's headquarters at which joint venture arrangements were discussed, believed that at least some of the joint venture deals and management contracts that

Sunrise entered into were designed with the intent of overstating Sunrise's actual joint venture income.

### 3.    Sunrise's Fraudulent Recognition Of Revenue From Real Estate Sales

77.    Sunrise also improperly recorded revenue from real estate sales before the revenue was actually earned.  As part of its joint ventures, Sunrise typically extended three to five year guarantees and commitments to its capital partners and lenders as part of its joint venture sales agreements.  Under proper real estate accounting principles and SFAS No. 66, Sunrise should have recognized any gain on the sale of its interests in these joint ventures only *after* such guarantees and commitments had expired, or ratably as they expired.  Instead of following this simple and well established GAAP rule, Sunrise prematurely recognized gains on the sale of at least 14 different joint ventures up front on receipt of the sales agreement – often months or years before the guarantees and commitments expired.

78.    Sunrise also provided uncapped guarantees to support operations of certain ventures.  Under SFAS No. 66, when guarantees are for an *extended* period of time (as was the case with at least four of Sunrise's properties), a company is required to keep the property on its books, net of any cash proceeds received from the buyer.  When the guarantees are for a *limited* period of time (as was the case with at least eight of Sunrise's properties), SFAS No. 66 requires the recognition of profit based on performance of services (*i.e.* when there was a reasonable assurance that future rent receipts would cover operating expenses).  Here, Sunrise disregarded SFAS No. 66 and recorded income from the real estate sale without any reduction to account for its uncapped guarantees.

79.    Similarly, on numerous occasions, Sunrise provided joint venture partners with "preferences."  These "preferences" gave joint venture partners the right to receive income distributions from real estate sales before Sunrise.  SFAS No. 66 provides that when preferences

exist, a company cannot record real estate sales income until sales proceeds exceed costs related to the entire property. In direct violation of this GAAP principle, Sunrise recorded income from such real estate sales without regard to such preferences.

80.     Finally, Sunrise improperly recognized income from real estate sales without regard to the significant liability costs they would continue to incur as a result of the Company's continuing involvement in the properties as property managers. Specifically, on a number of occasions, in violation of SFAS No. 66, Sunrise failed to deduct from these real estate sales the costs associated with their continuing development obligations.

81.     The Individual Defendants' fraudulent recognition of revenue from real estate sales caused Sunrise to overstate the Company's reported income by $66.3 million during the Class Period.

82.     Sunrise's fraudulent recognition of revenue from real estate sales was well-known within the Company and, in fact, was orchestrated by the Company's senior management. For example, CW-7, a former accounting manager at Sunrise headquarters from 2001 to 2006 who handled the books and accounting for joint ventures, was not surprised by the recent problems at Sunrise because it was clear to this witness that the Company was overstating profits through improper accounting for real estate sales, and that the "corporate heads" were the individuals responsible for that practice.

83.     Similarly, according to CW-8, an accounting manager at Sunrise headquarters from 2004 through 2007 who handled the allocation of expenses related to various programs at the joint venture communities, stated that nothing at Sunrise including sales and acquisitions was properly planned out. According to CW-8, costs were not properly accrued, often there was no information from which to determine where costs and expenses originated from, and allocations

for expenses were not timely.  According to CW-8, because costs were not expensed correctly, Sunrise's earnings were overstated.

> **4.    Sunrise's Fraudulent Capitalization Of Expenses And Manipulation Of Earnings**

84.    According to Sunrise's former CFO Bradley Rush, Sunrise also fraudulently manipulated the status of projects under construction in order to "smooth out" its quarterly financials.  Specifically, Sunrise fraudulently handled its capitalization of certain costs and its treatment of its "construction in process" reserves taken against those capitalized amounts. Historically, Sunrise experienced a loss of approximately $6 million per year on projects under development (referred to as "construction in process") that were terminated before completion. In violation of FASB Statement of Financial Accounting Concept No. 6, *Elements of Financial Statements* (1985) ("FASB Concept No. 6"), Sunrise maintained a reserve account for these losses, and used that reserve to offset such losses instead of recording the losses when they occurred.  In accordance with FASB Concept No. 6, Sunrise should have recognized its actual losses on construction in process *as those losses occurred*.  Instead, Sunrise improperly reduced its reserve of $6 million by approximately $500,000 each month.  By artificially smoothing reported losses on individual projects under construction based on a historically based reserve figure, rather than on actual losses incurred, Sunrise was able to recognize a stable amount of loss on construction in process each month.  According to Rush, Sunrise's former Treasurer, Defendant Abod, had been personally involved in this "fraudulent earnings management."  These manipulations allowed Sunrise to avoid the recognition of sudden large losses in particular quarters, and to maintain the appearance of stable, steady income.  Compounding this fraud, Sunrise then improperly capitalized certain amounts relating to construction in process in an effort to artificially reduce the Company's reported general and administrative expenses.

85.     In addition, instead of only capitalizing those costs permitted by GAAP, Sunrise improperly capitalized *all* costs incurred for projects under development.  Similarly, Sunrise capitalized certain indirect costs to active projects where such costs were ***not*** clearly related to those projects.  GAAP clearly delineates what types of expenses a company is allowed to capitalize.  In accordance with FASB Statement No. 67, *Accounting for Costs and Initial Rental Operations of Real Estate Projects* ("SFAS 67") (1982), these pre-acquisition costs should have been expensed as incurred unless: (i) the costs were directly identifiable with a specific property; (ii) the costs would be capitalized if the property were already acquired; and (iii) acquisition of the property was probable.  Thus, Sunrise violated SFAS No. 67 when it capitalized costs for projects under development rather than determining which expenses could properly be capitalized, and by capitalizing costs to unrelated projects.  Both of these improper capitalization practices served to understate Sunrise's expenses and overstate its earnings.

86.     Sunrise also fraudulently capitalized direct and indirect costs relating to the sales and marketing of condominium units, instead of expensing such costs as incurred as required under GAAP.  SFAS No. 67 allows capitalization of marketing costs only if the costs "(a) are reasonably expected to be recovered from the sale of the project or from incidental operations and (b) are incurred for (1) tangible assets that are used directly throughout the selling period to aid in the sale of the project or (2) services that have been performed to obtain regulatory approval of sales."  Costs that do not meet these criteria must be expensed as incurred.

87.     During the Class Period, Defendants' capitalization of sales and marketing costs in violation of SFAS No. 67 inflated Sunrise's earnings by approximately $9.6 million.

88.     In addition to former CFO Rush, other former Sunrise employees identified serious issues with respect to Sunrise's capitalization of expenses.  For example, according to

CW-3, Sunrise "had no capital controls at all – none." Indeed, CW-3 stated that the Company would just say "put it [expenses] in capital," even inventory items. CW-3 said this was a consistent issue at Sunrise; the Company would accumulate a bunch of expense items and then "capitalize" the aggregated expense items. CW-3 also stated that he frequently protested this policy, saying that Sunrise could not accumulate items and that capital expenditures had to consist of one item or two related items, but management persisted in its improper practices.

89.     According to CW-9, a facility controller at Sunrise from 2003 until 2007 who had the accounting responsibilities for the facilities that this witness oversaw (including financial reporting, budgeting, analysis, and expense control), senior management was expressly aware of these improper capitalization practices but allowed them to persist unchecked and unrectified for years.

90.     According to the Restatement, in 2005 alone, income was inflated by $11.6 million from "other adjustments" which included the improper capitalization of these expenses.

### 5.     Sunrise's Fraudulent Recording Of Unearned Professional Fees

91.     Sunrise has admitted that it improperly recorded more than $13 million of operating revenue from its Greystone subsidiary between May 10, 2005 and December 31, 2005 in direct violation of GAAP. Greystone is a wholly owned subsidiary of Sunrise that develops and manages continuing care retirement centers but has no interest in the real estate holdings of its clients.

92.     Emerging Issue Task Force Issue ("EITF") No. 00-21, *Revenue Arrangements with Multiple Deliverables* (2003), allows companies to recognize revenue prior to the completion of an entire project if the company can determine the fair market sales value of a given portion of the project. Here, Sunrise instead recognized revenue based on certain prescheduled "billing milestones" set forth in their development consulting agreements. These

arbitrary "milestones" provided no basis to determine the fair market sale value of any portion of the project. Since Sunrise failed to comply with EITF No. 00-21, the Company should have deferred the recognition of revenue until such projects were fully completed as required by the Accounting Research Bulletin ("ARB") No. 45 *Long-Term Construction-Type Contracts* (1955).

### 6. Sunrise's Improper Accounting For Stock Option Compensation

93. During the Class Period, Defendants Newell, Tomasso, Hulse and Klaassen each knowingly and/or recklessly received options that were backdated and sold the resulting shares for the primary purpose of furthering the fraudulent scheme.

94. A stock option allows a corporate officer to purchase the specified number of shares of company stock at a specified price – referred to as the "exercise price" or "strike price" – for a specified period of time. Stock options are granted by public companies as compensation for executives – supposedly to create incentives for them to boost long-term corporate performance and profitability by good, honest management efforts. When the executive exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's market price at the time the option is exercised. The exercise price of stock options is the market price on the date of grant – so if the stock goes up over time, the executive makes a profit. If the system is abused by "backdating," which refers to picking an option-grant date **earlier** than the actual date the option was granted when the stock price was lower than the actual grant date – or by "spring-loading," *i.e.*, granting the stock option just before the company is going to issue positive news which will push the stock price up, the executive gets an instant, guaranteed and riskless profit. Shareholders and share purchasers are hurt, as reported corporate profits are improperly inflated and the Company does not get the benefit of a tax deduction. Further, shareholders and share purchasers are hurt as their ownership interest in the corporation is unfairly diluted and, since they voted to approve the stock option

plan and elect the directors who proposed the plan and oversee its implementation and administration, their corporate suffrage rights are violated.

95.       In violation of the Company's own stated policies and applicable laws, Defendants engaged in or permitted "backdating" and "spring-loading" in the issuance of executive stock options for many years.  All the Company's stock option plans required stock options to have an exercise price equal to the fair market value of stock on the date of the grant, and Defendants regularly represented that stock options covered by the stock option plans were not granted at less than 100% of fair market value on the date of grant, but this was not true. *Often the grants were backdated to when Sunrise stock was materially lower in price or were granted just prior to the release of positive corporate news and a likely increase in the market price of the Company's stock, thus positioning the executives to achieve an instant, riskless profit.*  In fact, the Company has now admitted that it improperly backdated stock option grants. For example, Sunrise has admitted that it:

- did not recognize any compensation expense associated with modifications to the exercise price of repriced options nor did it recognize any compensation expense associated with repricing pursuant to FASB Interpretation No. 44,  Accounting for Certain Transactions Involving Stock Compensation an Interpretation of APB Opinion No. 25, ("FIN 44").  Under GAAP, the measurement date for the replacement stock options not previously disclosed should have been the date that the Company acknowledged receipt of the signed offer letter for each optionee from the employees, officers and/or directors.

- did not recognize any compensation expense associated with the cancellation and reissuance of "out-of-money" options as required by GAAP;

- did not recognize compensation expense for the difference between options' modified under agreements with employees and the fair market value of our common stock on the date of modification; and

- did not record $3.2 million of compensation expense associated with a grant of 700,000 options to Defendant Klaassen in 2000.

These improperly backdated stock option grants improperly inflated Sunrise's income by more than $44 million since 1996 (and by $7.1 million during the Class Period).

      **D.**      **SUNRISE'S UTTER LACK OF INTERNAL CONTROLS**

96.      As a public company, Sunrise and its management were required by law and by GAAP to establish and maintain adequate and effective internal accounting controls. According to SEC Rule 13a-15(f), internal controls are practices and procedures meant to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." An effective system of internal controls must include practices and procedures that "[p]rovide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of [a company's] assets that could have a material effect on [its] financial statements." Effective internal controls are important to investors because without such controls a company's financial reporting is not likely to be accurate. Simply put, it is easier for management to "cook the books" when internal controls are lacking. Moreover, a company with inadequate internal controls is less attractive to investors because such a company has an increased risk of material accounting irregularities and fraud.

97.      Sunrise and the Individual Defendants were able to manipulate the Company's financial statements as a direct result of the Company's utter lack of internal controls. Indeed, according to Ernst & Young LLP (as stated in the Restatement), the Company's independent auditor from 1994 through the present:

> *[T]he Company did not set the appropriate tone around accounting and control consciousness, lacked a sufficient complement of personnel with an appropriate level of accounting knowledge, experience and training* to support the size and complexity of the Company's organizational structure and financial reporting requirements, ***and did not exercise appropriate***

*oversight of accounting, financial reporting and internal control matters*.

*There was insufficient analysis and documentation of the application of GAAP to real estate and other transactions*.  In addition, there was a *lack of written procedures* for identifying and appropriately applying applicable GAAP to the various categories of items that were corrected in the restatement.

*There was a lack of adequate policies and procedures* to ensure that accounting personnel were made aware of the specific features in significant real estate transactions.  Further, there was a *lack of written procedures* for monitoring and adjusting balances related to certain accruals and reserves. Roles and responsibilities for establishing and maintaining internal controls, including manual transaction authorizations, were not adequately communicated.

*There was a lack of clear organization and accountability within the accounting function, including insufficient review and supervision*, combined with weak financial reporting systems that were not integrated and required extensive manual interventions. Specifically, there was a lack of effective accounting reviews for routine and non-routine transactions and accounts.  As a result, and coupled with a lack of a sufficient level of experienced personnel as described in the entity level control environment deficiencies above, the Company was unable to close its books in a timely and accurate manner.

98.     The Individual Defendants were directly responsible for the Company's lack of internal controls.  According to CW-6, Sunrise was "a public company run like Paul and Terry [Paul and T. Klaassen]*, still owned it privately.  Basically, what Paul and Terry Klaassen wanted, Paul and Terry Klaassen got."  CW-6 further stated that "any internal control would have to pass muster with Paul and Terry.  If it was something that they did not like, they could get around it."

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

99.    During the Class Period, the Defendants issued a series of materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.  These statements fell within two principal categories.  First, the Defendants issued false and misleading statements regarding the Company's financials, in particular the Company materially overstated its GAAP operating income and operating revenue, non-GAAP "core" earnings and "revenues under management."  As a result of these financial misstatements, Defendants mislead investors about its strong and stable growth and the effectiveness of its transformation into a management services company.  Second, the Defendants issued false and misleading statements regarding the Company's internal controls relating to stock option grants and related financial reporting.

### Fourth Quarter and Year-Ending December 31, 2003 Financial Results

100.    On February 26, 2004, the first day of the Class Period, Sunrise issued a press release announcing its financial results for the fourth quarter and year-ending December 31, 2003 (the "FY 2003 Release").  Sunrise reported fourth-quarter 2003 earnings per share of $0.67 and earnings per share of $2.63 for the full 2003 fiscal year.  Fourth-quarter 2003 earnings "excluding income from property sales and one-time transition expenses associated with the Marriott Senior Living transaction more than doubled to $0.40 per share."  Sunrise stated that "[t]he continued strong growth in earnings excluding income from property sales and one-time transition expenses is due to the Company's transition to a management services operating model . . . ."  Sunrise also stated that, "[a]s a result of revenue increases and continued growth in Sunrise's operating portfolio . . . revenues under management increased 160 percent to $417 million in the fourth quarter of 2003 . . . .  For 2003, revenues under management increased by

131 percent to $1.4 billion from $598 million in 2002." The Company reported that total stockholders' equity had risen to $490,275,000 as of December 31, 2003 from $465,818,000 as of December 31, 2002.

101.    In the press release, Defendant Klaassen touted that "[d]uring the year we more than doubled our resident capacity and revenues under management . . . and completed our transition to a management services company," and Defendant Newell commented that "[s]trong increases in both occupancy and average daily rate for our overall portfolio and our same-store portfolio led to revenue growth above our expectations. We attribute this strong revenue performance to the growing demand for senior living services, our expanded service offerings and locations and the track record we have built over the last 20 years."

102.    On February 26, 2004, Sunrise held an earnings conference call with Defendants Klaassen, Newell and Hulse to review these financial results ("FY 2003 Call"). Defendant Newell stated that the Company was reaffirming its "core earnings per share guidance" and that revenues under management were expected to increase more than 30%. According to Newell, Sunrise considers "core EPS to be total EPS less income from property sales." Further, Newell stated that "revenues under management is a very important measure for Sunrise and growth in this number is a result of higher revenues and earnings to our bottom line." Klaassen commented, "[t]he completion of the fourth quarter monthly ended very active, important, and ultimately very successful year for Sunrise . . . We doubled our revenues under management."

103.    In a February 27, 2004 report, Raymond James noted that "4Q03 EPS of $0.67 (incl. asset sale gains) . . . [was] in line with Street consensus. Operating EPS of $0.34 was a nickel below our $0.39 view." A Legg Mason analyst also stated "Sunrise earnings are

becoming more predictable and less volatile as the company completes its transition to a management company as we exclude future property sales from estimates."

104.     On March 12, 2004, Sunrise filed its Form 10-K for the year ended December 31, 2003 ("FY 2003 10-K"), with the SEC which repeated the materially false information that had been announced on February 26, 2004.  The 2003 10-K was signed by Defendants Klaassen, T. Klaassen, Hulse and Adams.

105.     The statements regarding the Company's financial results for the fiscal year ended December 31, 2003, as set forth in ¶¶ 100-104 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.  Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because the Defendants (i) improperly manipulated the Company's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly recognized revenue from real estate sales (*see* ¶¶ 77-83 above); (iv) improperly capitalized expenses (*see* ¶¶ 84-90 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above).  Cumulatively, this improper accounting inflated pre-tax income by $76 million (*see* ¶ 64 above), inflated operating income by 121% and operating revenue by 9% (*see* ¶¶ 50-51 above), inflated core earnings by 114% (*see* ¶ 52 above), and inflated revenues under management by 7% (*see* ¶ 55 above) for fiscal year 2003.

106.     As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the

Company's revenues under management were not as robust as previously reported (*see* ¶ 57 above).    Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

### First Quarter Ending March 31, 2004 Financial Results

107.    On May 4, 2004, Sunrise issued a press release announcing its financial results for the first quarter ending March 31, 2004 (the "Q1 2004 Release").  Sunrise reported first-quarter 2004 earnings per share of $0.60 compared to $0.56 per share in the first quarter of 2003.  The Company stated that "[t]he $0.04 per share, or 7.1 percent, increase was due to significant growth in Sunrise's management services operations, lower interest expense and a reduced share count, and was partially offset by an $8.3 million or $0.19 per share decrease in income from property sales."  First-quarter 2004 earnings excluding income from property sales more than tripled to $0.31 per share, compared to the $0.10 per share first-quarter 2003 earnings excluding income from property sales and one-time transition expenses associated with the Marriott Senior Living transaction.  Sunrise stated that the "strong growth" in earnings excluding income from property sales was generated by a $16.9 million, or 204% increase in management services revenues, a $4.7 million reduction in interest expense, the impact of the Company's share repurchase program, and strong property level operating performance.    Revenue under management increased 164 percent to $430.9 million in the first quarter of 2004 from $163.2 million in the first quarter of 2003.  The Company reported that total stockholders' equity had risen to $482,526,000 as of March 31, 2004.

108.    In the press release, Defendant Klaassen stated, "[w]e are off to a very good start in 2004 with revenue under management up in excess of 160 percent over last year's first quarter, significantly reduced interest expense and strong operating performance with our same-

store portfolio results exceeding our expectations," and Defendant Newell stated, "[w]e continue to achieve strong revenue growth driven by solid increases in both average daily rate and occupancy."

109.     On May 4, 2004, Sunrise held an earnings conference call with Defendants Klaassen, Newell and Hulse to review the Company's financial results ("Q1 2004 Call"). Klaassen commented that "2004 marks the first full year that Sunrise will report earnings following our transformation to a management services company. . . . During the quarter, we grew revenue under management more than 160% . . ."  Klaassen continued, "Revenue under management is an important metric for Sunrise, because we earn management fees on all revenue managed for third party and joint venture owners. . . . Our Management Services business model is performing well and becoming increasingly efficient and productive, as we get larger."  Newell re-affirmed the Company's core earnings per share ("EPS less income from property sales") guidance.

110.     In response to the May 4, 2004 news, shares increased from their May 3, 2004 close of $31.20 to $33.47 per share, an increase of $2.27 per share or 7.28%, on heavy volume.

111.     In a May 4, 2004 report, Wachovia Securities noted that core earnings per share of $0.31 was "a penny" ahead of its estimates.

112.     On May 10, 2004, Sunrise filed its Form 10-Q for the quarter ended June 30, 2004 ("Q1 2004 10-Q"), with the SEC which repeated the materially false information that had been announced on May 4, 2005.  The 10-Q was signed by Defendants Klaassen, Hulse and Adams.

113.    In a May 18, 2004 presentation filed with the SEC as an attachment to Form 8-K signed by Defendant Hulse ("May 18, 2004 8-K"), the Company noted the large increase in revenues under management:



114.    Similarly, the Company touted its "core" earnings per share growth:



115.    The statements regarding the Company's financial results for the first quarter of the fiscal year ended December 31, 2004, as set forth in ¶¶ 107-114 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable, and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.    Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because Defendants (i) improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly recognized revenue from real

estate sales (*see* ¶¶ 77-83 above); (iv) improperly capitalized expenses (*see* ¶¶ 84-90 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above). Cumulatively, for the fiscal year ended December 31, 2004, this improper accounting inflated pre-tax income by over $79 million (*see* ¶ 64 above), inflated operating income by 127% and operating revenue by 12% (*see* ¶¶ 50-51 above), inflated core earnings by 10% (*see* ¶ 52 above), and inflated revenues under management by 10% (*see* ¶ 55 above).

116.    As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported (*see* ¶ 57 above). Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

### Second Quarter Ending June 30, 2004 Financial Results

117.    On August 3, 2004, Sunrise issued a press release announcing its financial results for the second quarter ending June 30, 2004 ("Q2 2004 Release"). Sunrise reported second-quarter 2004 earnings per share of $0.66 compared to $0.67 per share in the second quarter of 2003. The Company stated that second-quarter 2004 earnings per share exceeded the Company's guidance because income from property sales was higher than expected. Second-quarter 2004 earnings excluding income from property sales "increased $0.14 per share, or 70 percent, to $0.34 per share," compared to the $0.20 per share second-quarter 2003 earnings excluding income from property sales and one-time transition expenses associated with the Marriott Senior Living transaction. Sunrise stated that the "strong growth" in earnings excluding income from property sales and transition expenses was generated by an increase in management

services revenue, a reduction in interest expense, the impact of the Company's share repurchase program, and strong property level performance, which exceeded the Company's expectations for its same-store portfolio.  Revenue under management increased 10 percent to $437 million in the second quarter of 2004 from $398 million in the second quarter of 2003. The Company reported that total stockholders' equity had risen to $ 497,632,000 as of June 30, 2004.

118.    In the press release, Defendant Klaassen stated that "2004 continues to be a very good year for Sunrise, our shareholders and the seniors we serve . . . This period is the first time our quarter-over-quarter comparison is inclusive of the communities that joined Sunrise as part of the Marriott Senior Living acquisition.  The integration is going well and the performance of the portfolio is trending according to our expectations. . . ."

119.    On August 3, 2004, Sunrise held an earnings conference call with Defendants Klaassen, Newell and Hulse to review the Company's financial results ("Q2 2004 Call").  Klaassen commented, "[t]he results of our second quarter illustrate our ability to generate strong financial performance as a management services company.  We have developed a core competency and capability that's unique in our industry to effectively manage senior living properties [in] all the major metropolitan markets in North America."  Klaassen noted, "as we successfully control overhead, growth and revenue under management should result in EPS growth for Sunrise."   Further, Klaassen stated, "[o]ur core earnings for the quarter, which are defined as total earnings excluding income from property sale[s] increased 70% to $0.34 a share. Our ability to deliver strong core earnings goal underscores our success in transitioning to a management services model and the benefits of this scalable business model."   Newell reaffirmed the Company's core earnings per share guidance and stated, "core EPS result should accelerate in the second have of 2004."

120.     In an August 3, 2004 report, Wachovia Securities noted that the Company's core earnings per share were in line with its estimates.  Similarly, in an August 4, 2004 report, Legg Mason stated that "[o]perating EPS (GAAP EPS – gain on sale income), or 'core EPS' as Sunrise calls it, came in at $0.34, a penny ahead of our estimate and in line with consensus."

121.     On August 6, 2004, Sunrise filed its Form 10-Q for the quarter ended June 30, 2004 ("Q2 2004 10-Q"), with the SEC which repeated the materially false information that had been announced on August 3, 2005.  The 10-Q was signed by Defendants Klaassen, Hulse and Adams.

122.     The statements regarding the Company's financial results for the second quarter of the fiscal year ended December 31, 2004, as set forth in ¶¶ 117-121 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable, and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.  Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because Defendants (i) improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly recognized revenue from real estate sales (*see* ¶¶ 77-83 above); (iv) improperly capitalized expenses (*see* ¶¶ 84-90 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above).  Cumulatively, for the fiscal year ended December 31, 2004, this improper accounting inflated pre-tax income by over $79 million (*see* ¶ 64 above), inflated operating income by 127% and operating revenue by 12% (*see* ¶¶ 50-51 above), inflated core earnings by 10% (*see* ¶ 52 above), and inflated revenues under management by 10% (*see* ¶ 55 above).

123.    As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported (*see* ¶ 57 above).    Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

### Third Quarter Ending September 30, 2004 Financial Results

124.    On November 4, 2004, Sunrise issued a press release announcing its financial results for the third quarter ending September 30, 2004 ("Q3 2004 Release").  Sunrise reported third-quarter 2004 earnings per share of $0.41 "which [was] at the high end of the Company's guidance range of $0.39 to $0.41."  Third-quarter 2004 results include $0.02 per share, of unusual expenses related to hurricane damage in Florida, and did not include any income from property sales.  Third-quarter 2004 earnings excluding income from property sales and hurricane expenses increased $0.10 per share, or 30 percent, to $0.43 per share, compared to third-quarter 2003 earnings per share of $0.33 per share.  Sunrise further stated that "the strong growth" in earnings excluding income from property sales, transition expenses and hurricane expenses was generated by a reduction in net interest expense in the third quarter of 2004, an increase in management services revenue, and the impact of the Company's share repurchase program. Revenue under management increased 11 percent to $451 million in the third quarter of 2004 from $405.2 million in the third quarter of 2003. The Company reported that total stockholders' equity had risen to $501,653,000 as of September 30, 2004.

125.      In the press release, Defendant Klaassen stated, "[o]ur results for the third quarter reflect the momentum we continue to build as the leading senior living management services provider."

126.      On November 4, 2004, Sunrise held an earnings conference call with Defendants Klaassen, Newell and Hulse to review the Company's financial results ("Q3 2004 Call"). Klaassen stated that the Company was impacted by the hurricanes that occurred in Florida and that the Company sustained $800,000 of uninsured expense.   Klaassen stated, "operating performance in the third quarter of '04 was strong and produced financial results at the high end of our guidance range even after absorbing the unanticipated hurricane expense. . . . Core earnings for the third quarter . . . grew 30% . . . and revenue under management grew . . . 11%." Newell commented that "[f]ourth quarter EPS should continue to accelerate over the third quarter of 2004."

127.      In response to the November 4, 2004 news, shares increased from their November 3, 2004 close of $39.10 to $40.50 per share, an increase of $1.40 per share or 3.58%, on heavy volume.

128.      In a November 5, 2004 report, Legg Mason stated that third quarter earnings per share of $0.41 was in line with its estimate and the consensus.

129.      On November 9, 2004, Sunrise filed its Form 10-Q for the quarter ended September 30, 2004 ("Q3 2004 10-Q"), with the SEC which repeated the materially false information that had been announced on November 4, 2005.   The 10-Q was signed by Defendants Klaassen, Hulse and Adams.

130.    In a January 25, 2005, presentation filed with the SEC as an attachment to Form 8-K signed by Defendant Hulse ("January 25, 2005 8-K"), the Company noted the large increase in revenues under management:



131.    Similarly, the Company touted its "core" earnings per share growth:



132.    The statements regarding the Company's financial results for the third quarter of the fiscal year ended December 31, 2004, as set forth in ¶¶ 124-131 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable, and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.   Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because Defendants (i) improperly manipulated Sunrise's insurance reserves (see ¶¶ 65-69 above); (ii) improperly inflated joint venture income (see ¶¶ 70-76 above); (iii) improperly recognized revenue from real

estate sales (*see* ¶¶ 77-83 above); (iv) improperly capitalized expenses (*see* ¶¶ 84-90 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above).  Cumulatively, for the fiscal year ended December 31, 2004, this improper accounting inflated pre-tax income by over $79 million (*see* ¶ 64 above), inflated operating income by 127% and operating revenue by 12% (*see* ¶¶ 50-51 above), inflated core earnings by 10% (*see* ¶ 52 above), and inflated revenues under management by 10% (*see* ¶ 55 above).

133.    As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported (*see* ¶ 57 above).    Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

**Fourth Quarter and Year-Ending December 31, 2004 Financial Results**

134.    On March 7, 2005, Sunrise issued a press release announcing its financial results for the fourth quarter and year-ending December 31, 2004 ("FY 2004 Release").    Sunrise reported fourth-quarter 2004 earnings per share of $0.57.  Fourth-quarter 2004 results included $0.05 per share of costs related to Sarbanes-Oxley compliance and $0.01 per share of income from the sale of a property (Sunrise stated that it expected to recognize and additional $0.04 per share of income from this sale in 2006 subject to the operating performance of the property). The Company stated that a "decrease in fourth-quarter, year-over-year earnings per share reflects the anticipated reduction in income from property sales . . . which was partially offset by continued strong growth in Sunrise's management services and consolidated community operations and lower net interest expense."  For 2004, Sunrise reported earnings per share of

$2.24, compared to earnings per share of $2.63 in 2003. According to Sunrise, the decrease in earnings per share reflects a reduction in income from property sales, which was partially offset by "continued strong growth in Sunrise's management services and consolidated community operations, and lower net interest expense." Earnings in 2004, excluding income from property sales, "increased 62 percent to $1.62 per share." Fourth-quarter 2004 earnings excluding income from property sales "increased 41 percent to $0.56 per share, which was at the high-end of the Company's guidance range of $0.52 to $0.56 per share." The Company further stated that "[t]he strong growth in fourth-quarter 2004 earnings excluding income from property sales and transition expenses" was generated primarily by an increase in management services revenues; reduction in net interest expense; and an increase in net operating income from Sunrise's consolidated operating portfolio, which was "driven by solid revenue growth and improved expense control." Revenues under management increased 11 percent to $464 million in the fourth quarter of 2004 from $417 million in the fourth quarter of 2003. For 2004, revenues under management increased by 29 percent to $1.8 billion from $1.4 billion in 2003. The Company reported that total stockholders' equity had risen to $523,518,000 as of December 31, 2004 from $490,276,000 as of December 31, 2003.

135.    In the press release, Defendant Klaassen stated, "2004 was another strong year for Sunrise and our 35,000 team members," and Defendant Newell stated, "[w]e experienced strong occupancy growth in 2004, both in overall occupancy (to 87.7 percent from 86.1 percent) and same-store occupancy (to 91.6 percent from 90.2 percent) . . . . This is the sixth quarter in a row that same-store revenue growth exceeded 6 percent. This performance is a testament to the great service our operations team provides to our residents and the strong and growing demand for senior living services."

136.    On March 8, 2005, Sunrise held an earnings conference call with Defendants Klaassen, Newell and Hulse to review the Company's financial results ("FY 2004 Call"). Klaassen commented that the "fourth quarter closed out a very successful year for Sunrise, both operationally and financially.  For fiscal year '04, revenue under management grew by 29% . . . . Fourth quarter core earnings grew by 41% . . . ."  Klaassen stated, "Sunrise enters '05 in the best financial shape of its history and with very good momentum."   Newell reaffirmed the Company's 2005 core earnings per share guidance "an increase of 12 to 19% over fiscal year 2004 results."

137.    In a March 9, 2005 report, Legg Mason noted that Sunrise EPS excluding income from property sales were $0.56, "$0.02 above our estimate and at the high end of company guidance."

138.    On March 16, 2005, Sunrise filed its Form 10-K for the year ended December 31, 2004 ("FY 2004 10-K"), with the SEC which repeated the materially false information that had been announced on March 7, 2005.  The 10-K was signed by Defendants Klaassen, T. Klaassen, Hulse and Anschutz.

139.    On March 22, 2005, Sunrise filed with the SEC a presentation attached to Form 8-K signed by Defendant Hulse ("March 22, 2005 8-K"), which noted a large increase in revenues under management:



140.    Similarly, the Company touted its "core" earnings per share growth:



141.    The statements regarding the Company's financial results for the fiscal year ended December 31, 2004, as set forth in ¶¶ 134-140 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable, and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.    Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because Defendants (i) improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly recognized revenue from real estate sales (*see* ¶¶ 77-83

above); (iv) improperly capitalized expenses (*see* ¶¶ 84-90 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above). Cumulatively, for the fiscal year ended December 31, 2004, this improper accounting inflated pre-tax income by over $79 million (*see* ¶ 64 above), inflated operating income by 127% and operating revenue by 12% (*see* ¶¶ 50-51 above), inflated core earnings by 10% (*see* ¶ 52 above), and inflated revenues under management by 10% (*see* ¶ 55 above).

142.     As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported (*see* ¶ 57 above). Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

### First Quarter Ending March 31, 2005 Financial Results

143.     On May 3, 2005, Sunrise issued a press release announcing its financial results for the first quarter ending March 31, 2005 ("Q1 2005 Release"). Sunrise reported first-quarter 2005 earnings per share of $0.37. The Company stated that "[t]he decrease in first-quarter, year-over-year earnings per share reflects the anticipated reduction in income from property sales of $11.5 million, or $0.29 per share, which was partially offset by continued strong growth in Sunrise's management services operations and lower net interest expense." First-quarter 2005 earnings excluding income from property sales increased 19 percent to $0.37 per share, which was within the Company's guidance range of $0.37 to $0.40 per share, compared to first-quarter 2004 earnings excluding income from property sales of $0.31 per share. There was no income from property sales in the first quarter of 2005. Sunrise further stated that the 19 percent increase in

first-quarter 2005 earnings compared to the year ago period excluding income from property sales was generated primarily by a $2.5 million, or 10 percent, increase in management services revenues and a $1.3 million reduction in net interest expense. Revenues under management increased 8 percent to $467 million in the first quarter of 2005 from $430.9 million in the first quarter of 2004. The Company also reported that total stockholders' equity had risen to $535,452,000 as of March 31, 2005.

144.     In the press release, Defendant Klaassen stated, "[t]he two recently announced acquisitions of The Fountains and Greystone Communities will further strengthen Sunrise by adding many talented, experienced and passionate senior living professionals to our team, as well as dozens of very high quality communities to our operating portfolio . . . . When combined with our record number of new communities under construction, our growth in 2005 will be very strong."

145.     On May 3, 2005, Sunrise held an earnings conference call with Defendants Klaassen, Newell and Hulse to review the Company's financial results ("Q1 2005 Call"). Klaassen stated, "the first quarter is now over and it promises to be a fruitful year. . . . Our core earnings for the first quarter was defined as total earnings excluding income from property sales and one time transition expenses grew 19% . . . . Revenue under management increase 8% . . . ." Newell reaffirmed core earnings per share guidance ("total EPS excluding income from property sales and transition expenses").

146.     On May 10, 2005, Sunrise filed its Form 10-Q for the quarter ended March 31, 2005 ("Q1 2005 10-Q"), with the SEC which repeated the materially false information that had been announced on May 3, 2005. The 10-Q was signed by Defendants Klaassen, Hulse and Anschutz.

147.    On May 18, 2005, Sunrise filed with the SEC a presentation attached to Form 8-K signed by Defendant Hulse ("May 18, 2005 8-K"), which noted a large increase in revenues under management:



148.    Similarly, the Company touted its "core" earnings per share growth:



149.    The statements regarding the Company's financial results for the first quarter of the fiscal year ended December 31, 2005, as set forth in ¶¶ 143-148 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.    Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because the Defendants (i) improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly capitalized expenses (*see* ¶¶

84-90 above); (iv) improperly recognized revenue form its Greystone subsidiary (*see* ¶¶ 91-92 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above). Cumulatively, for the fiscal year ended December 31, 2005, this improper accounting inflated operating income by 57% and operating revenue by 17% (*see* ¶¶ 50-51 above), inflated core earnings by 111% (*see* ¶ 52 above), and inflated revenue under management by 19% (*see* ¶ 55 above) for fiscal year 2005.  Also, as a result of these accounting machinations, core earnings per share were overstated by 144%, 128%, 117% and 75%, during the first through fourth quarters of 2005, respectively, (*see* ¶ 53 above), and revenues under management were overstated by 13%, 14%, 15%, and 33%, during the first through fourth quarters of 2005, respectively (*see* ¶ 56 above).

150.    As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported and in fact were flat in 2005 (*see* ¶ 57 above).  Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

### Second Quarter Ending June 30, 2005 Financial Results

151.    On August 4, 2005, Sunrise issued a press release announcing its financial results for the second-quarter ending June 30, 2005 ("Q2 2005 Release").  Sunrise reported second-quarter 2005 earnings per share of $0.46 compared to $0.66 per share in the second quarter of 2004.  The Company stated that "[t]he decrease in second-quarter, year-over-year earnings per share reflects the anticipated reduction in income from property sales of $12.1 million, or $0.31 per share, which was partially offset by continued strong growth in Sunrise's management and

professional services operations and growth in equity in earnings on investments in unconsolidated senior living properties." Second-quarter 2005 earnings excluding income from operating property sales and one-time transition expenses associated with the Greystone and The Fountains transactions "increased 35 percent to $0.46 per share" compared to second-quarter 2004 earnings excluding income from operating property sales of $0.34 per share. Sunrise stated that "[s]econd-quarter 2005 results exceeded the Company's outlook of $0.36 to $0.38 per share, excluding income from operating property sales and one-time transition expenses, due to better than expected management and professional services results, higher than expected earnings from Sunrise's minority equity investments in joint ventures that own senior living communities, and lower interest expense." Sunrise further stated that the increase in second-quarter 2005 earnings was generated primarily by an increase in management and professional services revenues and higher management and professional services fees due to the significant increase in the number of communities under construction. Revenues under management increased 10 percent to $482.2 million in the second quarter of 2005 from $436.7 million in the second quarter of 2004. The Company also reported that total stockholders' equity had risen to $550,702,000 as of June 30, 2005.

152.    In the press release, Defendant Klaassen stated, "[w]e are benefiting from our typical growth drivers which include revenue growth in our operating portfolio of management properties, additional community openings and new construction, and we expect our recent acquisitions to further fuel our growth in the second-half of 2005 and for the full-year 2006," and Defendant Newell stated, "we expect to see substantial growth in our income from earnings and returns on equity investments going forward."

153.    On August 4, 2005, Sunrise held an earnings conference call with Defendants Klaassen and Newell to review the Company's financial results ("Q2 2005 Call").  Klaassen commented that "Sunrise had an excellent second quarter.  Virtually every segment of the company performed at or above expected levels.  As a result, we had a significant increase in core earnings, which we define as total earnings excluding income from property sales, and acquisition transition expenses."  Klaassen also stated, "Since the beginning of 2003, we have increased our revenue under management from approximately 600 million to approximately 2 billion. . . . We have now met or exceeded expectations every quarter for the past six years, and we continue that unbroken streak in the second quarter, as we significantly exceeded the high-end of our guidance range of 36 cents to 38 cents by reporting core EPS of 46 cents a share.  In hindsight, our forecast was probably a bit conservative as we outperformed in occupancy growth, management and professional fees, earnings from joint ventures and lower interest costs."  Klaassen also stated, "core earnings for the second quarter grew 35%," and noted that Defendant Hulse would "oversee the Company's risk management and insurance programs."  Newell stated, "we are increasing our earnings per share outlook excluding acquisition, transition costs and property sales."

154.    In response to the August 4, 2005 news, shares rose from their August 3, 2005 close of $54.71 to $60.39 per share, an increase of $5.68 or 10.38%, on heavy volume.

155.    In an August 4, 2005 report, Legg Mason noted that "Sunrise reported 2Q05 EPS adjusted for unusual items of $0.46, $0.08 above our estimate and consensus. . . .  Reported results were $0.08 above the high end of company guidance and our estimate."  Legg Mason also commented that the Company made two strategic changes in the second-quarter which may "have a major impact on growth and earnings quality over time."  These changes were the

acquisition of Greystone Communities, Inc., a Dallas-based provider of development and management services to not-for-profit continuing care retirement community organizations. The other item is the contribution of equity earnings to Sunrise results. According to the report, "[w]hile we could argue that the $0.08 equity earnings pop in the quarter is almost a back door gain on sale because it represents an incentive fee upon the sale of a property, we believe it is more important to note that the results signal that Sunrise's minority joint venture interest can provide a meaningful contribution to earnings."

156.     On August 9, 2005, Sunrise filed its Form 10-Q for the quarter ended June 30, 2005 ("Q2 2005 10-Q"), with the SEC which repeated the materially false information that had been announced on August 4, 2005. The 10-Q was signed by Defendants Klaassen and Anschutz.

157.     The statements regarding the Company's financial results for the second quarter of the fiscal year ended December 31, 2005, as set forth in ¶¶ 151-156 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity. Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because the Defendants (i) improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly capitalized expenses (*see* ¶¶ 84-90 above); (iv) improperly recognized revenue form its Greystone subsidiary (*see* ¶¶ 91-92 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above). Cumulatively, for the fiscal year ended December 31, 2005, this improper accounting inflated

operating income by 57% and operating revenue by 17% (*see* ¶¶ 50-51 above), inflated core earnings by 111% (*see* ¶ 52 above), and inflated revenue under management by 19% (*see* ¶ 55 above) for fiscal year 2005. Also, as a result of these accounting machinations, core earnings per share were overstated by 144%, 128%, 117% and 75%, during the first through fourth quarters of 2005, respectively, (*see* ¶ 53 above), and revenues under management were overstated by 13%, 14%, 15%, and 33%, during the first through fourth quarters of 2005, respectively (*see* ¶ 56 above).

158.    As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported and in fact were flat in 2005 (*see* ¶ 57 above). Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

### Third Quarter Ending September 30, 2005 Financial Results

159.    On November 8, 2005, before the market opened, Sunrise issued a press release announcing its financial results for the third quarter ending September 30, 2005 ("Q3 2005 Release"). Sunrise reported third-quarter 2005 earnings per share of $0.24 compared to $0.21 (diluted) per share in the third quarter of 2004. The Company stated that the increase in earnings per share reflected strong growth in Sunrise's management and professional services operations and growth in equity in earnings and return on investments in unconsolidated senior living properties. Third-quarter 2005 earnings excluding one-time acquisition transition costs associated with the Greystone and The Fountains transactions and hurricane-related expenses "increased 18 percent to $0.26 per share." Sunrise stated that the increased earnings were

generated primarily by increase in management and professional services revenues less management and professional services expenses.  Revenue under management increased 20 percent to $540.8 million in the third quarter of 2005 from $451.0 million in the third quarter of 2004.  The Company reported that total stockholders' equity had risen to $572,283,000 as of September 30, 2005.

160.    In the press release, Defendant Klaassen stated, "[d]espite enduring hurricanes, and the strains and tragedy they caused, the Sunrise organization delivered a very solid quarter . . . . Our recent acquisitions combined with our strong revenue and earnings growth and near record occupancy levels should allow us to close 2005 with strong momentum heading into 2006," and Defendant Newell stated, "[w]e continue to benefit from our management services business model and our minority equity investments in unconsolidated properties . . . ."

161.    On November 8, 2005, Sunrise held an earnings conference call with Defendants Klaassen and Newell to review the Company's financial results ("Q3 2005 Call").  Klaassen noted that despite emotional and financial impact of the hurricanes on the Company during the quarter, "GAAP EPS grew 14%, revenue under management grew 20%, occupancy levels [were] up strongly, communities under construction are at a record level and our acquisitions are performing well."  Newell reaffirmed the Company's EPS guidance.

162.    On November 9, 2005, Sunrise filed its Form 10-Q for the quarter ended September 30, 2005 ("Q3 2005 10-Q"), with the SEC which repeated the materially false information that had been announced on November 8, 2005.  The 10-Q was signed by Defendants Klaassen and Anschutz.

163.     On a November 16, 2005, Sunrise filed with the SEC a presentation to be presented by Klaassen attached to Form 8-K ("November 16, 2005 Form 8-K"), which noted a large increase in revenues under management:



164.     The statements regarding the Company's financial results for the third quarter of the fiscal year ended December 31, 2005, as set forth in ¶¶ 159-163 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.   Specifically, as admitted by the Company in its Restatement, Sunrise's financial results were materially misstated because the Defendants (i)

improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly capitalized expenses (*see* ¶¶ 84-90 above); (iv) improperly recognized revenue form its Greystone subsidiary (*see* ¶¶ 91-92 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above). Cumulatively, for the fiscal year ended December 31, 2005, this improper accounting inflated operating income by 57% and operating revenue by 17% (*see* ¶¶ 50-51 above), inflated core earnings by 111% (*see* ¶ 52 above), and inflated revenue under management by 19% (*see* ¶ 55 above) for fiscal year 2005. Also, as a result of these accounting machinations, core earnings per share were overstated by 144%, 128%, 117% and 75%, during the first through fourth quarters of 2005, respectively, (*see* ¶ 53 above), and revenues under management were overstated by 13%, 14%, 15%, and 33%, during the first through fourth quarters of 2005, respectively (*see* ¶ 56 above).

165.    As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported and in fact were flat in 2005 (*see* ¶ 57 above). Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

**Fourth Quarter and Year-Ending December 31, 2005 Financial Results**

166.    On March 7, 2006, before the market opened, Sunrise issued a press release announcing its financial results for the fourth quarter and year-ending December 31, 2005 ("FY 2005 Release"). Sunrise reported fourth-quarter 2005 earnings of $1.01 per share. For the full year 2005, Sunrise reported earnings per share of $1.67. Revenue under management increased

14 percent to $529.7 million in the fourth quarter of 2005 from $463.7 million in the fourth

quarter of 2004.    The Company reported that total stockholders' equity had risen to

$632,677,000 as of December 31, 2005 from $523,518,000 as of December 31, 2004.

167.    In the press release, Defendant Klaassen stated, "[t]he fourth quarter and year

closed strongly, as we expected, and positions us for a very good 2006 during which we will be

celebrating our 25th anniversary. . . In 2005 we completed two major acquisitions, occupancy

rates rose to near all-time highs, revenues under management exceeded $2 [b]illion for the first

time in our history, development activities grew to a record level and our international

momentum accelerated with the opening of our first German communities."

168.    On March 7, 2006, Sunrise held an earnings conference call with Defendants

Klaassen and Newell to review the Company's financial results ("FY 2005 Call").    Defendant

Klaassen stated that the "fourth quarter closed out strongly as we expected and ended a very busy

and successful year for Sunrise. . . . Excluding the various non-recurring and unusual items listed

in the supplemental section of our earnings press release, our EPS grew 18% to 33 cents a share

in the December 2005 quarter over one year ago."

169.    In response to the March 7, 2006 news, shares rose from their March 6, 2006

close of $33.01 to $35.75 per share, an increase of $2.74 or 8.30%, on heavy volume.

170.    In a March 7, 2006 report, Citigroup stated commented that "operating results

were very strong" and that "4Q05 results were ahead of our expectations, with diluted EPS from

continuing operations coming in at $0.33 versus our estimate of $0.31."    Stifel Nicolaus also

noted that "[a]djusted EPS [of $0.33] beats consensus by $0.03."

171.    On March 16, 2006, Sunrise filed its Form 10-K for the year ended December 31,

2005 ("FY 2005 10-K"), with the SEC which repeated the materially false information that had

been announced on March 7, 2006.  The 10-K was signed by Defendants Klaassen, T. Klaassen, and Anschutz.

172.    On a March 8, 2006, Sunrise filed with the SEC as a presentation attached to Form 8-K ("March 8, 2006 8-K"), which noted a large increase in revenues under management:



173.    The statements regarding the Company's financial results for the fiscal year ended December 31, 2005, as set forth in ¶¶ 166-172 above, were materially false and misleading when made because, as described above, Sunrise reported financial results that were not accurate or reliable and were not presented in accordance with GAAP and materially overstated net income, operating income and operating revenue, core earnings, revenue under management, and shareholder equity.  Specifically, as admitted by the Company in its Restatement, Sunrise's

financial results were materially misstated because the Defendants (i) improperly manipulated Sunrise's insurance reserves (*see* ¶¶ 65-69 above); (ii) improperly inflated joint venture income (*see* ¶¶ 70-76 above); (iii) improperly capitalized expenses (*see* ¶¶ 84-90 above); (iv) improperly recognized revenue form its Greystone subsidiary (*see* ¶¶ 91-92 above); and (v) improperly accounted for stock based compensation (*see* ¶¶ 93-95 above).  Cumulatively, for the fiscal year ended December 31, 2005, this improper accounting inflated operating income by 57% and operating revenue by 17% (*see* ¶¶ 50-51 above), inflated core earnings by 111% (*see* ¶ 52 above), and inflated revenue under management by 19% (*see* ¶ 55 above) for fiscal year 2005.  Also, as a result of these accounting machinations, core earnings per share were overstated by 144%, 128%, 117% and 75%, during the first through fourth quarters of 2005, respectively, (*see* ¶ 53 above), and revenues under management were overstated by 13%, 14%, 15%, and 33%, during the first through fourth quarters of 2005, respectively (*see* ¶ 56 above).

174.      As a result of these accounting machinations, Sunrise falsely portrayed itself as a company experiencing strong and stable growth in revenue and earnings when in fact the Company's core earnings were unstable and indeed decreasing (*see* ¶ 54 above) and the Company's revenues under management were not as robust as previously reported and in fact were flat in 2005 (*see* ¶ 57 above).  Accordingly, Defendants statements touting the successful transformation into a management services company were false and misleading.

## A.    DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS

175.      Defendants Klaassen and Hulse also knowingly certified false and misleading financial statements.  Defendants Klaassen and Hulse certified the following financial statements during the Class Period: FY 2003 10-K (filed 3/12/04), Q1 2004 10-Q (filed 5/10/04), Q2 2004 10-Q (filed 8/6/04), Q3 2004 10-Q (filed 11/9/04), FY 2004 10-K (filed 3/16/05), and Q1 2005

10-Q (filed 5/10/05).   Defendant Klaassen also certified the following financial statements during the Class Period: Q2 2005 10-Q (filed 8/9/05), Q3 2005 10-Q (filed 11/9/05), and FY 2005 10-K (filed 3/16/05).

176.    Each of the Forms 10-Q for the fiscal quarters from the first quarter 2004 through the third-quarter 2005 described above, contained substantially the following language:

> The accompanying consolidated financial statements of Sunrise Senior Living, Inc. and subsidiaries ("Sunrise") are unaudited and include all normal recurring adjustments which are, in the opinion of management, necessary for a fair presentation of the results . . . [for the three-month periods ended March 31, 2004 and 2003] pursuant to the instructions to Form 10-Q and Article 10 of Regulation S-X. Certain information and footnote disclosures normally included in the financial statements prepared in accordance with generally accepted accounting principles have been condensed or omitted pursuant to such rules and regulations.

177.    In each of the Forms 10-Q for the fiscal quarters from the first quarter 2004 through the third-quarter 2005 and each of the Forms 10-K for the years ended December 31, 2003, 2004 and 2005, Defendants Klaassen (as to all of these SEC filings) and Hulse (as to the Form 10-Q's from the first quarter 2004 through second-quarter 2005 and Form 10-K's for 2003 and 2004) attested to the accuracy of the information contained therein.   In signing these attestations, Defendants Klaassen and Hulse certified that they had designed, established and maintained an effective set of internal controls.  The attestations stated, in pertinent part:

> (1)    I have reviewed this annual [quarterly] report on Form 10-K [10-Q] of Sunrise Senior Living, Inc;
>
> (2)    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

(3)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report

178.     These financial statements certified by Defendants Klaassen and Hulse were not in accordance with GAAP and SEC rules.  Section 302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") and SEC Rules 13a-14(a) and 15d-14(a) of the Exchange Act required Defendants Klaassen as the CEO, and Defendant Hulse as the CFO, to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report.  In their certifications, Defendants Klaassen and Hulse stated that the Company's financial reports did not contain any untrue statement of material fact or omit to state a material fact.  In addition, Defendants Klaassen and Hulse stated that Sunrise had established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.

179.     Defendants Klaassen and Hulse knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules.  In accordance with §906 of Sarbanes-Oxley and 18 U.S.C. §1350, Defendants Klaassen and Hulse were required to certify each periodic report that included financial statements.  Their signed certifications falsely stated that: (i) the report fully complied with the requirements of §13(a) or §15(d) of the Exchange Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of Sunrise.

180.     On the dates noted above, Defendants Klaassen and Hulse signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the Exchange Act and §906 of

Sarbanes-Oxley attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for Sunrise.  At the time, Defendants Klaassen and Hulse signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

## VII.    THE TRUTH ABOUT SUNRISE'S FINANCIAL CONDITION BEGINS TO EMERGE

181.    By May 8, 2006, Sunrise's common stock was trading at more than $39 per share. However, the house of cards was about to collapse.  On May 9, 2006, Sunrise issued a press release, entitled "Sunrise to Reschedule First Quarter Earnings Announcement," which stated in relevant part:

> Sunrise Senior Living; Inc. today announced it is rescheduling its first quarter 2006 earnings release to allow additional time for further review of the accounting treatment applied to investments in unconsolidated senior living communities and to complete the review of its Form I 0-Q for the first quarter ended March 31, 2006.

As a result of the disclosure, Sunrise's stock price fell to $6.95 per share to close at $32.35 per share on May 9, 2006, on huge trading volume of 4.4 million shares, from a closing price of $39.30 per share on May 8, 2006.

182.    The next day, on May 10, 2006, Sunrise issued another press release, entitled "Sunrise Provides Update on Accounting Treatment Review and Release of First Quarter Financial Results," which stated in relevant part:

> The accounting treatment review is focused on the allocation of profits and losses for a limited number of Sunrise joint ventures where Sunrise is a minority partner and the capital partner receives a preference, either on return of its capital over Sunrise's capital in the event of a refinancing or sale of the venture's properties or cash flow from operations.  Preferences on return of capital are no longer typical.

183.    On May 11, 2006, the Company issued yet another press release, entitled "Sunrise Reports Preliminary Selected Financial Data For First-Quarter 2006," which stated in relevant part:

> As a result of the review, Sunrise has decided to use a different methodology to allocate profits and losses in its joint ventures based on such rights and priorities of the partners. Sunrise is evaluating whether this methodology will require adjustments to prior period financial statements.
>
> * * *
>
> Sunrise will not file its Form 10-Q until it completes its review. This review encompasses a multi-year analysis of each affected venture and is being completed as thoroughly and quickly as possible.

184.    Later that morning, Defendants held a conference call with analysts. During the conference call, Defendant P. Klaassen stated in relevant part:

> The issue that necessitated this additional review has to do with the accounting treatment applied to certain of our investments in unconsolidated senior living communities. Specifically, this accounting treatment review is focused on the allocation of profits and losses for those joint ventures in which Sunrise is a minority partner and the capital partner receives a preference on return of its capital over Sunrise's capital, in the event of a refinancing or sale of the venture's properties.
>
> * * *
>
> In connection with this review, our accounting team determined and then brought to the attention of our auditors that there is a more preferable method under generally accepted accounting principles for allocating such profits and losses among the partners of theses ventures and for determining the timing of such allocations during the lifecycle of the ventures, from startup losses to stabilized cash flow refinancing or sale or the property.
>
> Now, as a result, we are now in the process of assessing the implications of adopting this alternative methodology and whether adjustments are necessary to prior period financial statements . . . .
>
> * * *
>
> We will completely avoid this accounting issue in the future by no longer providing preferential return on capital in any future

ventures. We were able to do this now because of the successful track record that we have established for these ventures.

* * *

The general effect of using this different methodology - known, I am told, as the hypothetical liquidation at book value method - is to shift more of any losses to Sunrise in the early days of any venture where the capital partner has a preference for return of capital . . . .

* * *

Now, if this partnership were to experience 1 million of initial losses, Sunrise would initially recognize 20% (minority interest) or $200,000 of the $1 million of losses.

Now, if the same venture has included a capital return preferences. Sunrise would be allocated 100% or all million dollars of the initial losses.

185.     When asked during this conference call if the new accounting method was a new option to the Company or if it had been available for years, a company spokesman admitted that the new accounting method that the Company was using going forward had been "available for a number of years" and that Sunrise had been aware of the method since at least 2005.

186.     On June 14, 2006, shares of Sunrise common stock fell significantly from their June 13, 2006 close of $30.42 per share to close at $28.80 per share, a decline of $1.62 per share or 5.33%, on heavy volume.  In a June 15, 2006 report, Stifel Nicolaus noted that "SRZ shares declined 5.3% yesterday, with most of the damage coming late in the day on a couple of large block trades.  Shares are down 26.3% from their 4/4/06 high due to general market conditions, ***Sunrise's delay in reporting 1Q06 results as a result of an accounting issue concerning its development joint ventures and yesterday's block sales***."  (Emphasis added).

187.     After a month that saw Sunrise's stock price continue to fall in the absence of any positive news concerning the results of Sunrise's ongoing accounting review, on Monday, July 31, 2006, at 6:00 a.m. (ET), the "other shoe" dropped when Sunrise was forced to announce a

multi-year financial restatement in a press release entitled "Sunrise Provides Update On

Accounting Review":

> [T]he Company will restate its financial statements for the years ended December 31, 2003, 2004 and 2005 primarily to adjust the accounting treatment related to ventures that contain partner preferences and the timing of sale accounting and recognition of income from prior sales of real estate. The cumulative impact of the restatement is expected to reduce net income for all periods impacted, including 1999 through 2005, by an estimated $60 million to $110 million . . . . Sunrise is unable at this time to provide precise impacts of the restatement since its review of these issues has not yet concluded. . . . The Company noted that its previously issued audited consolidated financial statements for the years ended December 31, 2003, 2004 and 2005, including the associated auditor's report currently on file with the SEC in the Company's 2005 Form 10-K, and its unaudited quarterly financial statements during these years should no longer be relied upon.

> \* \* \*

> As the review unfolded, Sunrise looked not only at partner preferences, but also at all guarantees and commitments provided to our venture partners and third party investors. Certain of these guarantees **should have been considered at the time of the sale** of real estate to these entities . . . .

> - Allocation of profits and losses in those ventures in which Sunrise's partners receive a preference on cash flow. This area of the review focused on the timing of both the recognition of profits and losses from ventures and the recognition of pre-opening fees from ventures in which our partners receive a cash flow preference. . . . In the future, Sunrise will no longer offer preferences on cash flows for its ventures. Sunrise will account for its equity in earnings of unconsolidated ventures by a method knows as Hypothetical Liquidation at Book Value ("HLBV"), rather than on its historical method based upon percentage ownership.

> \* \* \*

> **The impact of this restatement will require Sunrise to record additional losses in prior periods for those ventures with cash flow preferences.**

> \* \* \*

> - Effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real

estate.  Primarily during the period from 2000 to 2003, Sunrise sold mature senior living properties to ventures or independent third parties.  In addition, as part of its development program, Sunrise sometimes owns real estate during the zoning . . . process and then sells or contributes the real estate to a venture of third party investor.  *Sunrise historically has recognized income upon the completion of such sales*.  In connection with some of Sunrise's sales of real estate . . .  *Sunrise has provided limited guarantees or commitments* . . .  In accordance with SFAS 66, *Accounting for Sales of Real Estate*, based on the nature of the guarantee or commitment, *Sunrise may be required to defer some or all of the income* or may not be able to immediately record the transaction as a sale.

(Emphasis added).

188.    According to intraday trading data obtained from Francis Emory Fitch, Inc., between 8:00 a.m. and the 9:30 a.m. (ET) open on July 31, 2006, 34,100 shares of Sunrise traded at $25 per share, a decline of $1.34 per share (or 5.1%) from the previous trading day's closing price.

189.    At 9:02 a.m. (ET), *Reuters News* reported: "Sunrise Senior Living Inc., the biggest U.S. operator of independent communities for the elderly, on Monday said it would restate financial reports for 2003 through 2005 due to accounting adjustments related to real estate deals.  Shares of the company were trading at $25 on the electronic brokerage network Inet, down from a close of $26.34 [on Friday, July 28, a decline of $1.34 or 5.1%,] on the NYSE."  By comparison, using exchange-trade funds as a proxy for market movements, the S&P 500 stocks opened down 0.25% from the previous close, and the Russell 2000 stocks opened down 0.34% from the previous close.

190.    At 9:30 a.m. (ET) on July 31, 2006, Sunrise shares opened on the New York Stock Exchange at $25.00 per share ($1.34 per share below the previous trading day's close) and fell to as low as $24.40 per share in trading later that morning in response to Sunrise's restatement announcement of 6:00 a.m. that morning.

191.    Later in the day on July 31, 2006, Sunrise shares recovered after the Company's senior managers participated in an analyst conference call during which the Company sought to offset the negative news relating to the restatement by presenting a rosy picture of the Company's future performance.

## POST CLASS PERIOD DEVELOPMENTS

192.    Subsequently, on August 8, 2006, Sunrise issued a press release, entitled "Sunrise Reports Preliminary Selected Financial and Operating Data for Second-Quarter," which proved provided an update to the Company's accounting review.   In that statement, the Company announced that it was "able to narrow the range of the estimated impact to net income from the restatement.  The cumulative impact . . . is currently expected to reduce net income . . . by an estimated *$65 million to $100 million*." (Emphasis added).

193.    Also on August 8, 2006, Sunrise filed a Form 8-K/A with the SEC, amending its July 31, 2006 Form 8-K.  In its amended filing, Sunrise announced that, based on the Company's earlier disclosures, the SEC had requested additional information regarding the method used for determining Sunrise's share of equity in earnings or losses and regarding its application of SOP 78-9, *Accounting for Investments in Real Estate Ventures*.

194.    On November 7, 2006, Sunrise issued a press release entitled "Sunrise Reports Preliminary Selected Financial and Operating Data for Third-Quarter 2006," which stated in relevant part:

> Sunrise is completing its review of the accounting treatment related to ventures that contain partner preferences and to the timing of sale accounting and recognition of income from sales of real estate or partnership interests in joint ventures.  Subject to completion of its auditors review and clearing comments from the SEC, Sunrise currently expects to file its restated 2005 Form 10-K before year end, which will be followed by the filing of Sunrise's Forms 10-Q for the first three quarters of 2006. Sunrise currently

> expects to be current in its filings with the Securities and Exchange
> Commission upon the filing of its 2006 Form 10-K on or before
> March 1, 2007.
>
> The cumulative impact of the restatement is currently anticipated
> to reduce net income for all periods impacted, including 1999
> through 2005, by approximately ***$100 million.***

(Emphasis added).

195.    Shortly thereafter, on November 20, 2006, the Service Employees International Union ("SEIU"), a shareholder of Sunrise, sent a letter to the Company calling for an independent investigation into concerns about insider stock sales, questionable accounting practices, and improbably-timed stock option grants.  This request came after a review of the Company's finances by the SEIU Capital Stewardships Program concluded that Sunrise executives had sold $32 million worth of shares prior to announcing that the Company's financials would be delayed, that many of Sunrise's stock options grants were "fortuitously" timed and that all of the members of Sunrise's Audit and Compensation Committees had personal ties to the Company.

196.    On November 26, 2006, *The New York Times* published an article by Gretchen Morgenson, which stated in part:

> Shareholders of Sunrise Senior Living, a provider of residential
> communities and services for the elderly, have seen their holdings
> decline 17 percent since last spring.  Problematic bookkeeping kept
> the company from filing three quarterly financial statements on
> time, forced it to restate earnings for 2003 through 2005, drew
> Securities and Exchange Commission inquiries about its
> accounting and led it to warn that its internal controls were
> probably inadequate.
>
> All of that resulted in a $342 million hit to the market value of the
> company, based in McLean, VA. But a raft of insiders escaped
> some of that damage.  Three of the company's directors and its two
> founders sold $32 million worth of Sunrise stock in the six months
> leading up to the May 9 announcement that it was changing its
> accounting practices and delaying its financial filing.

Reviewing stock sales over the six months before the announcement is relevant because, during a conference call with investors in May, Sunrise officials said that "late in 2005" they had begun contemplating the accounting shift that later clobbered Sunrise shares.

* * *

Selling during the period were Paul J. Klaassen, the founder and chief executive; Theresa M. Klaassen, his wife and Sunrise's chief cultural officer; Ronald V. Aprahamian, a consultant and investor who is chairman of Sunrise's audit committee; Thomas J. Donohue, a Sunrise director who is chairman of the United States Chamber of Commerce; and J. Douglas Holladay, a founder of a private equity firm and a director.

* * *

The biggest sellers of Sunrise stock were the Klaassens, who generated $21.4 million in sales of 600,000 shares from December 2005 to April 4, 2006.  The sales began last Dec. 19, around the time the company first contemplated the accounting review that resulted in the restatements.  They were part of a series of planned sales put in place in December by the executives.

**An especially timely stock sale by Mr. and Mrs. Klaassen came a week before the company announced it was delaying its financial filings.  On May 1 and 2, they sold 100,000 shares at an average price of $36.91. The day of the announcement, the price fell to $32.35.  On Friday, the stock closed at $32.50.**

Reached last Wednesday at a vacation home in Florida, Mrs. Klaassen, who is also a director, declined to comment.  The Klaassens continue to hold a large stake in Sunrise - 5.2 million shares, or approximately 10 percent of the stock outstanding.  Although they entered into a derivatives contract relating to a forward sale of 750,000 shares last year, **the 600,000-share sales are their first outright disposal of Sunrise stock since the company went public in 1996.**

* * *

**Another apparently well-timed sale took place last April 18, exactly three weeks before the company announced its filing delay, when Mr. Aprahamian, chairman of the company's audit committee, sold 20,000 shares at $37.85 each, generating $757,040.**  Mr. Aprahamian declined to comment when reached last Wednesday at his home in Virginia.  He said he had not seen

> the shareholder letter, addressed to Sunrise directors and hand-delivered to the company last Monday.  He declined to provide a fax number or e-mail address where a reporter could send a copy.

> Mr. Donohue, the Chamber of Commerce chairman, has been a Sunrise director since 1995 and heads its compensation committee. He is also a member of its audit committee. On Nov. 21, 2005, he sold shares worth $3.4 million, according to regulatory filings. Mr. Klaassen is on both the Chamber of Commerce's board and that of its research arm, the National Chamber Foundation.

(Emphasis added).

197.     In response to the SEIU letter and *The New York Times* article, on December 11, 2006, Sunrise announced that its Board of Directors had appointed a special committee to review recent insider sales of Sunrise stock and the Company's historical practices related to stock option grants.  The Company further disclosed that the SEC had requested information relating to the Company's insider trading and stock option practices.  The Company stated that the review by the special committee would be conducted in parallel with the Company's ongoing efforts to complete the previously announced restatement.

198.     On January 15, 2006, Sunrise issued a press release, entitled "Sunrise Provides Update on Pending Restatement," which stated in relevant part:

> Sunrise believes that is it close - weeks, not months - to submitting its recast 2005 financial information with the SEC for its review, the essential first step in the process.  However, due to factors including the complexity of the issues involved, the need to clear comments with the SEC, as well as the ongoing review by the recently formed special committee of the board of directors, Sunrise will not be current with all SEC filings, including the 2006 Form l0-Qs and 2006 Form 10-K by March 1, 2007, as previously anticipated.

199.     In the fall of 2006, senior Sunrise management began to actively seek private investors for a potential sale of the Company.

200.     On January 17, 2007, a federal securities fraud class action was filed against the Company in United States District Court in and for the District of Columbia.

201.     On February 27, 2007, Sunrise issued a statement reiterating that it was "close" to completing its restatement, but admitted that its "significant" accounting issues would result in a restatement that would "reduce net income for all periods impacted, included 1999 through 2005, by approximately *$98 to $107 million*."  (Emphasis added).

202.     On March 2, 2007, Sunrise announced that it had extended the mandate of the Special Committee beyond reviewing certain insider sales and the Company's historical stock option grant practices to include a "review of facts and circumstances relating to the historical accounting treatment of certain categories of transactions in the pending restatement of the Company's financial statements."

203.     Sometime in March 2007, whistleblower Rush completed an eleven-page "roadmap" letter to the SEC regarding each of the accounting areas he believed necessitated restatement.  Rush presented this "roadmap" letter to Sunrise's Board of Directors and Audit Committee on March 13, 2007..

204.     On April 23, 2007, Rush learned that Sunrise would not provide the SEC with the "roadmap" letter.

205.     On April 25, 2007, the Company issued a press release stating that it was suspending Mr. Rush as its CFO.

206.     One week later, on May 2, 2007, Sunrise terminated Defendant Rush purportedly for his failure to comply with the document retention policies instituted by the Company.

207.     On May 8, 2007, Sunrise issued a Form 8-K which provided another update on its then-pending restatement.  In the Form 8-K, Sunrise stated that:

> In addition to the previously disclosed restatement adjustments, the company has determined that two previously unconsolidated Sunrise development ventures (six communities) and three previously unconsolidated Greystone development ventures (three communities) will need to be consolidated under Financial Accounting Standards Board Interpretation 46, Consolidated Variable Interest Entities, an Interpretation of ARB No. 51, as revised ("Fin 46(R)") at December 31, 2005.

208.    On May 29, 2007, Sunrise publicly announced in a Form 8-K that the SEC had commenced a formal investigation of the Company's insider stock sales, historical stock option granting practices and other accounting practices.

209.    On July 25, 2007, in a press release, Sunrise announced that its Board of Directors had "decided to explore strategic alternatives intended to enhance shareholder value including a possible sale of the Company." In addition, Sunrise announced that the cumulative impact of its restatement was now expected to reduce Sunrise's previously reported net income by approximately *$120 million to $125 million* (excluding any adjustment to non-cash stock compensation expense), an increase over prior estimates attributable to an overstatement of approximately $14 million of income related to improper recognition of a gain on the sale of real estate in 2004.

210.    On September 28, 2007, Sunrise announced that the Special Committee had completed the fact-finding portion of its investigation with respect to three of the issues to which it was tasked:

> The first involves the timing of certain stock option grants. The second involves the facts and circumstances with respect to two significant categories of errors in the pending restatement relating to real estate accounting: accounting for the effect of certain Sunrise guarantees and commitments on timing of sale accounting and recognition of income upon sale of real estate; and accounting for allocation of profits and losses in those ventures in which Sunrise's partners received a preference on cash flow. The third involves whether directors and executive officers had non-public knowledge of possible accounting errors related to these real estate

transactions prior to Sunrise's May 2006 announcement of its accounting review.

211.    The Company made significant admissions consistent with stock option backdating (although the Special Committee claimed it had found no "evidence" of "intentional misconduct"):

- *A substantial period of time elapsed* from the date the Stock Option Committee approved its September 1998 repricing and when most employees signed their repricing acknowledgments, and during which time the Company's stock price increased substantially.

- The Company made grants in 2000 and 2001 *with options exercisable above the then applicable market price*.

- The Company made three grants in which *the exercise price for the options was set at the closing price for the Company's stock on the date of the grant, rather than at the closing price of the trading date immediately prior to the date of the grant*, as contemplated by the terms of the Company's stock option plans.

- Certain grants *lacked sufficient documentation* to determine when the stock option grant was authorized.

- The Company retroactively corrected errors, which included adding grants to new hires who had been omitted from a recommendation list and correcting the number of options granted to individuals.

- The Company *modified the terms of grants after they were made*.

- The Company made certain grants in which the Company granted options to consultants but *accounted for such options as grants issued to employees*.

(Emphasis added).

212.    The Special Committee also acknowledged that Sunrise had numerous internal control deficiencies, which resulted in the Company's restatement now approximated to be approximately *$130 million* dollars (excluding stock option expenses).    Specifically, Sunrise stated:

> As previously disclosed by the Company, the occurrence of a restatement of previously issued financial statements is a strong indicator that material weaknesses in internal controls exist. …To date, the Company's management has preliminarily identified the following three control deficiencies:

Lack of personnel with sufficient technical accounting expertise to determine and document the appropriate application of accounting principles. This deficiency impacted the Company's accounting for real estate sales, capitalization of direct and indirect costs of real estate projects, equity accounting for variable interest entities, accounting for guarantees and accounting for stock options.

Lack of policies and procedures to ensure proper accounting of significant transactions. This deficiency impacted the Company's accounting for real estate sales and equity accounting.

Lack of a sufficient level of experienced personnel to enable the Company to close its books in a timely and accurate manner.

213.    Thus, on December 20, 2007, in a Form 8-K, Sunrise announced the completion of the fact-finding portion of the Special Committee's investigation relating to certain accruals and reserves:

As previously reported, this portion of the investigation primarily related to certain accruals and reserves. The Special Independent Committee's review of these issues found that *inappropriate accounting occurred during the third quarter of 2003 through the fourth quarter of 2005.* The net effect of adjustments arising from these findings, coupled with adjustments to other items, are not expected to increase the previously disclosed total restatement impacts.

Following consideration by the Company's Board of Directors of the results of the Special Independent Committee's work, the Board of Directors today announced the separation from the Company of the following individuals, effective immediately: Thomas Newell, President since April 2000; Larry Hulse, Chief Executive Officer of the Company's insurance captive since August 2005 and the Company's Chief Financial Officer from April 2000 to August 2005; and Carl Adams, Treasurer since November 2005 and former Chief Accounting Officer from 2000 through November 2004.

(Emphasis added).

214.    On March 3, 2008, in a Form 8-K, Sunrise increase its estimate of the cumulative impact of the impending restatement to approximately *$140 million*, excluding approximately

$44 million related to stock option adjustment and $14 million relating to improper revenue recognition at the Company's Greystone subsidiary.

215.    Finally, on March 24, 2008, as part of its Form 10-K for the fiscal year ending December 31, 2006, Sunrise issued its Restatement.

## VIII.    ADDITIONAL *SCIENTER* ALLEGATIONS

216.    As alleged herein, the Individual Defendants each acted with *scienter* in that each knew or recklessly disregarded that Sunrise's publicly reported financial results issued during the Class Period were materially false and misleading.  Among other things, the following facts establish a strong inference of *scienter*: (1) the magnitude and duration of the fraud, which lasted for nearly 6 full years, encompassed 24 consecutive quarters, and wiped out the vast majority of the Company's publicly reported profit during the Class Period; (2) the fact that each accounting "error" served to artificially inflate Sunrise's publicly reported net income and operating revenue; (3) the fact that the GAAP provisions violated were simple and clear-cut, and typically had been in existence for well-over 10 years; (4) the fact that the Company is being investigated by the SEC for insider selling, stock option backdating and accounting fraud; (5) the firing of then-CFO Rush in the wake of his continuing efforts to expose and correct Sunrise's myriad accounting manipulations; (6) the massive insider selling of Defendants Anschutz, Hulse, Klaassen. T. Klaassen and Newell; and (7) Defendants Newell, Tomasso, Hulse, and Klaassen receipt of illegally backdated stock option grants.

217.    Each of the Individual Defendants acted with *scienter* in that they (a) had access to all internal data concerning the Company's accounting practices and stock option plans; (b) directed and/or participated in establishing the terms of the option grants, including the choice of grant dates and exercise price; (c) knew or with deliberate recklessness disregarded that the public documents and statements issued or disseminated in the

name of the Company were materially false, incomplete or misleading; (d) knew or with deliberate recklessness disregarded that such statements or documents would be issued or disseminated to the investing public; and (e) knowingly or with deliberate recklessness participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

### A.   THE COMPANY'S ADMISSIONS AND RECENT ACTIONS

218.   Most notably, the Company has made admissions and taken actions that establish, without resort to circumstantial evidence, the *scienter* of the Individual Defendants.  Specifically, as discussed more fully below, Sunrise admitted that "inappropriate accounting" occurred for more than two years – from the third quarter of 2003 through the fourth quarter of 2005 – resulting in material misstatements to the Company's financial statements.  The Company further admitted that this inappropriate accounting" was orchestrated by Defendants Newell, Hulse and Adams.

219.   In its 2006 Form 10-K, the Company stated that the Special Committee's review identified numerous circumstances where the grant date of stock options used by the Company as the measurement date used for accounting purposes preceded the appropriate measurement date. Backdating of stock option grants is inherently intentional in nature as it requires someone to intentionally ascribe an incorrect transaction date to an options grant.

220.   In addition to these Company admissions, during the pendency of Special Committee's investigation, the Company announced the termination of Defendant Newell. Defendant Newell served as President, Executive Vice-President, President of Sunrise Development, Inc. and as General Counsel, and was intimately involved with the Company's accounting for its insurance reserves, real estate sales and joint venture arrangements.  Defendant Newell also received certain of the backdated options at issue here.

221.     During the pendency of the Special Committee's investigation, the Company also announced the firing of Defendant Hulse.  Defendant Hulse served as the Company's Chief Accounting Officer and Chief Financial Officer throughout the time period when the Company was committing the accounting manipulations alleged herein, and as such, was intimately involved with the Company's fraudulent accounting.  In addition, Defendant Hulse received certain of the backdated options at issue here.

222.     During the pendency of the Special Committee's investigation, the Company announced the firing of Defendant Adams.  Defendant Adams was the Company's Treasurer and was responsible for the Company's insurance reserve manipulations.

223.     In addition, even prior to the Special Committee investigation, former CFO Rush terminated Defendant Abod as Sunrise's Treasurer based on his belief that Abod had been involved in accounting manipulations.

### B.     THE DEFENDANTS' TERMINATION OF WHISTLEBLOWER RUSH

224.     On May 2, 2007, Sunrise terminated Rush as the Company's former CFO. According to a complaint filed by Rush in Virginia state court, Sunrise fired him in retaliation for his discovery and disclosure of Sunrise's improper and fraudulent accounting practices, and as part of Sunrise's campaign to make him the "fall guy for its improper and fraudulent behavior."  According to Rush, he purportedly uncovered "no less than *nine* significant improper accounting practices" employed by Sunrise, and brought them to the attention of Sunrise senior management, Sunrise's Board of Directors, and the SEC.  (Emphasis added).  Rush's complaint confirms that there were numerous "issues and irregularities with regard to Sunrise's accounting methodology."  These irregularities and manipulations included: (i) improper application of the Hypothetical Liquidation at Book Value ("HLBV") methodology in accounting for joint ventures with equity partners; (ii) the use of excess insurance reserves to cover earnings shortfalls; (iii)

improper accounting treatment of gains on the sale of real estate assets which were subject to guarantees and commitments; and (iv) improper accounting treatment for losses relating to construction projects under development.  Notably, the accounting manipulations alleged in Rush's complaint mimic closely Sunrise's Restatement issued 6 months later.

225.    According to Rush, between May and July of 2005, Rush worked with Defendants Klaassen, Newell, Tomasso and General Counsel John Gaul to reorganize the finance, accounting, and technology functions at Sunrise.  As part of the reorganization plan, the CFO and CIO roles were combined into one position, which Rush assumed on August 4, 2005.

226.    Rush alleges that as part of his reorganization of Sunrise's finance and accounting functions, and as early as the start of the third quarter of 2005, he discovered numerous accounting irregularities and manipulations in the Company's financial statements, including that Sunrise's Treasurer [Defendant Adams] was improperly manipulating accounting figures,[3] and that the accounting division was "obviously" lacking personnel with sufficient real estate transaction experience.  According to Rush, he routinely advised Sunrise's Board of Directors and Audit Committee of his discoveries as they were uncovered through monthly memoranda to the Board and during quarterly meetings of the Board and Audit Committee.

227.    The accounting manipulations uncovered by Rush ultimately became so pervasive that the Company was finally forced to admit that it would need to restate its financial results.  Contemporaneously, however, according to Rush, Sunrise's senior management was actively considering selling Sunrise to private investors.  To this end, according to Rush, throughout the

---

[3]  Rush also alleges that he discovered that the Company's Treasurer was improperly manipulating the Company's insurance reserves.  Promptly after his discovery, he alleges that he informed Defendant Newell of the Treasurer's actions, and advised Defendant Newell that, in his view, the Treasurer's actions constituted fraudulent earnings management.

Fall of 2006, Defendants Klaassen and Newell repeatedly pressured Rush to complete the restatement without regard to whether all accounting issues had been correctly resolved so the Company could go forward with privatization.    Specifically, according to Rush, Defendants Klaassen and Newell stated that Rush needed to "rein in" Ernst & Young – the Company's independent auditor – "so they would stop finding accounting issues that were delaying completion of the restatement, regardless of whether these issues were matters of legitimate concern."  For example, in November 2006, Rush stated that Defendant Newell came to Rush's office and told Rush that his "credibility was at risk" because Rush was not "managing" Ernst & Young.  Similarly, on several occasions during this time period, Defendant Klaassen told Rush that his work on the restatement was taking "too long" and that Defendant Rush, by thoroughly reviewing all of the Company's prior financial statements, was letting Ernst & Young "run all over" him.

228.    According to Rush, in March 2007, he completed work on an eleven-page letter that responded to a July 2006 request by the SEC for a "roadmap" to the restatement issues.  This roadmap letter identified numerous accounting manipulations, explained in detail how the problems had arisen, and delineated the impact of the accounting issues as far back as 1998.  The roadmap was reviewed and approved by Ernst & Young.  According to Rush, on March 13, 2007, he presented the roadmap letter to Sunrise's Board of Directors and Audit Committee.  At this Board meeting, Rush stated that he was again pressured by senior management to rush the restatement to completion notwithstanding the need for more time to fully address the many accounting irregularities and their impact.  Indeed, in the midst of presenting the roadmap document, Director William Little (who comprised the one-man Special Committee) pounded his fist on the table and yelled at Rush, "When are you going to finish the restatement?"  Shortly

thereafter, on April 23, 2007, Rush learned that Sunrise did not intend to provide the SEC with the roadmap letter.

229.    Uncomfortable with Defendants Klaassen and Newell's pressure to complete the restatement without ensuring that all of the accounting errors were rectified, Rush confronted Defendants Klaassen and Newell at a Board meeting about their desire to sell the Company. According to Rush, after being confronted, Defendants Klaassen and Newell admitted that their discussions with private equity firms might conflict with their duties as members of Sunrise's management because both stood to gain extraordinary profits if Sunrise was acquired. Nonetheless, Defendant Klaassen told Rush that, if asked, Klaassen and Newell would deny that substantive discussions had occurred and would falsely describe any meetings with potential private equity investors as merely preliminary and conceptual.  Defendant Klaassen encouraged Rush and others present to likewise have consistent, "convenient" memories.

### C.    THE DEFENDANTS' PERSONAL ENRICHMENT THROUGH INSIDER SELLING OF SUNRISE SHARES DURING THE CLASS PERIOD

230.    Defendants Anschutz, Hulse, Klaassen, T. Klaassen and Newell cashed in on the Company's artificially inflated stock price by selling more than 858,319 million shares of Sunrise stock for proceeds of in excess of *$31 million* during the Class Period.  A chart of sales of Sunrise stock by these Defendants including for each sale the number of shares sold, the price per share, the numbers of shares held by the insiders after each transaction, the percentage of total holdings sold, and the total proceeds, follows:

| Name | Transaction Date | Shares Sold | Price Per Share | Remaining Shares | Percent Sold | Total Sales |
|---|---|---|---|---|---|---|
| **Anschutz, Barron** | 11/21/2005 | 2,000 | $33.04 | 0 | 100% | $66,080.00 |
| | 11/21/2005 | 3,000 | $33.00 | 0 | 100% | $99,000.00 |
| | 1/3/2006 | 826 | $32.06 | 100 | 89.20% | $26,481.56 |
| | 1/3/2006 | 100 | $32.05 | 0 | 100% | $3,205.00 |

| Name | Transaction Date | Shares Sold | Price Per Share | Remaining Shares | Percent Sold | Total Sales |
|---|---|---|---|---|---|---|
| **Total** | | **5,926** | | | | **$194,766.56** |
| | | | | | | |
| **Hulse, Larry** | 8/4/2005 | 15,000 | $57.62 | 24,826 | 37.66% | $864,300.00 |
| | 8/12/2005 | 20,973 | $61.23 | 3,853 | 84.47% | $1,284,176.79 |
| | 8/12/2005 | 1,000 | $61.23 | 2,853 | 25.95% | $61,230.00 |
| **Total** | | **36,973** | | | | **$2,209,706.79** |
| | | | | | | |
| **Klaassen, Paul & T.** | 12/19/2005 | 50,000 | $34.77 | 5,732,640 | 0.86% | $1,738,500.00 |
| | 12/20/2005 | 50,000 | $34.57 | 5,682,640 | 0.87% | $1,728,500.00 |
| | 1/3/2006 | 50,000 | $32.11 | 5,632,640 | 0.87% | $1,605,500.00 |
| | 1/4/2006 | 50,000 | $34.39 | 5,582,640 | 0.88% | $1,719,500.00 |
| | 2/1/2006 | 50,000 | $36.27 | 5,532,640 | 0.89% | $1,813,500.00 |
| | 2/1/2006 | 50,000 | $36.13 | 5,482,640 | 0.90% | $1,806,500.00 |
| | 3/1/2006 | 50,000 | $34.76 | 5,432,640 | 0.91% | $1,738,000.00 |
| | 3/2/2006 | 50,000 | $34.36 | 5,382,640 | 0.92% | $1,718,000.00 |
| | 4/3/2006 | 50,000 | $38.81 | 5,332,640 | 0.93% | $1,940,500.00 |
| | 4/4/2006 | 50,000 | $38.49 | 5,282,640 | 0.94% | $1,924,500.00 |
| | 5/1/2006 | 50,000 | $37.04 | 5,232,640 | 0.95% | $1,852,000.00 |
| | 5/2/2006 | 50,000 | $36.77 | 5,182,640 | 0.96% | $1,838,500.00 |
| **Total** | | **600,000** | | | | **$21,423,500.00** |
| **Name** | **Transaction Date** | **Shares Sold** | **Price Per Share** | **Remaining Shares** | **Percent Sold** | **Total Sales** |
| **Newell, Thomas** | 3/22/2004 | 7,000 | $35.12 | 132,710 | 5.01% | $245,826.00 |
| | 3/22/2004 | 5,000 | $35.12 | 132,710 | 3.63% | $175,590.00 |
| | 8/22/2005 | 12,000 | $60.10 | 132,710 | 8.29% | $721,200.00 |
| | 9/22/2005 | 6,636 | $63.01 | 132,710 | 4.76% | $418,134.36 |
| | 9/22/2005 | 5,364 | $63.01 | 132,710 | 3.88% | $337,985.64 |
| | 10/24/2005 | 24,000 | $32.52 | 132,710 | 15.31% | $780,480.00 |
| | 11/22/2005 | 24,000 | $33.68 | 263,320 | 8.35% | $808,320.00 |
| | 12/22/2005 | 24,000 | $34.65 | 263,120 | 8.36% | $831,600.00 |
| | 1/23/2006 | 24,000 | $35.29 | 263,120 | 8.36% | $846,960.00 |
| | 2/22/2006 | 24,000 | $34.19 | 263,120 | 8.36% | $820,560.00 |
| | 3/22/2006 | 24,000 | $38.26 | 254,000 | 8.63% | $918,240.00 |
| | 4/24/2006 | 24,000 | $38.11 | 254,000 | 8.63% | $914,640.00 |
| **Total** | | **215,420** | | | | **$7,398,120.00** |
| | | | | | | |
| | | | | | | |
| **Grand Total** | | **858,319** | | | | **$31,226,094** |

231.    The timing of the Class Period trades of these Defendants was highly suspicious.

Specifically, Defendants Klaassen and T. Klaassen sold approximately $25 million worth of

Sunrise stock in the six months leading up to the May 9, 2006 announcement that Sunrise was changing its accounting practices and delaying the issuance of its first quarter financial results.

232.    Particularly troubling are Defendants Klaassens' sales of 600,000 shares of Sunrise stock in twelve transactions between December 19, 2005 and May 2, 2006, garnering insider selling proceeds of in excess of $21 million.  The timing of these transactions, in the fiscal quarter immediately preceding the Company's announcement that it would have to restate its historical financial statements due to improper accounting methods, is extremely suspect, and supports a strong inference that the Klaassens were dumping a large amount of shares with the knowledge that Sunrise's accounting woes and impending restatement would cause the stock price to plummet.  Indeed, the 600,000-share sales in this six month period are their first outright disposal of Sunrise stock since the Company went public in 1996.  An especially timely stock sale by the Klaassens came just one week before the Company announced that it was delaying the issuance of its first quarter 2006 financial results.  Specifically, on May 1 and 2, 2006, the Klaassens sold 100,000 shares at a price of $37.04 and $36.77, respectively.  The day of Sunrise's May 9 announcement, the price fell to $32.35.

233.    In addition, the Klaassens took advantage of Sunrise's inflated share price to enter into a lucrative "forward sale" contract on May 24, 2005 which provided for the sale of up to a further 750,000 shares of Sunrise common stock in five tranches.  In consideration for just two of these 150,000 share forward sale tranches, according to a Form 4 filed on May 27, 2005, the Klaassens received upfront cash proceeds of $5,923,481 and $5,918,906.25 based on weighted average prices equal to $51.79 and $51.75 per share, respectively.

234.    Defendant Hulse's, Newell's and Anschutz's insider sales in November 2005, while Rush's investigation into the Company's accounting practices was ongoing, are no less

suspicious. Defendants Hulse, Newell and Anschutz took advantage of their inside information into the Company's review of its historical financial results, reaping insider selling proceeds of approximately $2.2 million, $7.4 million and $195,000, respectively, in early 2006 and the second half of 2005. Defendant Newell sold 24,000 shares for nearly $1 million in insider selling proceeds just 13 days before the Company's May 9, 2006 announcement.

235.    To the extent any of the insider stock sales detailed above were pursuant to Rule 10b5-1 plans, those plans do not protect those sales from legal liability or from raising an inference of *scienter* because either (i) when the plan was put in place, the Defendants had knowledge of the ongoing fraudulent conduct and/or (ii) the plan allowed the Defendants discretion as to how stock sales under the plan would occur.

236.    The Individual Defendants were also were motivated to perpetrate the fraud because each had a tremendous stake in Sunrise meeting certain numerical benchmarks during the Class Period. According to Sunrise's proxy statements from the years 2003 through 2005, each of the Individual Defendants' annual bonuses were, at least partially, dependent on the Company meeting certain financial performance targets.

237.    The compensation chart below details the annual bonuses and other incentive compensation that these Defendants were able to collect – over and above their salaries – as a result of Sunrise's reporting inflated financial results that allowed the Individual Defendants to collect performance based compensation to which they were not entitled. As the following compensation chart demonstrates, close to 75% of the Defendant Tomasso's and Hulse's total compensation came through stock option grants, and approximately 50% of Defendants Klaassen and Newell's total compensation came through annual bonuses:

| Name and Principal Position | Annual Compensation | | | | Long-Term Compensation | | |
|---|---|---|---|---|---|---|---|
| | Fiscal Year | Salary ($) | Bonus($) | Other Annual Compensation | Restricted Stock Awards ($) | Securities Underlying Options (#) | All Other Compensation ($) |
| **Klaassen, Paul J.** **Founder, Chairman and CEO** | 2003 | $420,910 | $146,865 | $115,709 | $58,751 | n/a | n/a |
| | 2004 | $463,742 | n/a | $151,962 | n/a | n/a | $82,583 |
| | 2005 | $473,890 | $454,925 | $186,014 | $1,181,952 | n/a | $39,310 |
| | 2006 | $501,923 | n/a | $553,206 | n/a | n/a | $686,476 |
| | | | | | | | |
| **Newell, Thomas B.** **President (2000-2007)** | 2003 | $339,769 | $87,500 | n/a | n/a | n/a | n/a |
| | 2004 | $360,688 | $446,000 | n/a | n/a | n/a | n/a |
| | 2005 | $396,498 | $309,344 | n/a | $96,000 | 100,000 | n/a |
| | 2006 | $426,635 | n/a | $547,632 | n/a | n/a | $21,919 |
| | | | | | | | |
| **Tomasso, Tiffany L.** **COO** | 2003 | $283,812 | $80,000 | n/a | $974,825 | n/a | n/a |
| | 2004 | $309,162 | $160,000 | n/a | n/a | n/a | n/a |
| | 2005 | $348,138 | $204,716 | n/a | $626,598 | 100,000 | n/a |
| | 2006 | $388,846 | n/a | $399,233 | $106,862 | n/a | $11,415 |
| | | | | | | | |
| **Hulse, Larry E.** **CFO (2000-2005)** | 2003 | $235,933 | $41,667 | n/a | $487,413 | n/a | n/a |
| | 2004 | $257,635 | $212,333 | n/a | n/a | n/a | n/a |
| | 2005 | n/a | n/a | n/a | n/a | n/a | n/a |
| | 2006 | n/a | n/a | n/a | n/a | n/a | n/a |

238.     Thus, the Individual Defendants clearly had motive and opportunity to perpetrate the fraudulent scheme described herein.

### D.     THE DEFENDANTS' SPECIFIC PARTICIPATION IN, AND PERSONAL ENRICHMENT AS A RESULT OF, SUNRISE'S OPTIONS BACKDATING

239.     The Special Committee of Sunrise's Board found numerous instances where the recorded grant date of stock options by Sunrise preceded the actual date of the grants. Defendants Newell, Tomasso, Hulse and Klaassen each received substantial backdated stock option grants. Thus, each of these Defendants was motivated to participate in this fraudulent scheme in order to reap significant personal profits. By provided themselves with a direct form of compensation, they received millions in undisclosed and unaccounted for compensation.

240.    Although Sunrise has not identified precisely which options were backdated, it has confirmed in its September 28, 2007 Form 8-K that options granted during this period had been retroactively priced for all employees who received such grants.   Based on these admissions, there is a strong inference that all of the options granted to Defendants Newell, Tomasso, Hulse and Klaassen during the Class Period were backdated options.

241.    The following paragraphs set forth the options granted to Defendants Newell, Tomasso, Hulse and Klaassen in calendar years 1997 through 2000 as reported in the Company's Proxy Statements and Forms 4 filed with the SEC:

### The 1997 Backdated Option Grants

242.    Defendant Newell was granted stock options dated May 2, 1997 with an exercise price (pre-split) of $24.38, knowing that May 2, 1997 was not the date the Company actually approved the grants:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price[4] | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 05/02/97 | Newell | $24.38 | 100,000 | $12.19 | 200,000 |

243.    This grant date coincided with Sunrise's second lowest closing price for the fiscal quarter as well as the entire fiscal year, as shown below.  By the end of the year, Sunrise's stock price had nearly doubled to $43.13 (pre-split), an increase of 76.9%.  Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a

---

[4] All references to adjusted exercise prices and adjusted numbers of options in the tables set forth herein reflect adjustments that have been made to take into account the Company's 2-for-1 stock split effective October 4, 2005.

twenty day return of 29%, or 533% annualized, as compared to a 25% annualized return for investors – a difference of 497%.

244.    Defendant Tomasso was granted stock options dated August 28, 1997 with an exercise price (pre-split) of $30.75, knowing that August 28, 1997 was not the date the Company actually approved the grants[5]:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 8/28/97 | Tomasso | $30.75 | 30,000 | $15.38 | 60,000 |

245.    This grant date coincided with Sunrise's second lowest closing price for the fiscal quarter.  By the end of 1997, Sunrise's stock price (pre-split) had risen to $43.13, an increase of 40.2%.  Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 20%, or 360% annualized, as compared to a 25% annualized return for investors – a difference of 335%.

246.    Defendant Hulse was granted stock options dated November 4, 1997 with an exercise price (pre-split) of $36.63, knowing that November 4, 1997 was not the date the Company approved the grant[6]:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/04/97 | Hulse | $36.63 | 25,000 | $18.31 | 50,000 |

---

[5]  These options were later re-priced pursuant to a re-pricing program authorized and implemented by the Stock Option Committee.  The re-pricing program allowed Sunrise officers to trade in options with an exercise price of more than $29.00 in exchange for an equal number of options at an exercise price of $25.00, which was the closing price of Sunrise stock on September 14, 1998.

[6] *Id.*

247.    This grant date preceded a dramatic rise in the price of Sunrise stock.  In the five days following the date of grant, Sunrise's stock price traded at an average of $38.76 (pre-split), an average increase of 5.8%.  This rise in the price of Sunrise stock can be directly attributed to the Company's November 4, 1997 third quarter earnings release, which reported a 110% increase in third quarter revenues from the previous year and profits of $.09 per share, which topped analysts' estimates by $.02 per share.  Based on the preceding information, this is a "spring-loaded" option grant timed to take advantage of the non-public material information regarding Sunrise's better than expected earnings figures which they were privy to and which they knew would positively affect the stock price.  By "spring-leading" this stock option granted to Defendant Hulse, Hulse received options that were essentially in-the-money because, as expected, the stock price would immediately rise upon the Company's announcement of good news.

### 1998 Backdated Option Grants

248.    Defendants Newell, Tomasso and Hulse were granted re-priced stock options dated September 14, 1998 with an exercise price (pre-split) of $25.00,[7] knowing that September 14, 1998 was not the date the Company actually approved the grants:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/14/98 | Newell | $25.00 | 200,000 | $12.50 | 400,000 |
| | Tomasso | $25.00 | 230,000 | $12.50 | 460,000 |
| | Hulse | $25.00 | 25,000 | $12.50 | 50,000 |

---

[7] The September 14, 1998 re-priced grants were granted with an exercise price equal to fair market value of Sunrise common stock on the purported date of the grant, rather than the day immediately preceding the date of grant as directed by the Company's Plans.

249.     These grants were allegedly part of a re-pricing program implemented by the Stock Option Committee.  However, the September 14, 1998 grant date coincided with one of the lowest prices of Sunrise's stock for the fiscal quarter, as well as the fiscal year.  By November 10, 1998, when Sunrise first publicly disclosed the re-pricing plan, Sunrise's stock price had ballooned to $42.63 (pre-split), an increase of 70.5%.  Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 32%, or 576% annualized, as compared to a 20% annualized return for investors – a difference of 556% on an annualized basis.  Additionally, all the underwater options[8] that were re-priced in favor of Defendants Newell, Tomasso and Hulse were profitable again by the end of the year.

250.     Defendant Hulse was granted stock options dated December 10, 1998 with an exercise price of $41.19 (pre-split), knowing that December 10, 1998 was not the date the Company actually approved the grants:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 12/10/98 | Hulse | $41.19 | 21,666 | $20.59 | 43,332 |

251.     This grant preceded a very significant rise in the price of Sunrise stock.  By the end of the year, in just 14 trading days, Sunrise's stock price has risen to $51.88 (pre-split), an increase of 26%.  Moreover, employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 21%, or 378% annualized, as

---

[8] "Underwater options" is a term used for options whose exercise price is above the current market stock price, and as such would be useless to exercise because the grantee would have to pay more to obtain the stock than the price at which the grantee could sell the stock.

compared to a 20% annualized return for investors – a difference of 358% on an annualized basis.

### 1999 Backdated Option Grants

252.    Defendant Hulse was granted stock options dated March 5, 1999 with an exercise price of $37.63 (pre-split), knowing that March 5, 1999 was not the date the Company actually approved the grants:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 03/05/99 | Hulse | $37.63 | 15,000 | $18.81 | 30,000 |

253.    This grant coincided with one of the lowest prices of Sunrise's stock for the fiscal quarter.  Additionally, on the very next trading day following the purported date of grant, March 8, 1999, Sunrise's stock price had soared to $46.38 (pre-split), an increase of 23.3% *in one day*. In the ten days following the March 5, 1999 grant, Sunrise stock traded at an average price of $43.66 (pre-split), an average increase of 16%.  Employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 12%, or 216% annualized, as compared to a -73% annualized return for investors – a difference of 289% on an annualized basis.

254.    Defendants Newell Hulse and Tomasso were granted stock options dated November 8, 1999 with an exercise price of $12.75 (pre-split), knowing that November 8, 1999 was not the date the Company approved the grants.

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 11/10/99 | Newell | $12.75 | 65,000 | $6.38 | 130,000 |
| | Tomasso | $12.75 | 65,000 | $6.38 | 130,000 |
| | Hulse | $12.75 | 35,000 | $6.38 | 70,000 |

### 2000 Backdated Option Grants

255.    Defendants Newell, Hulse and Tomasso were granted stock options dated February 25, 2000 with an exercise price (pre-split) of $12.38, knowing that February 25, 2000 was not the date the Company actually approved the grants, and granted and Defendants Tomasso, Hulse and Newell stock options dated March 28, 2000 with an exercise price (pre-split) of $12.44, knowing that March 28, 2000 was not the date the Company actually approved the grants:

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/25/00 | Newell | $12.38 | 60,000 | $6.19 | 120,000 |
| | Tomasso | $12.38 | 55,000 | $6.19 | 110,000 |
| | Hulse | $12.38 | 7,222 | $6.19 | 14,444 |
| 03/28/00 | Newell | $12.44 | 25,000 | $6.22 | 50,000 |
| | Tomasso | $12.44 | 15,000 | $6.22 | 30,000 |
| | Hulse | $12.44 | 25,000 | $6.22 | 50,000 |

256.    Both of these grants coincided with two of Sunrise's lowest closing prices for the fiscal quarter.  Employing a slight variation on the Merrill Lunch analysis used for the entire relevant period to these individual grants (because of when they were reported on Form 4 to the SEC), results in a ten day return for the February 25, 2000 grant of 27%, or 486% annualized, as

compared to an 82% annualized return for investors (a difference of 404% on an annualized basis), and a nine day return for the March 28, 2000 grant of 12%, or 216% annualized, as compared to an 82% annualized return for investors – a difference of 134% on an annualized basis.

257.    Defendant Klaassen was granted stock options dated September 11, 2000 with an exercise price (pre-split) of $17.00, knowing that September 11, 2000 was not the date the Company actually approved the grants.

| Purported Grant Date | Defendant | Exercise Price | Number of Options | Split Adjusted Exercise Price | Split Adjusted Number of Options |
|---|---|---|---|---|---|
| 09/11/00 | Klaassen | $17.00 | 350,000 | $8.50 | 700,000 |

258.    This grant was allegedly pursuant to an employment agreement with Sunrise which took effect on September 12, 2000, the day after the stock options were granted, but was not publicly disclosed until November 13, 2000. Remarkably, the stock options granted to Klaassen coincided with the lowest closing prices of the fiscal quarter. Additionally, on November 13, 2000, when the option grant was first publicly disclosed, Sunrise's stock price has soared to $24.56 (pre-split), and reached a high of more than $28.00 (pre-split), an increase of 44.5%. Employing the same Merrill Lynch analysis used for the entire relevant period to this single grant results in a twenty day return of 15%, or 270% annualized, as compared to an 82% annualized return for investors – a difference of 188% on an annualized basis.

259.    Each and every one of the aforementioned stock option grants was dated just before a significant increase in Sunrise stock price and/or at or near the date of Sunrise's lowest closing price for the pertinent fiscal quarter or year. The reason for the extraordinary patterns set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the

actual dates on which the stock option grants were made.  Rather, at the behest of the Defendants, the Stock Option Committee knowingly and deliberately backdated the stock option grants to make it ***appear*** as though the grants were made on dates when the market price of Sunrise stock was lower than the market price on the actual grant dates, thereby improperly benefiting the recipients of backdated stock options.  This improper backdating, which violated the terms of the Company's stock option plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts the Defendants had to pay the Company upon exercise of the options.

### E. THE PERVASIVENESS OF THE FRAUDULENT CONDUCT AND THE NATURE OF THE ACCOUNTING RULES AT ISSUE

260.    The duration, sheer magnitude and pervasiveness of the scheme alleged herein also support a strong inference of *scienter* on the part of the Defendants.

261.    Sunrise has admitted that it committed multiple accounting manipulations and improprieties during the Class Period – running the gamut from fraudulent accounting for real estate sales to intentionally manipulating insurance reserves.  Year after year after year, the same accounting and GAAP principles were violated.

262.    Sunrise has also admitted that its manipulations were massive, spanning at least six years and wiping out massive percentages of the Company's reported income and operating revenue.

263.    A strong inference of *scienter* is further supported by the nature of the accounting rules at issue.  The primary accounting rules at issue – SFAS 66, SFAS 6, SFAS 67, ARB 45, APB No. 25 and SFAS 123(R) – are simple and straightforward in application.  Indeed, the majority of the basic accounting principles violated by Sunrise were well-established, having been in force for over 10 years.

264.    Finally, a strong inference of *scienter* is also supported by the fact that the accounting violations subject to Restatement took place in areas of vital important to Sunrise's overall financial condition and health, involving its core businesses and operations.

## IX.    LOSS CAUSATION

265.    The Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiffs and the Class.  As Lead Plaintiffs will establish by expert opinion, the market prices of Sunrise securities were inflated by Defendants' materially false and misleading statements and, as a result, Lead Plaintiffs and the Class purchased Sunrise securities at artificially inflated prices during the Class Period.  The Company's subsequent disclosures revealed to the market the fraudulent nature of these statements and the extent of the misrepresentations contained in Sunrise's financial statements that form the primary basis of this action.

266.    When the misrepresentations and omissions that Defendants concealed from the market were revealed through the series of partial disclosures beginning after the close of the market on May 9, 2006 and continuing through the close of the market on July 31, 2006 (as set forth in ¶¶ 181-191 above), the price of Sunrise securities fell dramatically, causing substantial losses to investors.

267.    For example, on May 9, 2006, before the market opened, Sunrise issued its first partial corrective disclosure by announcing that it was rescheduling its first quarter 2006 earnings release to allow additional time to review the accounting treatment for its investments in unconsolidated senior living communities.  In response to this May 9, 2006 news, shares of Sunrise common stock fell significantly from their May 8, 2006 close of $39.30 per share to close at $32.35 per share on May 9, 2006, a decline of $6.95 per share or 17.68% on heavy volume.

268.      The May 9, 2006 disclosure revealed to the market for the first time that there were significant problems with the Company's financial statements.  In a May 9, 2006 report, Stifel Nicolaus lowered its rating on Sunrise shares from "Buy to Hold."  The report continued, "[i]n years past, a delay in an earnings release of thus type would probably not have concerned us.  However, we have seen situations in which audit firms have abruptly reversed decisions about accounting treatments, leading to material multi-year account restatements.  We tend to think the risk of this at Sunrise is small, but believe the risk is sufficient that we are not comfortable recommending this stock until this uncertainty is removed."  Similarly, in a May 10, 2006 report, Citigroup noted that the "timing of this announcement and the delay was a surprise and given the lack of additional commentary from the company was viewed negatively."

269.      On June 14, 2006, shares of Sunrise common stock fell significantly from their June 13, 2006 close of $30.42 per share to close at $28.80 per share, a decline of $1.62 per share or 5.33%, on heavy volume.  This dropped was caused by certain large block trades which were viewed to be in response to, *inter alia*, "Sunrise's delay in reporting 1Q06 results as a result of an accounting issue concerning its development joint ventures."

270.      On Monday, July 31, 2006, at 6:00 a.m. (ET), the market finally learned that the accounting issues were more significant than previously disclosed when Sunrise was forced to announce that it would have to restate its previously reported financial results for 2003 through 2005 and that the restatement would reduce reported net income for 1999 through 2005 by an estimated $60 million to $110 million, cumulatively.

271.      As a result of the early morning disclosure on July 31, 2006 that Sunrise would restate financial reports for fiscal years 2003 through 2005, the Company's stock traded down to $25 per share on the electronic brokerage network Inet (from a close of $26.34 on Friday, July

28, 2006) a decline of $1.34 or 5.1% from the previous Friday closing price. This 5.1% drop by Sunrise at the opening was a significant drop. Sunrise shares fell to as low as $24.40 per share on July 31, 2006 in trading later that morning before rebounding later in the day.

272.    The decline of $6.95 per share on May 9, 2006; $1.62 per share on June 14, 2006; and $1.34 per share on the opening of trading on July 31, 2006 all reflect the market's re-valuing Sunrise's stock price in light of revelations of a significant restatement due to improper recognition of revenue and earnings.

273.    Indeed, Sunrise's stock price declined nearly $15 per share from its close on May 8, 2006, before there was any disclosure of accounting problems, to July 31, 2006, when the Company acknowledged that it would have to restate three years of financial statements..

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

274.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sunrise who knew that those statements were false when made.

## XI.    PRESUMPTION OF RELIANCE

275.    At all relevant times, the market for Sunrise's securities on the NYSE was an efficient market for the following reasons, among others:

(a)    Sunrise's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market

(b)    As a regulated issuer, Sunrise filed periodic public reports with the SEC and the NYSE;

(c)    Sunrise regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and;

(d)    Sunrise was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

(e)    The market price of Sunrise securities reacted promptly to the dissemination of public information regarding the Company;

(f)    The average weekly trading volume for Sunrise stock during the Class Period was approximately 2,055,644 million shares; and

(g)    The Company's market capitalization was approximately $1,920.7 million on March 16, 2006 (date the 2005 10-K was filed), $993.1 million on March 16, 2005 (date the 2004 10-K was filed) and $765.9 million on March 12, 2004 (date the 2003 10-K was filed).

276.     As a result of the foregoing, the market for Sunrise's securities efficiently digested current information regarding Sunrise from all publicly available sources and reflected such information in the prices of Sunrise's securities.  Under these circumstances, all purchasers of Sunrise's securities during the Class Period suffered similar injury through their purchase of Sunrise securities at artificially inflated prices and a presumption of reliance applies.

277.     Lead Plaintiffs and the other Class members relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Sunrise securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

278.     Had Lead Plaintiffs and the other members of the Class known of the material adverse information not disclosed by the Defendants, or been aware of the truth behind the Defendants' material misstatements, they would not have purchased Sunrise securities at inflated prices.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

279.     Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

280.     The Defendants named herein are liable for: making material false statements and/or material omissions; failing to disclose adverse facts known to them about Sunrise; and/or participating in, permitting or causing contrivances and manipulative acts regarding Sunrise's financial statements.  Defendants' fraudulent scheme and course of business operated as a fraud

or deceit on purchasers of Sunrise stock, as it deceived the investing public regarding Sunrise's business and finances and artificially inflated the prices of Sunrise's publicly traded securities.

281. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

282. During the Class Period, each of the Individual Defendants named in this claim occupied a position at Sunrise that gave them access to non-public information concerning the Company. Each of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose these facts.

283. Defendants pursued a scheme and course of conduct which was designed to and did conceal the fact that the Company was misrepresenting its financial results, and which was disguised to maintain the Defendants' executive and directorial positions at Sunrise and the profits, power and prestige which Defendants enjoyed as a result of these positions. Each of the Defendants was a direct, necessary, and substantial participant in the scheme, common enterprise and/or common course of conduct complained of here.

284. The purpose and effect of the Defendants' scheme and common course of conduct was, among other things, to disguise the Defendants' violations of law, abuse of control and unjust enrichment; to conceal adverse information concerning the Company's operations and financial condition; and to artificially inflate the price of Sunrise common stock so Defendants could, *inter alia*, sell millions of dollars of their own Sunrise stock at artificially inflated prices,

enhance their executive and directorial positions, and reap the benefits of artificially inflated performance based compensation.

285.    In taking such actions to substantially engage in the wrongdoing complained of herein, each of the Defendants acted with knowledge of the primary wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

286.    Defendants named in this Complaint acted with *scienter* in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

287.    The Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

    (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and other similarly situated in connection with their purchases of Sunrise publicly traded securities during the Class Period.

288.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Sunrise's publicly traded securities.  Lead Plaintiffs and the Class would not have purchased Sunrise publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been

artificially and falsely inflated by Defendants' misleading statements and/or failure to disclose material facts.

289.     By misrepresenting the Company's financial statements and making the false statements described above, the Defendants presented a misleading picture of Sunrise's business, financial results, and prospects.  This caused and maintained artificial inflation in the trading prices of Sunrise's securities throughout the Class Period and until the full truth came out.

290.     The Defendants' false and misleading statements had the intended effect and caused Sunrise stock to trade at artificially inflated levels throughout the Class Period.  As the truth about the extent and severity of Sunrise's prior overstatement of income, revenue and other measures of financial performance (and the extent of the harm to its reputation and credibility in the market) was disclosed and became apparent to the market, Sunrise's common stock price plummeted as the prior artificial inflation came out of the Company's stock price.  All or a significant portion of the decrease in Sunrise's stock price during the Class Period was due to the disclosure, revelation and/or leakage of information inconsistent with Defendants' prior financial disclosures and related public statements.

291.     As a result of their purchases of Sunrise securities at artificially inflated prices during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

292.     As investors and the market became aware that Sunrise's prior financial results had been falsified and that Sunrise's actual financial results, which had long been obfuscated by Defendants' fraudulent scheme to inflate Sunrise's stock price, the prior artificial inflation came out of Sunrise's stock price, damaging investors.

293.    As a direct result the public revelations regarding the truth about Defendants' misconduct and Sunrise's false financial results, the price of Sunrise shares plummeted, causing damage to plaintiffs and the Class.  This decline in response to these revelations removed the inflation from the price of Sunrise's shares, causing real economic loss to investors who had purchased Sunrise shares during the Class Period.

294.    The circumstances and magnitude of Sunrise's stock price declines negate any inference that the losses suffered by plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

295.    As a direct and proximate result of the Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Sunrise publicly traded securities during the Class Period.

### SECOND CLAIM FOR RELIEF

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

296.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

297.    This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of all members of the Class.

298.    During their tenures as officers and/or directors of Sunrise, each of the Individual Defendants was a controlling person of Sunrise within the meaning of § 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Sunrise, the Individual Defendants had the power and authority to cause Sunrise to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did control,

directly and indirectly, the content of the public statements made by Sunrise during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

299.     In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company and in Sunrise's financial reporting and accounting functions.  Each of the Individual Defendants was also directly involved in providing false information and certifying and/or approving the false financial statements disseminated by Sunrise during the Class Period. Further, as detailed above, each of the Individual Defendants had direct involvement in the presentation and/or manipulation of false financial reports included within the Company's press releases and filings with the SEC.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Sunrise within the meaning of §20(a) of the Exchange Act.

300.     As set forth above, Sunrise violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Sunrise and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the Company is liable under Section 10(b) of the Exchange Act and Rule10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Sunrise securities.

301.     As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Sunrise securities.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment individually and on behalf of the Class, as follows:

A.     Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Lead Plaintiffs and the Class members damages, including interest;

C.     Directing all Defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D.     Awarding such equitable/injunctive or other relief for the benefit of the Class as the Court may deem just and proper;

E.     Awarding Lead Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs and expenses of litigation;

F.     Awarding Lead Plaintiffs their individual costs and expenses incurred in this action; and

G.     Awarding such other relief as this Court may deem just and proper.

## XIV.  JURY TRIAL DEMAND

Lead Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated:  June 6, 2008

**COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.**

/s/ Daniel S. Sommers
Steven J. Toll, D.C. Bar #225623
Daniel S. Sommers, D.C. Bar #416549
Elizabeth S. Finberg, D.C. Bar #468555
1100 New York Ave., N.W.
West Tower, Suite 500
Washington, DC  20005-3965
Tel: (202) 408-4600
Fax: (202) 408-4699

*Liaison Counsel for the Class*

**BERMAN DEVALARIO PEASE
  TABACCO BURT & PUCILLO**
Michael J. Pucillo
Jay W. Eng
Esperante Building
222 Lakeview Avenue, Suite 900
West Palm Beach, FL 33401
Tel: (561) 835-9400
Fax: (561) 835-0322

*Attorneys for Lead Plaintiff Oklahoma
Firefighters Pension and Retirement System
and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
William H. Fredericks
Laura C. Gundersheim
1285 Avenue of the Americas
New York, New York 10019
Tel: (212) 554-1400
Fax: (212) 554-1444

*Attorneys for Lead Plaintiff City of Miami
General Employees' & Sanitation Employees'
Retirement Trust and Co-Lead Counsel for
the Class*

**KLAUSNER & KAUFMAN, PA**
Robert D. Klausner
10059 N.W. 1st Court
Plantation, FL 33324
Tel.: (954) 916-1202
Fax: (954) 916-1232

*Additional Counsel for Lead Plaintiff City of
Miami General Employees' & Sanitation
Employees' Retirement Trust*

## CERTIFICATE OF SERVICE

I certify that on June 6, 2008, the foregoing Consolidated and Amended Class Action Complaint of Lead Plaintiffs, Oklahoma Firefighters Pension and Retirement System and City of Miami General Employees' & Sanitation Employees' Retirement System, was filed with the Clerk of Court, using the Court's generic email address (dcd_cmecf@dcd.uscourts.gov), which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF system.  I further certify that, in addition to notification via the CM/ECF system, copies of the foregoing were sent by U.S. Mail and email on counsel for defendants, as follows:

**HOGAN & HARTSON, LLP**
Joseph M. Hassett, D.C. Bar #123935
George H. Mernick, III, D.C. Bar #294256
555 Thirteenth Street, N.W.
Washington, D.C., 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
ghmernick@hhlaw.com
jmhassett@hhlaw.com

**HOGAN & HARTSON, LLP**
N. Thomas Connally, D.C. Bar # 448355
Jon M. Talotta, D.C. Bar #473626
8300 Greensboro Drive, Suite 1100
McLean, Virginia 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
ntconnally@hhlaw.com
jmtalotta@hhlaw.com

*Counsel for Defendants*

**AKIN GUMP STRAUS HAUER & FELD, LLP**
John M. Dowd D.C. Bar #003525
Jeffrey M. King D.C. Bar #461644
Elizabeth C. Peterson D.C. Bar #460259
Paul W. Butler D.C. Bar #493942
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C., 20036-1564
Telephone (202)887-4000
Facsimile (202) 887-4288
jdowd@akingump.com
jking@akingump.com
petersone@akingump.com
pbutler@akingump.com

*Counsel for Bradley B. Rush*

/s/ Elizabeth S. Finberg_____
Elizabeth S. Finberg